## EXHIBIT A

**FOURTH AMENDED JOINT PLAN OF REORGANIZATION
FOR DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FEDERAL-MOGUL GLOBAL INC., | ) | Case No. 01-10578 (JKF) |
| T&N LIMITED, et al.,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## FOURTH AMENDED JOINT PLAN OF REORGANIZATION (AS MODIFIED)

### ARTICLE IX OF THIS PLAN AND THE ADDENDUM TO THE PLAN PROVIDE FOR THE ISSUANCE OF A CHANNELING INJUNCTION UNDER SECTION 524(g) OF THE BANKRUPTCY CODE THAT PERMANENTLY ENJOINS ALL PERSONS HOLDING ASBESTOS PERSONAL INJURY CLAIMS FROM PURSUING A REMEDY AGAINST THE PROTECTED PARTIES (AND, IN THE CASE OF THE ADDENDUM, THE PNEUMO PROTECTED PARTIES) AND CHANNELS THEM TO THE TRUST FOR RESOLUTION AND PAYMENT

---

[1]    The U.S. Debtors (collectively, the "U.S. Debtors") are Carter Automotive Company, Inc., Federal-Mogul Corporation, Federal-Mogul Dutch Holdings Inc., Federal-Mogul FX, Inc., Federal-Mogul Global Inc., Federal-Mogul Global Properties, Inc., Federal-Mogul Ignition Company, Federal-Mogul Machine Tool, Inc., Federal-Mogul Mystic, Inc., Federal-Mogul Piston Rings, Inc., Federal-Mogul Powertrain, Inc., Federal-Mogul Products, Inc., Federal-Mogul Puerto Rico, Inc., Federal-Mogul U.K. Holdings, Inc., Federal-Mogul Venture Corporation, Federal-Mogul World Wide, Inc., Felt Products Manufacturing Co., FM International LLC, Ferodo America, Inc., Gasket Holdings Inc., J.W.J. Holdings, Inc., McCord Sealing, Inc., and T&N Industries Inc.

The United Kingdom Entities to which this Plan applies (collectively, the "U.K. Debtors") are AE Piston Products Limited, Aeroplane & Motor Aluminium Castings Limited, Ashburton Road Services Limited, Brake Linings Limited, Duron Limited, Edmunds, Walker & Co. Limited, Federal-Mogul Aftermarket UK Limited, Federal-Mogul Bradford Limited, Federal-Mogul Bridgwater Limited, Federal-Mogul Camshaft Castings Limited, Federal-Mogul Camshafts Limited, Federal-Mogul Engineering Limited, Federal-Mogul Eurofriction Limited, Federal-Mogul Friction Products Limited, Federal-Mogul Global Growth Limited, Federal-Mogul Ignition (U.K.) Limited, Federal-Mogul Powertrain Systems International Limited, Federal-Mogul Sealing Systems (Cardiff) Limited, Federal-Mogul Sealing Systems (Rochdale) Limited, Federal-Mogul Sealing Systems (Slough) Limited, Federal-Mogul Sealing Systems Limited, Federal-Mogul Shoreham Limited, Federal Mogul Sintered Products Limited, Federal-Mogul Systems Protection Group Limited, Federal-Mogul Technology Limited, Ferodo Caernarfon Limited, Ferodo Limited, Fleetside Investments Limited, F-M UK Holding Limited, Friction Materials Limited, Greet Limited, Halls Gaskets Limited, Hepworth & Grandage Limited, J.W. Roberts Limited, Lanoth Limited, Newalls Insulation Company Limited, TAF International Limited, T&N Holdings Limited, T&N International Limited, T&N Investments Limited, T&N Limited, T&N Materials Research Limited, T&N Piston Products Group Limited, T&N Properties Limited, T&N Shelf Eighteen Limited, T&N Shelf Nineteen Limited, T&N Shelf One Limited, T&N Shelf Seven Limited, T&N Shelf Three Limited, T&N Shelf Twenty Limited, T&N Shelf Twenty-One Limited, T&N Shelf Twenty-Six Limited, TBA Belting Limited, TBA Industrial Products Limited, Telford Technology Supplies Limited, The Washington Chemical Company Limited, Turner & Newall Limited, Turner Brothers Asbestos Company Limited, and Wellworthy Limited. Unlike all the other U.K. Debtors, T&N Investments Limited is a Scottish rather than English company and commenced administration in Scotland in April 2002. Certain additional U.K. Affiliates of the U.S. Debtors and U.K. Debtors have commenced chapter 11 cases but are not subjects of this Plan.

## TABLE OF CONTENTS

<u>Page</u>

ARTICLE I DEFINITIONS, CONSTRUCTION OF TERMS, AND EXHIBITS ........................1

    1.1.    Definitions.........................................................................................................1
    1.2.    Other Terms ....................................................................................................32
    1.3.    Deemed Acts ..................................................................................................32
    1.4.    Exhibits .........................................................................................................32

ARTICLE II TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX
    CLAIMS ....................................................................................................................32

    2.1.    Allowed Administrative Claims ....................................................................32
    2.2.    No Double Payment of Administrative Claims .............................................33
    2.3.    Special Provisions Relating to United States Customs and Border
           Protection ......................................................................................................33
    2.4.    Priority Tax Claims ........................................................................................33
    2.5.    Treatment of Claims for Payment or Reimbursement of Professional Fees
           and Expenses .................................................................................................33

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND
    INTERESTS ...............................................................................................................34

    3.1.    Federal-Mogul Corporation (Classes 1A through 1O) .................................35
    3.2.    Federal-Mogul Piston Rings, Inc. ("FMPRI") (Classes 2A through 2P) ......44
    3.3.    Federal-Mogul Powertrain, Inc. ("FMPT") (Classes 3A through 3P) ...........48
    3.4.    Federal-Mogul Ignition Company ("FMIC") (Classes 4A through 4P) ........51
    3.5.    Federal-Mogul Products, Inc. ("FMP") (Classes 5A through 5P) .................55
    3.6.    T&N Limited ("T&N") (Classes 6A – 6P) ...................................................59
    3.7.    Federal-Mogul Ignition (U.K.) Limited ("FM Ignition")(Classes 7A – 7P) .........63
    3.8.    Federal-Mogul Systems Protection Group Limited ("FMSPG") (Classes
           8A 8P) ............................................................................................................65
    3.9.    Federal-Mogul Aftermarket UK Limited ("FMAUK") (Classes 9A – 9P) ...........67
    3.10.    Federal-Mogul Sintered Products Limited ("FMSP") (Classes 10A – 10P) .........68
    3.11.    Federal-Mogul Sealing Systems (Slough) Limited ("FMSS-Slough")
           (Classes 11A – 11P) .......................................................................................70
    3.12.    Federal-Mogul Friction Products Limited ("FMFP") (Classes 12A – 12P) ..........72
    3.13.    Federal-Mogul Sealing Systems (Rochdale) Limited ("FMSS-Rochdale")
           (Classes 13A – 13P) .......................................................................................75
    3.14.    Federal-Mogul Camshaft Castings Limited ("FMCC") (Classes 14A –
           14P) ...............................................................................................................77
    3.15.    Federal-Mogul Bradford Limited ("Bradford") (Classes 15A – 15P) ..................79
    3.16.    Federal-Mogul Camshafts Limited ("FM Camshafts") (Classes 16A –
           16P) ...............................................................................................................81
    3.17.    Federal-Mogul Eurofriction Limited ("FMEL") (Classes 17A – 17P) .................83

i

3.18.    Federal-Mogul Powertrain Systems International Limited ("Powertrain")
         (Classes 18A – 18P)................................................................................................85
3.19.    TBA Industrial Products Limited ("TBA-IP") (Classes 19A – 19P).....................87
3.20.    Remaining Debtors ................................................................................................89

ARTICLE IV THE TRUST ........................................................................................................89

4.1.     Establishment Of Trust ..........................................................................................89
4.2.     Purpose of Trust.....................................................................................................89
4.3.     Receipt Of Trust Assets .........................................................................................90
4.4.     Discharge Of Liabilities To Holders Of Asbestos Personal Injury Claims ..........90
4.5.     Special Provisions Applicable to the Reorganized Hercules-Protected
         Entities ..................................................................................................................91
4.6.     Special Provisions Relating to CVA Asbestos Claims.........................................105
4.7.     The Swiss Re Settlement ......................................................................................106
4.8.     Extension of Injunctions to Curzon and/or Its Reinsurers ..................................106
4.9.     Investment Guidelines .........................................................................................106
4.10.    Excess Trust Assets..............................................................................................106
4.11.    Trust Expenses .....................................................................................................106
4.12.    Selection Of The Initial Trustees .........................................................................106
4.13.    Advising The Trust. ..............................................................................................107
4.14.    Trust Indemnity Obligations ................................................................................107
4.15.    Retrospective Insurance Premiums and Related Matters......................................110

ARTICLE V EXECUTORY CONTRACTS AND UNEXPIRED LEASES.............................110

5.1.     Assumption And Rejection Of Unexpired Leases And Executory
         Contracts ..............................................................................................................110
5.2.     Rejected Unexpired Leases And Executory Contracts .........................................111
5.3.     Continuation Of Product Warranties ....................................................................112
5.4.     Collective Bargaining Agreements and Retiree Benefit Plans. ............................112
5.5.     Damages Upon Rejection .....................................................................................113
5.6.     Corporate Indemnities..........................................................................................113

ARTICLE VI ACCEPTANCE OR REJECTION OF THE PLAN .............................................114

6.1.     Each Impaired Class Entitled To Vote Separately................................................114
6.2.     Acceptance By Impaired Classes Of Claims ........................................................114
6.3.     Acceptance Pursuant To Section 524 Of The Bankruptcy Code ..........................114
6.4.     Presumed Acceptance Of Plan..............................................................................115
6.5.     Presumed Rejection Of Plan .................................................................................115
6.6.     Votes With Respect to U.K. Debtors ....................................................................115
6.7.     Confirmability And Severability Of The Plan. .....................................................115

ARTICLE VII CONDITIONS TO CONFIRMATION AND EFFECTIVENESS ......................116

7.1.     Conditions To Confirmation .................................................................................116
7.2.     Conditions To Effectiveness .................................................................................118

ii

ARTICLE VIII IMPLEMENTATION OF THE PLAN............................................................119

    8.1.    Matters Involving the U.K. Debtors ....................................................119
    8.2.    Continued Corporate Existence .........................................................120
    8.3.    Federal-Mogul Corporation Securities and Corporate Governance ...................120
    8.4.    Ownership and Management of Reorganized Debtors other than
            Reorganized Federal-Mogul ..............................................................126
    8.5.    Dissolution Of Inactive Debtor Subsidiaries .......................................127
    8.6.    Corporate Action...........................................................................127
    8.7.    Vesting of Assets ..........................................................................127
    8.8.    Preservation of Rights Of Action.......................................................127
    8.9.    Setoffs .......................................................................................128
    8.10.   Reorganized Federal-Mogul Secured Term Loan Agreement............................128
    8.11.   Issuance of Reorganized Federal-Mogul Junior Secured PIK Notes..................128
    8.12.   Exit Facilities ..............................................................................129
    8.13.   Effectuating Documents And Further Transactions .................................129
    8.14.   Distributions Under the Plan............................................................129
    8.15.   Distributions to Holders of Unsecured Claims Against U.S. Debtors.................132
    8.16.   Implementation of Plans for Federal-Mogul Bradford Limited and
            Federal-Mogul Sealing Systems (Rochdale) Limited..................................134
    8.17.   Objections to Claims Other than Asbestos Personal Injury Claims ..................134
    8.18.   Resolution of Asbestos Personal Injury Claims.......................................135
    8.19.   Settling Asbestos Insurance Companies...............................................135
    8.20.   Release by Dan=Loc Group................................................................135
    8.21.   Implementation of Environmental Settlements .....................................136
    8.22.   Implementation of Plan B Settlement With Pneumo Parties..........................136
    8.23.   Effectiveness of Addendum................................................................140
    8.24.   Plan Support Agreement..................................................................141
    8.25.   Implementation of Owens-Illinois Settlement .......................................141
    8.26.   Implementation of Settlement Agreement with Certain Asbestos Property
            Damage Claimants........................................................................141
    8.27.   Implementation of MagneTek Settlement Agreement.................................141
    8.28.   Dismissal of CNA Adversary Proceeding ..............................................141
    8.29.   Implementation of CIP Agreement and Controlling Effect Thereof..................141

ARTICLE IX INJUNCTIONS, RELEASES AND DISCHARGE ............................................142

    9.1.    Discharge ...................................................................................142
    9.2.    Releases.....................................................................................144
    9.3.    The Supplemental Injunction, The Third Party Injunction and The
            Asbestos Insurance Entity Injunction .................................................145
    9.4.    Reservation Of Rights.....................................................................149
    9.5.    Disallowed Claims And Disallowed Equity Interests.................................150
    9.6.    Exculpation .................................................................................150

ARTICLE X MATTERS INCIDENT TO PLAN CONFIRMATION......................................151

10.1.   No Liability For Tax Claims.......................................................................151
10.2.   No Successor Liability..............................................................................151
10.3.   Asbestos Insurance Actions and Asbestos In-Place Insurance Coverage............151
10.4.   Insurance Neutrality.................................................................................152
10.5.   Supersedeas Bond Actions........................................................................155
10.6.   Institution And Maintenance Of Legal And Other Proceedings..........................155
10.7.   Retention And Enforcement Of Trust Causes Of Action ...................................156
10.8.   Sherrill Litigation....................................................................................156

ARTICLE XI MISCELLANEOUS .................................................................................156

11.1.   Jurisdiction............................................................................................156
11.2.   General Retention ...................................................................................157
11.3.   Specific Purposes ...................................................................................157
11.4.   District Court Jurisdiction.........................................................................159
11.5.   Reservation of Rights...............................................................................159
11.6.   Interpretation of Certain Terms ..................................................................159
11.7.   The Official Committees and The Future Claimants Representative ..................159
11.8.   Revocation Of Plan..................................................................................160
11.9.   Modification Of Plan. ...............................................................................160
11.10.  Certain Provisions Regarding Thornwood........................................................161
11.11.  Modification Of Payment Terms ..................................................................161
11.12.  Entire Agreement ...................................................................................161
11.13.  Headings ..............................................................................................161
11.14.  Administrative Claims Bar Date..................................................................161
11.15.  Governing Law .......................................................................................162
11.16.  No Interest............................................................................................162
11.17.  Limitation On Allowance ..........................................................................162
11.18.  Estimated Claims ...................................................................................162
11.19.  Consent To Jurisdiction ...........................................................................162
11.20.  Successors And Assigns ...........................................................................162
11.21.  Non-Debtor Waiver of Rights......................................................................162
11.22.  Consistent United States Federal Tax Reporting ............................................162
11.23.  Duty to Cooperate...................................................................................163
11.24.  Notices ................................................................................................163

Pursuant to 11 U.S.C. § 1121, the Debtors, the Unsecured Creditors Committee, the Asbestos Claimants Committee, the Future Claimants Representative, the Administrative Agent and the Equity Committee hereby jointly propose the following Fourth Amended Joint Plan of Reorganization (As Modified) in accordance with the provisions of Chapter 11, Title 11 of the United States Code:

## ARTICLE I
## DEFINITIONS, CONSTRUCTION OF TERMS, AND EXHIBITS

**1.1.**    <u>**Definitions**</u>.  As used herein, the following terms shall have the respective meanings specified below, unless the context otherwise requires:

**1.1.1.**    *1930 Act* means the Third Parties (Rights Against Insurers) Act 1930 of the United Kingdom.

**1.1.2.**    *1930 Act Rights* means rights (whether vested, future, contingent or inchoate), (a) which have been or will be transferred to the holder of an Asbestos Personal Injury Claim in respect of that Asbestos Personal Injury Claim by operation of law under the 1930 Act, or any replacement thereof; and/or (b) which are conferred by any law (whether of the United Kingdom or any other jurisdiction), and which entitle the holder of an Asbestos Personal Injury Claim to recover any sum in respect of that claim from any insurer of a Debtor whether directly or by transfer or assignment of any rights under an insurance policy under which a Debtor is insured; and/or (c) which are conferred by any law (whether of the United Kingdom or any other jurisdiction), and which give the holder of an Asbestos Personal Injury Claim any rights in relation to sums recovered in respect of that Asbestos Personal Injury Claim by a Debtor under an insurance policy under which that Debtor is insured.

**1.1.3.**    *1997 Flexitallic Asset Purchase Agreement* means that certain Asset Purchase Agreement, dated as of April 11, 1997, by and among T&N plc, Flexitallic Limited, Flexitallic Sealing Materials Ltd., Flexitallic, Inc., Goetze Vermogenswerwaltungs, GmbH, Flexitallic Canada Ltd., Ferodo a.s., Dan=Loc Corporation, Dan=Loc Limited, Delta 72 Unternehmenswerwaltungs GmbH, Frederique s.r.o., Dan=Loc (Canada) Ltd. and Dan=Loc Transitional, L.P.

**1.1.4.**    *Addendum* means the Addendum of Additional Provisions Incorporated Into Joint Plan of Reorganization (Pneumo Abex "Plan A" Settlement), together with the exhibits thereto, filed with the Bankruptcy Court by the Plan Proponents as Exhibit 1.1.4 to the Plan.

**1.1.5.**    *Administrative Agent* means JPMorgan Chase Bank, N.A. (formerly The Chase Manhattan Bank), as administrative agent under the Bank Credit Agreement.

**1.1.6.**    *Administrative Claim* means any Claim for the payment of an Administrative Expense.

**1.1.7.**    *Administrative Expense* means (a) any cost or expense of administration of the Reorganization Cases under Section 503(b) of the Bankruptcy Code including, but not limited to (1) any actual and necessary postpetition cost or expense of

preserving the Estates or operating the businesses of the Debtors, (2) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (3) any postpetition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of business, (4) any valid and allowed reclamation claims in accordance with Section 546(c) of the Bankruptcy Code, (5) compensation or reimbursement of expenses of professionals to the extent allowed by the Bankruptcy Court under Sections 328, 330(a) or 331 of the Bankruptcy Code, (6) the Indenture Trustee fees and expenses under the terms of the respective Indentures and pursuant to Section 8.14.6 of the Plan; (7) all Claims arising under the DIP Facility; and (8) all Claims for adequate protection authorized and entitled to administrative expense status pursuant to the DIP Facility (and/or Final Orders approving prior debtor-in-possession financing facilities for Federal-Mogul and its subsidiaries); and (b) any fee or charge assessed against the Estates under 28 U.S.C. § 1930. Administrative Expenses shall not include the fees or expenses of the Administrators and/or any of their professionals or advisors, which shall be paid under the CVAs in accordance with the U.K. Global Settlement Agreement.

**1.1.8.** *Administrators* means, in relation to a U.K. Debtor, the administrators appointed by the U.K. Court from time to time in respect of that U.K. Debtor.

**1.1.9.** *Affiliate* shall have the meaning ascribed to such term in Section 101(2) of the Bankruptcy Code, and when used with reference to any Debtor, shall include, but not be limited to, each of the entities listed in Exhibit 1.1.9 to the Plan.

**1.1.10.** *Affiliate Claims* means all prepetition Claims against any of the Debtors held by a Debtor or non-Debtor Affiliate, or any interest held by such entities in any property of the Debtors, but excluding Secured Claims, Equity Interests and the Convertible Subordinated Debentures.

**1.1.11.** *Affiliated Subsidiaries* means the subsidiaries of the Debtors or their Affiliates in which the Debtors or their Affiliates own greater than 5% but less than 20% of the outstanding voting securities of such entity, each of which is listed in Exhibit 1.1.11 of the Plan.

**1.1.12.** *Allowed* means:

**1.1.12.1.** With respect to any Claim other than an Administrative Claim, an Asbestos Personal Injury Claim, a Bonded Claim or an Other U.K. Claim, any Claim (a) that is specifically designated as Allowed under this Plan, (b) that has been, or hereafter is, listed in the Schedules as liquidated in amount and not disputed or contingent or (c) proof of which was timely filed in a liquidated non-contingent amount with the Bankruptcy Court or its duly appointed claims agent, or, in compliance with any order of the Bankruptcy Court regarding the filing of a Proof of Claim and with respect to which either (i) no objection to the allowance thereof has been filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court or (ii) the Claim has been allowed by a Final Order (but only to the extent so allowed).

**1.1.12.2.** With respect to an Asbestos Personal Injury Claim other than a Bonded Claim, the term "Allowed" shall not apply.

2

**1.1.12.3.**    With respect to any Bonded Claim, any Claim that qualifies as a Bonded Claim under the applicable definitions of the Plan, with respect to which the Bankruptcy Court or other court of competent jurisdiction determines by Final Order, or the applicable Debtor or Reorganized Debtor and the holder of such Claim agree, that such holder is entitled to some or all of the proceeds of the applicable supersedeas bond or other payment assurance (but only to the extent so ordered or agreed).  An Allowed Bonded Claim shall constitute a final, non-appealable judgment determining the legal liability of the Debtors or their Estates, as applicable.

**1.1.12.4.**    With respect to any Claim that is asserted to constitute an Administrative Expense (a) a Claim that represents an actual and necessary expense of preserving the estate or operating the business of the Debtors, to the extent such Claim is determined by the Plan Proponents to constitute an Administrative Expense; (b) other than with respect to a Claim of a professional person employed under Sections 327, 328 or 1103 of the Bankruptcy Code that is required to apply to the Bankruptcy Court for the allowance of compensation and reimbursement of expenses pursuant to Section 330 of the Bankruptcy Code, a Claim that the Plan Proponents do not believe constitutes an Administrative Expense, and such Claim is allowed in whole or in part by a Final Order of the Bankruptcy Court and only to the extent that such allowed portion is determined pursuant to a Final Order to constitute a cost or expense of administration under Sections 503(b) and 507(a)(1) of the Bankruptcy Code; or (c) that represents a Claim of a professional person employed under Sections 327, 328 or 1103 of the Bankruptcy Code that is required to apply to the Bankruptcy Court for the allowance of compensation or reimbursement of expenses pursuant to Section 330 of the Bankruptcy Code, to the extent such Claim is allowed by a Final Order of the Bankruptcy Court under Section 330 of the Bankruptcy Code.

**1.1.12.5.**    With respect to any Other U.K. Claim, (i) in the case of T&N Limited, J.W. Roberts Limited and TAF International Limited, a Claim that is non-contingent and is either (a) allowed in accordance with the provisions of the CVA for the applicable U.K. Debtor or (b) is allowed by a Final Order of the Bankruptcy Court; (ii) in the case of any U.K. Debtor other than T&N Limited, J.W. Roberts Limited and TAF International Limited for which a CVA becomes effective, a Claim that is non-contingent and is allowed in accordance with the provisions of the CVA for such U.K. Debtor, and (iii) in the case of any U.K. Debtor for which a CVA is not proposed or does not become effective, a Claim that is non-contingent and that is allowed by a Final Order of the Bankruptcy Court.

**1.1.12.6.**    With respect to any Equity Interest, an Equity Interest held by any Person as of the Record Date.

3

**1.1.13.**  *Allowed Amount* means, with respect to any Claim, the amount in which that Claim is Allowed, denominated in dollars (in the case of a U.S. Debtor) or pounds sterling (in the case of a U.K. Debtor).

**1.1.14.**  *Ancillary CVAs* means the company voluntary arrangements under Part I IA 1986 which have been proposed by the Administrators of F-M UK Holding Limited and Federal-Mogul Global Growth Limited in respect of those companies, and which are attached to the Plan as Exhibit 1.1.14, as may be varied from time to time.

**1.1.15.**  *Asbestos Claimants Committee* means the Official Committee of Asbestos Claimants appointed in the Reorganization Cases by the United States Trustee.

**1.1.16.**  *Asbestos In-Place Insurance Coverage* means any insurance coverage to the extent to be utilized for the payment or reimbursement of liability, indemnity or defense costs arising from or related to Asbestos Personal Injury Claims or Trust Expenses under any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement.

**1.1.17.**  *Asbestos Insurance Action* means any claim, cause of action, or right of the Debtors or any of them, under the laws of any jurisdiction, against any Asbestos Insurance Company, arising from or related to: (a) any such Asbestos Insurance Company's failure to provide or pay under Asbestos In-Place Insurance Coverage, (b) the refusal of any Asbestos Insurance Company to compromise and settle any Asbestos Personal Injury Claim under or pursuant to any Asbestos Insurance Policy, (c) the interpretation or enforcement of the terms of any Asbestos Insurance Policy with respect to any Asbestos Personal Injury Claim, or (d) any conduct of any Asbestos Insurance Company constituting "bad faith" or other wrongful conduct under applicable law. Asbestos Insurance Actions shall not include any disputes relating to the CIP Agreement, unless otherwise provided in the CIP Agreement.

**1.1.18.**  *Asbestos Insurance Action Recoveries* means (a) Cash derived from and paid pursuant to Asbestos Insurance Settlement Agreements entered into prior to the Effective Date attributable to any Asbestos Personal Injury Claim other than reimbursement for payments made on account of Asbestos Personal Injury Claims prior to the Petition Date, (b) the right to receive proceeds of Asbestos In-Place Insurance Coverage and (c) the right to receive the proceeds or benefits of any Asbestos Insurance Action.

**1.1.19.**  *Asbestos Insurance Company* means any insurance company, insurance broker or syndicate insurance broker, guaranty association or any other entity that may have liability under an Asbestos Insurance Policy.

**1.1.20.**  *Asbestos Insurance Entity Injunction* means the injunction described in Section 9.3.3 of the Plan.

**1.1.21.**  *Asbestos Insurance Policy* means any insurance policy (other than the Hercules Policy and the EL Policies) in effect at any time on or before the Effective Date naming any of the Debtors (or any predecessor, subsidiary, or past or present Affiliate of any of the Debtors) as an insured, or otherwise affording the Debtors indemnity or insurance coverage, upon which any claim has been or may be made with respect to any Asbestos Personal Injury

Claim. For the avoidance of doubt, Asbestos Insurance Policy shall not include any Pneumo Asbestos Insurance Policy (as defined in the Addendum).

**1.1.22.** *Asbestos Insurance Settlement Agreement* means any settlement agreement with a Settling Asbestos Insurance Company relating to any Asbestos Personal Injury Claim. For the avoidance of doubt, Asbestos Insurance Settlement Agreement shall not include any settlement agreement related to or under any of the Pneumo Asbestos Insurance Policies. For the further avoidance of doubt, the CIP Agreement shall be an Asbestos Insurance Settlement Agreement.

**1.1.23.** *Asbestos Insurer Coverage Defenses* means all rights and defenses at law or in equity that any Asbestos Insurance Company may have under any Asbestos Insurance Policy or applicable law to a claim seeking insurance coverage; provided, however, that the pursuit of such defenses shall be subject to the terms of the Bankruptcy Insurance Stipulation (if applicable). Asbestos Insurer Coverage Defenses include, without limitation, any defense based on the terms of the Plan or the Plan Documents or the manner in which the Plan or Plan Documents were negotiated, including but not limited to (i) the defense that Asbestos Personal Injury Claims asserted against one Debtor cannot be tendered to nor paid by insurers that have issued or subscribed Asbestos Insurance Policies to a different Debtor and/or with respect to risks that are not insured under those policies, (ii) defenses based on the provisions in the Plan, Plan Documents, and any Order confirming the Plan relating to the treatment or handling of Vellumoid and Fel-Pro Claims, and (iii) the defenses that excess insurers have no duty to undertake the defense of any claim and have no duty to pay defense costs with respect to claims that are not covered by any Asbestos Insurance Policy issued or subscribed by them; but Asbestos Insurer Coverage Defenses do not include any defense that the Plan or any of the Plan Documents do not comply with the Bankruptcy Code. In the event that it is finally determined in the Reorganization Cases that the Bankruptcy Code authorizes the Assignment (as defined in the Bankruptcy Insurance Stipulation) by preempting any terms of Asbestos Insurance Policies or provisions of applicable non-bankruptcy law that otherwise might prohibit the Assignment, Asbestos Insurer Coverage Defenses shall not include any defense that the Assignment is prohibited by the Asbestos Insurance Policies or applicable non-bankruptcy law.

**1.1.24.** *Asbestos Personal Injury Claim* means a liquidated or unliquidated claim against one or more of the Debtors, their non-Debtor Affiliates, or the present or former officers, directors or employees of any of them, whether asserted by agents or employees of the Debtors or their non-Debtor Affiliates or any other Person or Entity, whether in the nature of or sounding in tort, contract, warranty, employer liability or any other theory of law, equity or admiralty, whatsoever, for, attributable to or arising under the laws of any jurisdiction, by reason of, directly or indirectly, physical, emotional or other personal injuries or other damages (including, without limitation, death) caused, or allegedly caused, in whole or in part, directly or indirectly, by the presence of, or exposure to, asbestos – including, but not limited to, asbestos-containing products, automotive or industrial parts and components, equipment, manufacturing processes, improvements to real property or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors, their non-Debtor Affiliates or the predecessors of any of them – and arising or allegedly arising, directly or indirectly, from acts, omissions, business or operations of one or more of the Debtors, their non-Debtor Affiliates or the predecessors of any of them, or any other Entity for whose acts,

omissions, business or operations any of the Debtors have liability (to the extent of such Debtor's or Debtors' liability for such acts, omissions, business or operations), including, but not limited to, all claims, debts, obligations or liabilities for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general and special damages) and punitive damages. Asbestos Personal Injury Claims shall include, without limitation, (i) Indirect Asbestos Personal Injury Claims, (ii) Demands, and (iii) any Claim or Demand based upon, arising under or attributable to an asbestos personal injury settlement agreement or protocol entered into by CCR on behalf of one or more of the Debtors. Notwithstanding the foregoing, Asbestos Personal Injury Claims shall not include (i) Bonded Asbestos Personal Injury Claims (but shall include the unsecured deficiency, if any, of any Bonded Asbestos Personal Injury Claim), (ii) Asbestos Property Damage Claims, (iii) any workers' compensation claim brought directly against a Debtor or a non-Debtor Affiliate by a past or present employee of any U.S. Debtor under an applicable workers' compensation statute, (iv) Hercules Claims, and (v) EL Claims Handling Costs Claims.

**1.1.25.** *Asbestos Personal Injury Expenses* means all costs, taxes and expenses of or imposed on the Trust attributable or allocable to Asbestos Personal Injury Claims, including, but not limited to, trustee compensation, employee compensation, insurance premiums, legal, accounting and other professional fees and expenses, overhead, disbursements, and expenses relating to the implementation of the Asbestos Personal Injury Trust Distribution Procedures, but excluding payments to holders of Asbestos Personal Injury Claims on account of such Claims or Demands, or reimbursements of such payments.

**1.1.26.** *Asbestos Personal Injury Trust Distribution Procedures* means the Asbestos Personal Injury Trust Distribution Procedures substantially in the form attached to the Trust Agreement, or as subsequently modified or amended.

**1.1.27.** *Asbestos Property Damage Claim* means a liquidated or unliquidated Claim against, or any debt, obligation or liability of one or more of the Debtors, arising under the laws of any jurisdiction, whether in the nature of or sounding in tort, contract, warranty or any other theory of law, equity or admiralty, for, attributable to or arising by reason of, directly or indirectly, property damages (whenever suffered), including, but not limited to, diminution in the value thereof, or environmental damage or economic loss caused or allegedly caused, directly or indirectly, by asbestos - including, but not limited to, asbestos-containing products, automotive or industrial parts and components, equipment, manufacturing processes, improvements to real property or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors or their predecessors – and arising or allegedly arising, directly or indirectly, from acts or omissions of one or more of the Debtors, or their predecessors, including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages, and also including, without limitation, any claim for contribution, reimbursement, subrogation or indemnity, whether contractual or implied by law, attributable to Asbestos Property Damage Claims. Asbestos Property Damage Claims shall exclude all Asbestos Personal Injury Claims.

**1.1.28.** *Asbestos Property Damage Claimants Committee* means the Official Committee of Asbestos Property Damage Claimants appointed in the Reorganization Cases by the United States Trustee.

**1.1.29.** *Bank Claims* means any and all obligations, rights, claims or interests, whether secured or unsecured, matured or unmatured, fixed or contingent, including, but not limited to, principal, accrued and unpaid interest, charges, costs, breakage fees, counsel fees, contingent reimbursement obligations under unfunded or partially drawn letters of credit, and any and all other rights to payment of money arising under, based upon or related to the Bank Credit Agreement.

**1.1.30.** *Bank Credit Agreement* means that certain Fourth Amended and Restated Credit Agreement and related Loan Documents as therein defined, dated as of December 29, 2000, as such Agreement has been amended, supplemented or otherwise modified from time to time thereafter among Federal Mogul, certain Affiliate Debtors and non-Debtor Affiliates, a syndicate of lenders and the Administrative Agent.

**1.1.31.** *Bankruptcy Code* means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

**1.1.32.** *Bankruptcy Court* means the United States Bankruptcy Court for the District of Delaware.

**1.1.33.** *Bankruptcy Insurance Stipulation* means that certain Stipulation and Agreed Order approved by the Bankruptcy Court in the Reorganization Cases by an order entered on September 19, 2006 as docket no. 10606, by and between the Debtors, certain Asbestos Insurance Companies, the Asbestos Claimants Committee and the Future Claimants Representative, as such Stipulation and Agreed Order may subsequently be amended and modified by agreement of the parties thereto.

**1.1.34.** *Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

**1.1.35.** *Bonded Asbestos Personal Injury Claim* means an Asbestos Personal Injury Claim evidenced by a judgment as to which, but only to the extent that, a supersedeas bond or equivalent form of payment assurance was posted by a Debtor as security for such Claim, and only to the extent that the Bankruptcy Court or other court of competent jurisdiction determines by Final Order, or the applicable Reorganized Debtor and the holder of such Bonded Asbestos Personal Injury Claim agree, that such holder is entitled to some or all of the proceeds of the supersedeas bond or other payment assurance.

**1.1.36.** *Bonded Claim* means any Bonded Asbestos Personal Injury Claim or Bonded Non-Asbestos Claim, but shall not include the unsecured deficiency, if any, of any such Claims.

7

**1.1.37.** **_Bonded Non-Asbestos Claim_** means any Claim, other than an Asbestos Personal Injury Claim, evidenced by a judgment as to which, but only to the extent that, a supersedeas bond or equivalent form of payment assurance was posted by a Debtor as security for such Claim, and only to the extent that the Bankruptcy Court or other court of competent jurisdiction determines by Final Order, or the applicable Reorganized Debtor and the holder of such Bonded Non-Asbestos Claim agree, that such holder is entitled to some or all of the proceeds of the supersedeas bond or other payment assurance.

**1.1.38.** **_Business Day_** means any day other than a Saturday, Sunday or legal holiday (as such term is defined in Bankruptcy Rule 9006(a)).

**1.1.39.** **_Cash_** means lawful currency of the United States of America and its equivalents as to the U.S. Debtors, and pounds sterling and its equivalents as to the U.K. Debtors.

**1.1.40.** **_CCR_** means the Center for Claims Resolution, a Delaware non-profit corporation.

**1.1.41.** **_CCR Surety Bonds_** means Performance Bond No. 6066092 issued by Safeco in favor of CCR, Performance Bond Nos. 103529126 and 103529229 REL issued by Travelers in favor of CCR, and Performance Bond No. 929182983 issued by CNA in favor of CCR.

**1.1.42.** **_Chester Street Claims_** has the same meaning as in the Principal CVAs.

**1.1.43.** **_Chester Street Fund_** has the same meaning as in the Principal CVAs.

**1.1.44.** **_Chester Street Hercules Fund_** means those Hercules Recoveries referred to in Section 4.5.12(c) _Seventhly_ (ii)(3), the assets or investments derived from those recoveries from time to time, and all accumulations of income on or arising from those assets.

**1.1.45.** **_Chester Street Hercules Fund Costs_** has the same meaning as in the Principal CVAs.

**1.1.46.** **_Chester Street Percentage_** means 4.76% or such other percentage as may be agreed from time to time under Section 4.5.14.

**1.1.46A.** **_CIP Agreement_** means that certain Asbestos Bodily Injury Coverage in Place Agreement dated October 30, 2007 by and among Felt Products Manufacturing Co., Federal-Mogul Corporation, and certain insurers. As used herein, the term CIP Agreement shall include all exhibits and documents attached to the CIP Agreement. The CIP Agreement is an Asbestos Insurance Settlement Agreement as defined in the Plan.

**1.1.47.** **_Claim_** shall have the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code, and shall include, but not be limited to, Asbestos Personal Injury Claims and interests other than Equity Interests.

**1.1.48.** *Class* means a category of Claims or Equity Interests pursuant to the Plan, as such term is used and described in Section 1122 of the Bankruptcy Code.

**1.1.49.** *Collateral Trustee* means the Persons serving as trustees of collateral pledged as security for the Bank Claims, Noteholder Claims and Surety Claims, as applicable, pursuant to, among other things, the Bank Credit Agreement and related documents.

**1.1.49A.** *Commutation Agreement* means that certain Settlement Agreement and Release attached to the CIP Agreement as Exhibit I thereto.

**1.1.50.** *Company Specific Distribution Ratio* means a ratio, the numerator of which shall be the value of the referenced U.K. Debtor's assets as estimated on Exhibit 1.1.50 to the Plan and the denominator of which shall be the Allowed Amount of all Claims against the referenced U.K. Debtor other than U.S. Asbestos Personal Injury Claims.

**1.1.51.** *Confirmation* or *Confirmation of the Plan* means the entry of an order approving the Plan in accordance with Section 1129 of the Bankruptcy Code.

**1.1.52.** *Confirmation Date* means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

**1.1.53.** *Confirmation Hearing* means the hearing(s) which will be held before the Bankruptcy Court and/or District Court, as applicable, in which the Plan Proponents will seek Confirmation of the Plan.

**1.1.54.** *Confirmation Order* means the order confirming the Plan pursuant to Section 1129 and other applicable sections of the Bankruptcy Code.

**1.1.55.** *Convertible Subordinated Debentures* means the 7% Convertible Junior Subordinated Debentures due 2027 in the original aggregate principal amount of $575,000,000 issued by Federal-Mogul on December 1, 1997, and sold to Federal-Mogul Financing Trust, the indenture trustee for which is currently The Bank of New York.

**1.1.56.** *Cooper* means Cooper Industries, Ltd., a Bermuda company, and Cooper LLC, together with any Affiliates thereof that asserted Claims against any of the Debtors.

**1.1.57.** *Cooper/Pneumo Escrow Account* shall have the meaning set forth in the Plan B Settlement Agreement.

**1.1.58.** *Cooper/Pneumo Escrow Agreement* shall have the meaning set forth in Section 8.22.4.1(b) of the Plan.

**1.1.59.** *Intentionally Omitted.*

**1.1.60.** *Cooper Claims* shall mean any Claims asserted or that could be asserted by Cooper in the Reorganization Cases against any of (a) Federal-Mogul, (b) FMP, (c) F-M UK Holding Limited, (d) FM International LLC, and/or (e) Federal-Mogul Global Growth Limited, including but not limited to those Claims set forth in the proofs of claim filed by

9

Cooper, on behalf of itself and its Affiliates, dated (i) March 1, 2003 in the total liquidated claim amount of $17,786,050.88, including alleged asbestos liabilities and defense costs liquidated since October 1, 2001, (ii) July 12, 2004 (amending the proof of claim dated March 1, 2003) in the total liquidated claim amount of $104,382,778.41, including alleged asbestos liabilities and defense costs liquidated as of May 31, 2004, (iii) November 2, 2004 (amending the proof of claim dated July 12, 2004) in the total liquidated claim amount of $135,075,462.42, including alleged asbestos liabilities and defense costs liquidated as of November 1, 2004, and (iv) May 8, 2006 (amending the proof of claim dated November 2, 2004) in the total amount of $479,542,188.86, including alleged asbestos liabilities and defense costs liquidated as of March 31, 2006 and the alleged net present value of future claims.

**1.1.61.**   *Cooper LLC* has the meaning set forth in Section 8.22.1 of the Plan.

**1.1.62.**   *CRU* means the Compensation Recovery Unit established in the United Kingdom under the U.K. Social Security (Recovery of Benefits) Act 1997.

**1.1.63.**   *Curzon* means Curzon Insurance Limited, a company incorporated in Guernsey whose principal place of business is St Julian's Court, St Peter's Port, Guernsey GY1 4AT, in its capacity as insurer under the Hercules Policy.

**1.1.64.**   *CVA Asbestos Claim* has the same meaning as in the Principal CVAs.

**1.1.65.**   *CVAs* means the Principal CVAs and the Ancillary CVAs when referred to together, and "*CVA*" means the company voluntary arrangement applicable to the relevant U.K. Debtor under Part I of the IA 1986 and Part I of the IR 1986.

**1.1.66.**   *CVA Supervisors* means, in relation to each of the CVAs, the supervisors thereof or their duly appointed successors.

**1.1.67.**   *Dan=Loc Deed of Guarantee* means that certain Deed of Guarantee, dated as of April 11, 1997, by and among T&N plc, and Dan=Loc Corporation, Dan=Loc, Inc., Dan=Loc Limited, Delta 72 Unternehmenswerwaltungs GmbH, Frederique s.r.o., Dan=Loc (Canada) Ltd., Dan=Loc Investments, Inc. and Dan=Loc Transitional, L.P.

**1.1.68.**   *Dan=Loc Deed of Special Indemnity* means that certain Deed of Special Indemnity, dated as of April 11, 1997, by and among T&N plc, Flexitallic Limited, Flexitallic Sealing Materials Ltd., Flexitallic, Inc., Goetze Vermogenswerwaltungs, GmbH, Flexitallic Canada Ltd., Ferodo a.s., Dan=Loc Corporation, Dan=Loc Limited, Delta 72 Unternehmenswerwaltungs GmbH, Frederique s.r.o., Dan=Loc (Canada) Ltd. and Dan=Loc Transitional, L.P.

**1.1.69.**   *Dan=Loc Group* means Dan=Loc Corporation and its subsidiaries or affiliates and their respective successors, including but not limited to, The Flexitallic Group, Inc. and its subsidiaries and affiliates.

**1.1.70.**   *Dan=Loc Indemnified Indirect Asbestos Personal Injury Claims and Demands* means any Asbestos Personal Injury Claim or Demand that is *both*: (A)(i) based upon exposure, occurring at any time, to an asbestos containing product which was manufactured,

10

distributed, or sold prior to April 11, 1997 by GHI or any other Debtor, that has been, is or could be asserted against the Dan=Loc Group or (ii) based upon exposure, prior to April 11, 1997, to asbestos present in the internal or external fabric of any building owned or leased by GHI or any other Debtor and which was acquired or leased by the Dan=Loc Group from GHI or any other Debtor under the terms of the 1997 Flexitallic Asset Purchase Agreement, that has been, is or could be asserted against the Dan=Loc Group; and (B) is an "Asbestos Related Claim" (as such term is defined in the Dan=Loc Deed of Special Indemnity) subject to indemnification by GHI under Section 2.2 of the Dan=Loc Deed of Special Indemnity and Section 2.2 of the Dan=Loc Deed of Guarantee (copies of which are attached hereto as Exhibit 1.1.70). Dan=Loc/GHI Indemnified Asbestos Personal Injury Claims and Demands shall also include any Asbestos Personal Injury Claims and Demands asserted in connection with any asbestos containing product manufactured, distributed or sold by GHI or any other Debtor prior to April 11, 1997, which Asbestos Personal Injury Claim *also* alleges exposure to any asbestos containing product manufactured, distributed or sold by the Dan=Loc Group on or after April 11, 1997, and which Asbestos Personal Injury Claim is based upon exposure to asbestos from such product during a period of time *both* prior to and after April 11, 1997, *but* only to the extent of the percentage allocable to GHI or any other Debtor pursuant to and in accordance with the sharing provisions set forth in Section 2.5 of the Dan=Loc Deed of Special Indemnity; *provided, however,* that in no event shall Dan=Loc Indemnified Indirect Asbestos Personal Injury Claims and Demands include any Claims or Demands made against the Dan=Loc Group at any time after April 11, 2024.

      **1.1.71.**   *Date of Finality* has the meaning set forth in the Addendum.

      **1.1.72.**   *Debtor HPE Asbestos Claim* means, in respect of each Reorganized Hercules-Protected Entity, an Asbestos Personal Injury Claim against the relevant Reorganized Hercules-Protected Entity other than a CVA Asbestos Claim.

      **1.1.73.**   *Debtor Insurance Claim* means a Claim (other than an Asbestos Personal Injury Claim) that is alleged to be covered by an insurance policy issued or allegedly issued by an Asbestos Insurance Company.

      **1.1.74.**   *Debtors* means Federal-Mogul and its affiliated U.S. Debtors and U.K. Debtors (or any of them as the context may require).

      **1.1.75.**   *Debtors in Possession* means the Debtors (or any of them as the context may require) in their capacities as debtors in possession in the Reorganization Cases.

      **1.1.76.**   *Demand* means a demand as such term is used and defined in Section 524(g)(5) of the Bankruptcy Code, including a demand for payment, present or future, that (i) was not a Claim prior to the Effective Date; (ii) arises out of the same or similar conduct or events that gave rise to an Asbestos Personal Injury Claim or the Claims addressed by the Third Party Injunction or the Asbestos Insurance Entity Injunction; and (iii) pursuant to the Plan, is to be satisfied exclusively by the Trust.

      **1.1.77.**   *DIP Facility* means that certain Credit and Guaranty Agreement, as amended from time to time, by, between and among certain of the U.S. Debtors and a syndicate

of lenders, with Citicorp USA, Inc. as administrative agent, and those certain Tranche C Loans (as defined in the Final Order approving the DIP Facility), which the Bankruptcy Court authorized through a Final Order entered on May 24, 2007.

      **1.1.78.**   *Disbursing Agent* means Reorganized Federal-Mogul or any Person selected by Reorganized Federal-Mogul (with approval of the Bankruptcy Court) to hold and distribute the consideration to be distributed to the holders of Allowed Claims (other than Allowed Asbestos Personal Injury Claims) or Allowed Equity Interests under the Plan. Disbursing Agent does not include any Indenture Trustee relating to the Notes or the Indentures.

      **1.1.79.**   *Discharge Injunction* means the injunction described in Section 1141 of the Bankruptcy Code and contained in Section 9.1.2 of the Plan.

      **1.1.80.**   *Disclosure Statement* means the Disclosure Statement Describing Third Amended Joint Plan Of Reorganization, dated June 4, 2004, including all exhibits, appendices, schedules and annexes attached thereto, as submitted by the Plan Proponents pursuant to Section 1125 of the Bankruptcy Code and approved by the Bankruptcy Court, as such Disclosure Statement may be further amended, supplemented or modified from time to time (including the Supplemental Disclosure Statement dated as of January 30, 2007).

      **1.1.81.**   *Distribution Date* means, when used with respect to an Allowed Claim (other than an Asbestos Personal Injury Claim that is not a Bonded Asbestos Personal Injury Claim), the date which is as soon as reasonably practicable after the later of: (a) the Effective Date, and (b) the first Business Day of the next calendar quarter after the date upon which the Claim becomes Allowed, unless the Claim becomes Allowed within fifteen Business Days before the first Business Day of the next calendar quarter, in which case the Distribution Date shall be the first Business Day of the next succeeding calendar quarter.

      **1.1.82.**   *District Court* means the United States District Court for the District of Delaware, or the unit thereof having jurisdiction over the matter in question.

      **1.1.83.**   *Effective Date* means, and shall occur on, the date on which the Debtors file notice with the Bankruptcy Court of the Effective Date, which notice shall state that the conditions contained in Section 7.2 of the Plan have been satisfied or waived, and on which date all acts, events, terms and conditions contemplated under the Plan to occur on the Effective Date or as soon as practicable thereafter shall be deemed to have occurred simultaneously.

      **1.1.84.**   *EL Asbestos Insurance* means employer's liability policies (other than (i) (if the EL Scheme becomes effective before the EL Scheme Long Stop Date) those that are the subject of the EL Settlement and (ii) the Hercules Policy) that afford any of the U.K. Debtors rights of indemnity or insurance coverage with respect to any Asbestos Personal Injury Claim asserted by an employee or former employee relating to exposure to asbestos in the course of such individual's employment.

      **1.1.85.**   *EL Asbestos Insurance Expiry Date* means the date upon which all of the obligations of all the EL Insurers under all the EL Asbestos Insurance cease to have effect, whether by commutation or otherwise.

**1.1.86.**   *EL Claims Handling Costs Claims* has the same meaning as in the Principal CVAs.

**1.1.87.**   *EL Insurer* means any insurer (except, for the avoidance of doubt, Curzon) providing employer's liability insurance cover (except, for the avoidance of doubt, the Hercules Policy) to any of the U.K. Debtors.

**1.1.88.**   *EL Recoveries* means all amounts received or recoverable in respect of EL Asbestos Insurance.

**1.1.89.**   *EL Scheme* means the scheme of arrangement proposed in the United Kingdom by the Administrators of T&N Limited and certain other U.K. Debtors to facilitate the distribution of the amounts to be received under the EL Settlement to such persons who are scheme creditors under the terms of the EL Scheme.

**1.1.90.**   *EL Scheme Long Stop Date* means 31 May 2007 or such later date as may be agreed in writing between the Administrators of T&N or, if T&N has ceased to be in administration, the CVA Supervisors with respect to T&N and the U.K. Asbestos Trustee.

**1.1.91.**   *EL Settlement* means the settlement of the proceedings HC02C01451 which were commenced against Royal & Sun Alliance Insurance Plc and the Brian Smith Syndicate at Lloyd's (Syndicate Number 45/177) (and, insofar as it is the successor thereto, Equitas Limited) by T&N and certain other U.K. Debtors.

**1.1.92.**   *Employee Benefit Plan* means any employment, compensation, pension, healthcare (including, but not limited to, medical, surgical, hospital, dental and counseling), bonus, incentive compensation, sick leave and other leaves (including, but not limited to, jury duty, child-bearing and military service), vacation pay, expense reimbursement, dependent care, retirement, savings, workers compensation, life insurance, disability, dependent care, dependent healthcare, education, car allowance, miscellaneous executive benefits, severance or other benefit plan or arrangement for the benefit of the directors, officers or employees (whether salaried or hourly, active or retired) of the applicable Debtor, but excluding (i) any new agreements provided for in Section 8.3.14 of this Plan and (ii) that portion of the Debtors' non-tax qualified pension plans giving rise to Excluded Non-Qualified Pension Claims.

**1.1.93.**   *English Court* means the High Court of Justice of England and Wales.

**1.1.94.**   *Entity* means any Person, estate, trust, Governmental Unit, or the United States Trustee.

**1.1.95.**   *Environmental Claim* means any Claim, other than an Asbestos Personal Injury Claim, asserted by any Governmental Unit or Person, arising out of, related to, or based upon any Environmental Law, including, but not limited to, any Claim (a) to restrict or enjoin, or recover damages, costs or expenses to remedy any release or threatened release of any environmental pollution, contamination or nuisance or to require the Debtors or their non-debtor Affiliates to remedy or to reimburse, pay or incur costs to remedy any release or threatened release of any environmental pollution, contamination or any nuisance; (b) to remedy, reimburse, compensate or pay any damage, penalty, fine or forfeiture for, or to restrict or enjoin any

13

violation of, or alleged violation of, any Environmental Law; (c) to pay any contractual claim with respect to any Environmental Law; or (d) to pay or reimburse any such Entity for personal injury (including workers compensation, sickness, disease or death), tangible or intangible property damage or natural resource damage arising out of, relating to, or based upon any release or threatened release of any environmental pollution, contamination or nuisance, whether or not contemplated in subsections (a) through (d) above, including, but not limited to, any related Asbestos Property Damage Claim. For purposes of the Plan, prepetition Environmental Claims fall into one of two categories – (x) Claims arising from or related to property either never owned or occupied, or formerly but no longer owned or occupied by the Debtors (*"Off-Site Environmental Claims"*), and (y) Claims arising from or related to property currently owned or occupied, and that will continue to be owned or occupied by the Debtors after Confirmation of the Plan, excluding, however, any Claims arising from or relating to wastes or other materials which were shipped or were arranged to be shipped for disposal to a site that was never owned or occupied, or was formerly owned or occupied but is no longer owned or occupied by the Debtors (*"On-Site Environmental Claims"*). A schedule of all known On-Site Environmental Claims is set forth in Exhibit 1.1.95 to the Plan.

      **1.1.96.** *Environmental Laws* means (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C., §§ 9601, et seq., (b) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendment of 1984, 42 U.S.C. §§ 6901, et seq., (c) the Clean Air Act, 42 U.S.C. §§ 7401, et seq., (d) the Clean Water Act of 1977, 33 U.S.C. §§ 1251, et seq., (e) the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et seq., (f) the Environmental Protection Act 1990, the Environment Act 1995, the Control of Pollution Act 1974, the Planning (Hazardous Substances) Act 1990, the Radioactive Substances Act 1993, the Clean Air Act 1993, the Water Resources Act 1991, the Water Industry Act 1991, the Health and Safety at Work, etc. Act 1974 and the Public Health Act 1936 (all of the United Kingdom) as the same may from time to time be amended or reenacted, and all orders and regulations from time to time made thereunder, (g) all statutes, laws, rules or regulations issued or promulgated by any Governmental Unit or court (including, without limitation, the common law), as they may be amended from time to time, relating to the protection and/or prevention of harm, contamination or pollution of or to the environment (including, without limitation, ecological systems and living organisms including humans and the following media whether alone or in combination: air (including air within buildings), water (including water under or within land or in pipe or sewage systems), land, buildings and soil) and (h) the ordinances, rules, regulations, orders, notices of violation, requests, demands and requirements issued or promulgated by any Governmental Unit in connection with such statutes or laws.

      **1.1.97.** *Environmental Settlement Agreements* shall have the meaning ascribed to such term in Section 8.21 hereof.

      **1.1.98.** *Equity Committee* means the Official Committee of Equity Security Holders of Federal-Mogul Corporation appointed in the Reorganization Cases by the United States Trustee.

14

**1.1.99.** *Equity Interest* means any equity interest in the Debtors represented by (a) existing Federal-Mogul common or preferred stock as classified in Classes 1M and 1O below or (b) shares of capital stock in the remaining Debtors, whether or not issued.

**1.1.100.** *Estate* means, as to each Debtor, the estate created for that Debtor under Section 541 of the Bankruptcy Code upon the commencement of its Reorganization Case.

**1.1.101.** *Excluded Non-Qualified Pension Claims* means any Claims based upon or arising out of the Debtors' non-tax qualified pension plans in which the existing or prior employee was entitled to receive more than $3,500 per month, but for which such employee has received or will receive only $3,500 per month pursuant to the Bankruptcy Court's order entered on April 30, 2002 (Docket No. 1655), all of which Claims shall be classified and treated as Unsecured Claims; provided, however, that the claims of James Zamoyski, Wilhelm Schmelzer and Richard Randazzo, respectively, based upon the Supplemental Key Executive Pension Plan of Federal-Mogul shall not be subject to the aforementioned $3,500 per month limitation as provided in the Bankruptcy Court's order entered on August 9, 2002 (Docket No. 582591721).

**1.1.102.** *Exit Facilities* means the agreements described in Section 8.12 below providing for one or more credit facilities which shall be used to repay obligations under the DIP Facility on the Effective Date, make cash payments required under the Plan and/or provide working capital for the business operations of the Reorganized Debtors.

**1.1.103.** *Federal-Mogul* means Federal-Mogul Corporation, a corporation incorporated in Michigan and one of the U.S. Debtors.

**1.1.103A.** *Fel-Pro Claim* means any Fel-Pro Asbestos Claim, as that term is defined in the CIP Agreement.

**1.1.104.** *Ferodo* means Ferodo America, Inc., a corporation incorporated in Delaware and one of the U.S. Debtors.

**1.1.105.** *Final Order* means an order or judgment of any court of competent jurisdiction, the implementation, operation or effect of which has not been stayed and as to which order (or any revision, modification or amendment thereof) the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari has been taken and is pending.

**1.1.106.** *FMP* means Federal-Mogul Products, Inc., a Missouri corporation and one of the Debtors.

**1.1.107.** *FM Ignition Pension Plan* means the pension scheme known as the Champion Pension Scheme, a defined benefit plan operated by Federal-Mogul Ignition (U.K.) Limited for eligible employees.

**1.1.108.** *Future Claimants Representative* means Eric D. Green (or any court-appointed successor) who was appointed by the Bankruptcy Court in the Reorganization Cases pursuant to an Order dated February 11, 2002 as the legal representative of any and all persons described in Section 524(g)(4)(B)(i) of the Bankruptcy Code who may assert demands for

15

asbestos-related personal injuries, as that term is defined in Section 524(g)(5) of the Bankruptcy Code.

        **1.1.109.**   ***GHI*** means Gasket Holdings Inc. (f/k/a Flexitallic, Inc.), a corporation incorporated in Delaware and one of the U.S. Debtors.

        **1.1.110.**   ***Governmental Unit*** means any domestic, foreign, provincial, federal, state, local or municipal (a) government, or (b) governmental agency, commission, department, bureau, ministry or other governmental entity.

        **1.1.111.**   ***Hercules Claims*** has the same meaning as in the Principal CVAs.

        **1.1.112.**   ***Hercules Claims Handling Costs*** means all amounts now or at any time in the future incurred or paid by T&N or any Hercules-Protected Entity to Curzon or the Reinsurers in accordance with and under the Hercules Policy for costs, fees and expenses that are attributable to the administration, defense or disposition (including but not limited to settlement) of one or more Asbestos Personal Injury Claims against any of the Hercules-Protected Entities, or the pursuit of subrogation rights, all in accordance with and under the terms of the Hercules Policy. "Hercules Claims Handling Costs" shall exclude (a) Hercules Recovery Costs, and (b) the costs, fees and expenses of T&N or any other Hercules-Protected Entity seeking coverage under Section 4.5.19(a).

        **1.1.113.**   ***Hercules Coverage*** means the £500,000,000 insurance coverage provided by Curzon under the Hercules Policy.

        **1.1.114.**   ***Hercules Payment Agency Agreement*** means the agreement to be entered into between T&N, the Administrators of T&N, the U.K. Asbestos Trustee, the Asbestos Claimants Committee, the Future Claimants Representative, GHI, Ferodo and Phillip Rodney Sykes and Jeremy Mark Willmont as the initial Hercules Payment Agents in the form set out in Annex 19 to the Principal CVAs, with such variations thereto as the parties thereto may agree (to which it is intended that the U.S. Asbestos Trust should accede once it has been established).

        **1.1.115.**   ***Hercules Payment Agents*** means the Hercules Payment Agents as defined in the Hercules Payment Agency Agreement.

        **1.1.116.**   ***Hercules Policy*** means the asbestos liability policy number CZ 7/96 ASB/096 dated December 30, 1996 and made among T&N (then known as "T&N plc") and Curzon, as varied from time to time.

        **1.1.117.**   ***Hercules Policy Expiry Date*** means the date that is the later of (a) the earlier of (i) the date that (aa) the Hercules Retention has been satisfied; and (bb) the Hercules Coverage has been exhausted or is otherwise determined by agreement, judicial proceedings or otherwise, to be unavailable; and (cc) all other amounts under or in connection with the Hercules Policy including, without limitation, sums payable by Marsh USA Inc, Sedgwick Limited and Sedgwick U.K. Risk Services Limited under the collateral settlement agreement dated 16 January 2004 and amounts payable by the Reinsurers under the Reinsurance Agreement (including any amounts recoverable as a result of any breach by the Reinsurers of their obligations under the Reinsurance Agreement) and amounts recoverable as a result of any breach

by Curzon of its obligations under or with respect to the Hercules Policy, to the extent they exceed the Hercules Coverage, are recovered or are otherwise determined by agreement, judicial proceedings or otherwise to be unavailable; or (ii) the date that the Hercules Policy ceases to have effect, whether by commutation or settlement pursuant to Section 4.5.21 or otherwise; and (b) the date that both (i) all Hercules Recoveries paid to the credit of the Hercules Receipt Account have been applied in accordance with Section 4.5.12(a) and (ii) there can be no further Hercules Recoveries that are required to be credited to the Hercules Receipt Account to be applied in accordance with Section 4.5.12(a).

1.1.118. *Hercules-Protected Entities* means (a) T&N, (b) Reorganized T&N, (c) the Debtors listed as subsidiaries or subsidiary undertakings of T&N in Schedule B to the Hercules Policy, (d) those Debtors identified in (c) as reorganized under and pursuant to the Plan and (e) the non Debtor companies listed as subsidiaries or subsidiary undertakings of T&N Limited in Schedule B to the Hercules Policy. *Reorganized Hercules-Protected Entities* means the companies identified in (b) and (d) above and *Non-Debtor Hercules-Protected Entities* means the companies identified in (e) above.

1.1.119. *Hercules Receipt Account* means a bank account (not attracting interest or other income) in the name of T&N and designated as the "T&N Hercules Trust Account" and in respect of which the Hercules Payment Agents are or will be the sole authorized signatories as more particularly described in the Hercules Payment Agency Agreement.

1.1.120. *Hercules Recoveries* means all amounts received or recoverable in respect of the Hercules Coverage (including, for the avoidance of doubt, any sum paid in respect of any commutation of or settlement of claim under the Hercules Policy) and all such amounts as are referred to in paragraph (a)(i)(cc) of the definition of Hercules Policy Expiry Date except (in each case) for any proceeds of the Hercules Policy which Reorganized T&N is entitled to retain pursuant to Section 4.5.21(a).

1.1.121. *Hercules Recovery Costs* means (a) all reasonable amounts properly incurred after the U.K. Effective Date by Reorganized T&N for costs, fees and expenses (other than salaries, management time and overhead costs of Reorganized T&N incurred by Reorganized T&N in maintaining the books, records, document and control systems of Reorganized T&N) in connection with the preservation, recovery or attempted recovery of any Hercules Recoveries (net of the amount of any monetary collateral benefit actually received by Reorganized T&N in connection with such recovery or attempted recovery (which for the avoidance of doubt includes any VAT charged to Reorganized T&N on such costs, fees and expenses recoverable and actually recovered by Reorganized T&N (or where Reorganized T&N is a member of a VAT group, by such representative member) but does not include any relief from or other benefit in relation to tax)) or in connection with the exercise of Reorganized T&N's rights or the performance of Reorganized T&N's obligations under the Hercules Policy, provided that the costs, fees and expenses referred to above (other than those which are excluded in this paragraph (a)) are incurred at the request of the U.K. Asbestos Trustee or the Trust or in response to the assertion of an Asbestos Personal Injury Claim by the U.K. Asbestos Trustee or the Trust as agent of the holder of such claim; (b) all reasonable amounts properly incurred after the U.K. Effective Date by the U.K. Asbestos Trustee or the Trust for costs, fees and expenses (other than salaries and other overhead costs of the U.K. Asbestos Trustee or the Trust) in

17

connection with the preservation, recovery or attempted recovery of any Hercules Recoveries; (c) any costs, fees and expenses (or other liabilities) incurred by Reorganized T&N by reason of the exercise of any power of attorney granted by Reorganized T&N to the U.K. Asbestos Trustee under the terms of paragraph 19.7.1 of Principal CVAs or to the Trust under the terms of Section 4.5.11, provided that to the extent that such costs, fees and expenses (or other liabilities) are incurred in litigation and Reorganized T&N (and not the U.K. Asbestos Trustee or the Trust as donee of any power of attorney given by Reorganized T&N) has the conduct of the case, any such costs, fees and expenses (or other liabilities) shall be limited to the reasonable costs, fees and expenses (or other liabilities) properly incurred by Reorganized T&N; and (d) any reasonable costs or expenses (other than the cost or expense of salaries, management time and overhead costs of Reorganized T&N which would be borne by Reorganized T&N in any case) which Reorganized T&N may properly incur in connection with any application referred to in paragraph 19.19.13(b) of the Principal CVAs. Hercules Recovery Costs shall not include (i) Hercules Claims Handling Costs, (ii) the T&N Hercules Fund Costs and the Chester Street Hercules Fund Costs, except to the extent set out in sub-paragraph (b) above, and (iii) any costs, fees and expenses incurred in seeking coverage under Section 4.5.19(a).

      **1.1.122.**   *Hercules Retention* means the remaining amount of the "Retained Limit" of £690,000,000 as defined by the Hercules Policy.

      **1.1.123.**   *Hercules U.S. Holding Account* means a bank account in the name of the Hercules Payment Agents and designated as the "The Hercules Payment Agents' U.S. Holding Trust Account" and in respect of which the Hercules Payment Agents are the sole authorized signatories as more particularly described in the Hercules Payment Agency Agreement.

      **1.1.124.**   *Hercules Waterfall Account* means a bank account in the name of the U.K. Asbestos Trustee (and, when the Trust has come into existence and has become an account-holder of the account) the Trust and designated as the "Hercules Waterfall Trust Account" and in respect of which the Hercules Payment Agents are the sole authorized signatories as more particularly described in the Hercules Payment Agency Agreement.

      **1.1.125.**   *[Intentionally Omitted.].*

      **1.1.126.**   *IA 1986* means the Insolvency Act 1986 of the United Kingdom, as amended from time to time.

      **1.1.127.**   *Inactive Debtor Subsidiaries* means the affiliated Debtors which may, at the discretion of their respective boards of directors and corporate parent companies, be liquidated, dissolved, wound-up, struck off, merged into another entity, and/or left in existence after Confirmation.

      **1.1.128.**   *Indenture Trustees* means the Persons serving as trustees under the Indentures for the Notes and for the Convertible Subordinated Debentures.

      **1.1.129.**   *Indentures* means the indenture agreements entered into between and among Federal-Mogul, the Indenture Trustees and certain other parties relating to each series of

Notes and to the Convertible Subordinated Debentures, as amended, modified or supplemented from time to time.

**1.1.130.** *Indirect Asbestos Personal Injury Claim* means any Asbestos Personal Injury Claim for contribution, reimbursement, subrogation or indemnity, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative or indirect Asbestos Personal Injury Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law, equity or admiralty, whatsoever. Without limitation, Indirect Asbestos Personal Injury Claims include (i) Dan=Loc Indemnified Indirect Asbestos Personal Injury Claims and Demands; (ii) any Claim or Demand by an EL Insurer for premium, indemnity, reimbursement, contribution, fees, expenses or otherwise in connection with any EL Asbestos Insurance made available by any EL Asbestos Insurer or Asbestos Personal Injury Claims held or asserted by any EL Insurer in respect of EL Asbestos Insurance; and (iii) Claims or Demands held or asserted by the CRU based on Asbestos Personal Injury Claims. Indirect Asbestos Personal Injury Claims shall not include (i) Hercules Claims, (ii) EL Claims Handling Costs Claims, (iii) Pneumo Parties Claims, and (iv) Other Cooper Claims.

**1.1.131.** *Injunctions* means the Discharge Injunction, the Supplemental Injunction, the Third Party Injunction, the Asbestos Insurance Entity Injunction and any other injunctions entered by Order of the Bankruptcy Court in the Reorganization Cases.

**1.1.132.** *IR 1986* means the Insolvency Rules 1986 of the United Kingdom, as amended from time to time.

**1.1.133.** *IRC* means the Internal Revenue Code of 1986, as amended.

**1.1.134.** *Lien* means, with respect to any asset or property, any mortgage, lien, pledge, charge, security interest, encumbrance or other security device of any kind pertaining to or affecting such asset or property.

**1.1.135.** *Loan Notes* has the same meaning as in the Principal CVAs.

**1.1.136.** *Non-CVA Asbestos Claim* has the same meaning as in the Principal CVAs.

**1.1.137.** *Non-Priority Employee Benefit Claim* means any Claim that (i) arises from or relates to an Employee Benefit Plan or otherwise to the performance of service by an employee to the Debtors and (ii) is neither secured nor entitled to priority or preference to other Claims under the Bankruptcy Code or U.K. insolvency laws. For the avoidance of doubt, Non Priority Employee Benefit Claims include claims described in Section 1114 of the Bankruptcy Code, except to the extent such retiree benefit claims (a) are entitled to priority under Section 503 of the Bankruptcy Code or (b) arise in connection with the termination or modification of any retiree benefit plan in accordance with Section 1114 of the Bankruptcy Code. Non-Priority Employee Benefit Claims shall not include: (w) Excluded Non-Qualified Pension Claims, (x) Non-Priority T&N Pension Plan Employee Benefit Claims, (y) Non-Priority FM Ignition Pension Plan Employee Benefit Claims or (z) any Claims arising out of the rejection of a collective bargaining agreement in accordance with Section 1113 of the Bankruptcy Code.

19

**1.1.138.** *Non-Priority FM Ignition Pension Plan Employee Benefit Claim* means any Claim that arises from or relates to the FM Ignition Pension Plan.

**1.1.139.** *Non-Priority T&N Pension Plan Employee Benefit Claim* means any Claim that arises from or relates to the T&N Pension Plan.

**1.1.140.** *Noteholder* means each Person holding or having a beneficial interest in any of the Notes as of the Record Date.

**1.1.141.** *Noteholder Claims* means all Claims of the Noteholders against Federal Mogul and/or any Debtor that guaranteed the Notes arising under or evidenced by the Notes or the Indentures for the Notes and related documents. Notwithstanding the foregoing, Noteholder Claims shall not include any Convertible Subordinated Debenture Claims or Subordinated Securities Claims.

**1.1.142.** *Notes* means Federal-Mogul's 7.5% Notes due 2009, 7.375% Notes due 2006, 7.75% Notes due 2006, 7.875% Notes due 2010, 7.5% Notes due 2004, 8.8% Senior Notes due 2007, 8.37% Medium Term Notes due 2001, 8.25% Medium Term Notes due 2005, 8.33% Medium Term Notes due 2001, 8.12% Medium Term Notes due 2003, 8.16% Medium Term Notes due 2003 and 8.46% Medium Term Notes due 2002.

**1.1.143.** *Official Committees* means the Asbestos Claimants Committee, the Unsecured Creditors Committee, the Asbestos Property Damage Claimants Committee and the Equity Committee (or, in the singular, any of them).

**1.1.144.** *Other Cooper Claims* shall mean any Claims asserted by Cooper in the Reorganization Cases other than the Cooper Claims.

**1.1.145.** *Other U.K. Claim* means Unsecured Claims against any of the U.K. Debtors (including, but not limited to, Asbestos Property Damage Claims) and any other Claims asserted against a U.K. Debtor other than Administrative Claims, Priority Claims, Bank Claims, Surety Claims, Noteholder Claims, Other Secured Claims, Non-Priority T&N Pension Plan Employee Benefit Claims, Non-Priority FM Ignition Pension Plan Employee Benefit Claims, Asbestos Personal Injury Claims, and Affiliate Claims.

**1.1.146.** *Owens-Illinois Settlement Agreement* shall mean that certain Stipulation and Settlement Agreement By and Between the Plan Proponents and Owens-Illinois, Inc. Resolving Certain Claims and Objections, as approved by the Bankruptcy Court by a Final Order entered on November 15, 2005.

**1.1.147.** *Owens-Illinois Settlement Amount* shall mean $4.8 million in Cash, as payable by Federal-Mogul to Owens-Illinois pursuant to the Owens-Illinois Settlement Agreement.

**1.1.148.** *PCT* means PCT International Holdings Inc., a Delaware corporation.

**1.1.149.** *Person* means any person, individual, partnership, corporation, limited liability company, joint venture company, association or other entity or being of whatever kind,

20

whether or not operating or existing for profit, including, but not limited to, any "person" as such term is defined in Section 101(41) of the Bankruptcy Code, but excluding any Governmental Unit.

      **1.1.150.** *Petition Date* means October 1, 2001.

      **1.1.151.** *PIK Notes Trustee* means, as the context requires, the trustee or trustees under those certain Indentures of Trust pursuant to which the Reorganized Federal Mogul Junior Secured PIK Notes are to be issued.

      **1.1.152.** *Plan* means this Fourth Amended Joint Plan of Reorganization filed by the Plan Proponents, as the same may be amended or modified from time to time pursuant to Section 1127 of the Bankruptcy Code. To the extent the Addendum is implemented pursuant to Section 8.23 of the Plan, the Addendum shall also constitute part of the Plan; provided, however, that if Articles II and III of the Plan B Settlement Agreement become effective in accordance with Section 5.01 of the Plan B Settlement Agreement, except (i) as otherwise provided in Section 8.23.1.2 of the Plan and (ii) for capitalized terms set forth in this Article I that have the meaning set forth in the Addendum (for which purposes such defined terms contained in the Addendum shall survive), the Addendum shall cease to have force and effect and shall not constitute part of the Plan.

      **1.1.153.** *Plan A Date* shall have the meaning set forth in the Addendum.

      **1.1.154.** *Plan A Settlement* shall have the meaning set forth in the Addendum.

      **1.1.155.** *Plan B Date* has the meaning set forth in the Plan B Settlement Agreement.

      **1.1.156.** *Plan B Effective Date* has the meaning set forth in the Plan B Settlement Agreement.

      **1.1.157.** *Plan B Settlement* means the settlement embodied in the Plan B Settlement Agreement, as implemented pursuant to the Plan.

      **1.1.158.** *Plan B Settlement Agreement* means that certain Amended and Restated Plan B Settlement Agreement dated as of November 20, 2006 by and among Cooper Industries, Ltd., a Bermuda company, Cooper Industries, LLC, a Delaware limited liability company, PCT International Holdings Inc., a Delaware corporation, Pneumo Abex LLC, a Delaware limited liability company, Federal-Mogul Corporation, a Michigan corporation, Federal-Mogul Products, Inc., a Missouri corporation, the Future Claimants Representative for Federal-Mogul Corporation and Federal-Mogul Products, Inc. appointed in the Reorganization Cases, and the Official Committee of Asbestos Claimants for Federal-Mogul Corporation and Federal-Mogul Products, Inc. appointed in the Reorganization Cases (as amended by the First Amendment thereto dated as of September 26, 2007), a copy of which is attached to the Plan as Exhibit 8.22.

      **1.1.159.** *Plan B Settlement Amount* shall have the meaning set forth in Section 8.22.1 of the Plan.

**1.1.160.** *Plan Documents* means all documents, attachments and exhibits related to the Plan, including, but not limited to, the Trust Documents and the Cooper/Pneumo Escrow Agreement, that aid in effectuating the Plan, which documents, attachments and exhibits shall be filed by the Plan Proponents with the Bankruptcy Court on or before a date established by the Bankruptcy Court. To the extent the Addendum is implemented pursuant to Section 8.23 of the Plan, the Addendum and the exhibits thereto shall also be Plan Documents; provided, however, that if Articles II and III of the Plan B Settlement Agreement become effective in accordance with Section 5.01 of the Plan B Settlement Agreement, except as otherwise provided in Section 8.23.1.2 of the Plan, the Addendum shall cease to have force and effect and the Addendum and the exhibits thereto shall not be Plan Documents.

**1.1.161.** *Plan Documents Repository* means the offices of Sidley Austin LLP, counsel to the Debtors, at the address set forth in Section 1.4 of the Plan, at which any party-in-interest may review all of the Plan Documents after such Plan Documents have been filed with the Bankruptcy Court.

**1.1.162.** *Plan Proponents* means, collectively, the Debtors, the Unsecured Creditors Committee, the Asbestos Claimants Committee, the Future Claimants Representative, the Administrative Agent and the Equity Committee.

**1.1.163.** *Plan Support Agreement* means that certain Plan Support Agreement among the Debtors, the Asbestos Claimants Committee, the Future Claimants Representative and each of the Pneumo Parties dated as of November 20, 2006, as approved by the Bankruptcy Court by an order dated as of February 7, 2007, which is attached as Exhibit 8.24 to the Plan.

**1.1.164.** *Pneumo Abex* means Pneumo Abex LLC, a Delaware limited liability company.

**1.1.165.** *Pneumo Abex Claims* means any Claims or that could be asserted by Pneumo Abex and/or PCT against FMP in the Reorganization Cases, including but not limited to those Claims set forth on that certain proof of claim filed by Pneumo Abex against FMP dated February 28, 2003, in the total liquidated amount of $2,190,615.39, together with any and all contingent Claims.

**1.1.166.** *Pneumo Asbestos Claims* shall have the meaning set forth in the Addendum and in the Plan B Settlement Agreement.

**1.1.167.** *Pneumo Asbestos Insurance Policies* shall have the meaning set forth in the Addendum.

**1.1.168.** *Pneumo Excluded Claims* has the meaning set forth in Section 8.22.3.2 of the Plan.

**1.1.169.** *Pneumo Parties* means, collectively, Cooper LLC, Cooper Industries, Ltd., PCT, and Pneumo Abex.

**1.1.170.** *Pneumo Parties Claims* means, collectively, the Cooper Claims and the Pneumo Abex Claims.

**1.1.171.** *Pneumo Protected Party Injunction* shall have the meaning set forth in the Addendum.

**1.1.172.** *PPF* means the Board of the Pension Protection Fund, established under Part 2 of the Pensions Act 2004 of the United Kingdom.

**1.1.173.** *Principal CVAs* means the company voluntary arrangements under Part I IA 1986 which have been proposed by the Administrators of T&N and certain other U.K. Debtors in respect of those companies, and which are attached to the Plan as Exhibit 1.1.173, as may be varied from time to time.

**1.1.174.** *Priority Claim* means any Claim (other than an Administrative Claim or a Priority Tax Claim) to the extent such Claim is entitled to a priority in payment under Section 507(a) of the Bankruptcy Code.

**1.1.175.** *Priority Tax Claim* means any Claim to the extent that such Claim is entitled to a priority in payment under Section 507(a)(8) of the Bankruptcy Code.

**1.1.176.** *Pro Rata* means the proportion that a Claim in a particular Class bears to the aggregate amount of all Claims in such Class except in cases where Pro Rata is used in reference to multiple classes, in which case Pro Rata means the proportion that a Claim in a particular Class bears to the aggregate amount of all Claims in such multiple Classes.

**1.1.177.** *Proof of Claim* means any proof of claim filed with the Bankruptcy Court or its duly appointed claims agent with respect to the Debtors pursuant to Bankruptcy Rules 3001 or 3002, unless and to the extent that the Bankruptcy Court has ordered the use of a special or customized form for the particular type of claim at issue, and in such case, the special or customized form proof of claim.

**1.1.178.** *Protected Party* means any and all of the following parties:

**1.1.178.1.** the Debtors, their non-Debtor Affiliates (excluding, however, any person or Entity that may qualify as an Affiliate, but that is not commonly owned or controlled by the Debtors), the Affiliated Subsidiaries, Reorganized Federal-Mogul and the other Reorganized Debtors and all of their respective past and present officers, directors and employees;

**1.1.178.2.** the Noteholders, the holders of Bank Claims, and the Sureties, together with their respective successors, past and present officers, directors and employees, in each case limited to such party's capacity set forth in this Subsection 1.1.178.2;

**1.1.178.3.** any Entity which, pursuant to the Plan or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any assets of the Debtors, Reorganized Federal-Mogul or the Trust, but only to the extent that a claim or liability is asserted against such Entity on account of its status as such transferee or successor;

**1.1.178.4.** any Entity that, pursuant to the Plan or after the Effective Date, makes a loan to the Debtors, Reorganized Federal-Mogul, or the Trust, or to a successor to,

or transferee of, any assets of the Debtors, Reorganized Federal-Mogul, or the Trust, but only to the extent that liability is asserted to exist by reason of such lending relationship or to the extent any Lien created in connection with such a loan is sought to be challenged or impaired;

        **1.1.178.5.**    each Settling Asbestos Insurance Company and, to the extent specified in the Confirmation Order, each contributor of funds, proceeds or other consideration to the Trust; provided, however, that in the event a Settling Asbestos Insurance Company enters into any Asbestos Insurance Settlement Agreement(s) that cover less than all Asbestos Insurance Policies applicable to such Settling Asbestos Insurance Company, such Settling Asbestos Insurance Company shall be a Protected Party only with respect to those Asbestos Insurance Policies as to which it has entered into an Asbestos Insurance Settlement Agreement or Agreements; and

        **1.1.178.6.**    the Dan=Loc Group, but only to the extent specified in the Confirmation Order.

        **1.1.179.**    *Record Date* means the Confirmation Date.

        **1.1.180.**    *Reinsurance Agreement* means the Reinsurance Agreement dated 30 December 1996 entered into between Curzon and the Reinsurers whereby Curzon re-insured all its liability under the Hercules Policy, as varied from time to time.

        **1.1.181.**    *Reinsurers* means Centre Reinsurance International Company, European International Reinsurance Company Limited and Münchener Rückversicherungs-Gesellschaft AG.

        **1.1.182.**    *Released Claims Against FMC Group* has the meaning set forth in the Plan B Settlement Agreement.

        **1.1.183.**    *Released Party* means each of (a) the Debtors, their non-Debtor Affiliates (excluding, however, any person or Entity that may qualify as an Affiliate, but that is not commonly owned or controlled by the Debtors), the Affiliated Subsidiaries, the Reorganized Debtors, and their respective present and former agents, attorneys, accountants, financial advisors, restructuring consultants and investment bankers, including Rothschild Inc. (together with its officers, directors and employees who served in such capacity during the term of its engagement by the Debtors) (but specifically excluding Gilbert Randolph LLP; provided, however, that Gilbert Randolph LLP shall not be excluded as a Released Party to the extent that any and all issues related to the contested matter involving that certain Motion to Disqualify Gilbert, Heintz & Randolph as Special Insurance Counsel to the Debtors (Docket No. 10123, filed July 24, 2006) are resolved in favor of Gilbert Randolph LLP pursuant to a Final Order) and their respective successors or assigns, (b) the officers and directors of the Debtors, their non-Debtor Affiliates, Rothschild Inc. (together with its officers, directors and employees who served in such capacity during the term of its engagement by the Debtors) (excluding, however, any person or Entity that may qualify as an Affiliate, but that is not commonly owned or controlled by the Debtors), and the Affiliated Subsidiaries, who were serving as officers or directors on or after the Petition Date, (c) the Official Committees and their respective members, agents, attorneys, accountants, financial advisors, restructuring consultants and investment bankers (but

24

specifically excluding L. Tersigni Consulting, Inc. (*"Tersigni Consulting"*), pending the outcome of the review of Tersigni Consulting's professional fees and expenses in the Reorganization Cases by the United States Trustee and the Office of the United States Attorney for the District of Delaware), (d) the Future Claimants Representative and his agents, attorneys, accountants, financial advisors, restructuring consultants and investment bankers, and (e) the holders of Noteholder Claims, holders of Bank Claims, the Administrative Agent and the Sureties, together in each case with all of their respective successors, officers, directors, employees, agents, attorneys, accountants, financial advisors, restructuring consultants and investment bankers.

   **1.1.184.** *Remuneration Fund* has the meaning given to it in paragraph 32.3 of the Principal CVAs.

   **1.1.185.** *Remuneration Reserve* has the same meaning as in the Principal CVAs.

   **1.1.186.** *Reorganization Cases* means the cases currently pending under Chapter 11 of the Bankruptcy Code of Federal-Mogul and its affiliated Debtors before the Bankruptcy Court.

   **1.1.187.** *Reorganized Federal-Mogul* means Federal-Mogul on and after the Effective Date, as reorganized pursuant to the Plan. *Reorganized Debtor* or *Reorganized [name of Debtor]* shall have the same meaning with reference to the particular Debtor identified. In each instance, and unless a successor entity is specified, the Reorganized Debtor shall consist of the same legal entity as the corresponding Debtor, but subject to the terms and conditions of the Plan, including, without limitation, the discharge, release and Injunctions under Article IX of the Plan, and, except as provided in Article IV of the Plan, each Reorganized Debtor shall have and incur no successor liability with respect to Claims or Demands that may have existed prior to Confirmation of the Plan.

   **1.1.188.** *Reorganized Federal-Mogul Class A Common Stock* shall have the meaning set forth in the Amended and Restated Certificate of Incorporation of Federal-Mogul Corporation which is attached as Exhibit 8.3.12(1) to the Plan.

   **1.1.189.** *Reorganized Federal-Mogul Class B Common Stock* shall have the meaning set forth in the Amended and Restated Certificate of Incorporation of Federal-Mogul Corporation which is attached as Exhibit 8.3.12(1) to the Plan.

   **1.1.190.** *Reorganized Federal-Mogul Common Stock* means the shares of Reorganized Federal-Mogul Class A Common Stock and Reorganized Federal-Mogul Class B Common Stock to be distributed pursuant to the Plan.

   **1.1.191.** *Reorganized Federal-Mogul Junior Secured PIK Notes* means the junior secured PIK Notes to be issued by Reorganized Federal-Mogul pursuant to the Plan on account of the Allowed Class B Bank Claims and the Allowed Class C Surety Claims, in the original principal amount of $305,236,000.00. The principal terms and conditions of the Reorganized Federal-Mogul Junior Secured PIK Notes are set forth in Exhibit 1.1.191 to the Plan.

**1.1.192.** *Reorganized Federal-Mogul Secured Term Loan Agreement* means the loan agreement among Reorganized Federal-Mogul, the holders of Allowed Class 1B Bank Claims and the Administrative Agent, and the Sureties, in the principal amount of $1,326,661,117.90 (as adjusted as of the Effective Date to convert any foreign currencies to U.S. dollars) plus the amount of any draws prior to the Effective Date on letters of credit outstanding under the Bank Credit Agreement. The principal terms and conditions of the Reorganized Federal-Mogul Secured Term Loan Agreement are set forth in Exhibit 1.1.192 to the Plan. The then-current form of the Reorganized Federal-Mogul Secured Term Loan Agreement shall be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing as a supplement to Exhibit to 1.1.192 to the Plan.

**1.1.193.** *Reorganized T&N* means T&N on and after the Effective Date, as reorganized pursuant to the Plan.

**1.1.194.** *Repayment Percentage* means (a) unless and until the Swiss Re Settlement becomes effective in accordance with its terms, the percentage of the amount actually recoverable under the Hercules Policy within the Hercules Coverage in respect of CVA Asbestos Claims that are established pursuant to paragraph 19.5 of the Principal CVAs and/or Debtor HPE Asbestos Claims that are established pursuant to Section 4.5.9; and (b) after the Swiss Re Settlement becomes effective in accordance with its terms, 94.25%.

**1.1.195.** *Review Date* has the same meaning as in the Hercules Payment Agency Agreement.

**1.1.196.** *Schedules* means the Schedules, Statements and Lists filed by the Debtors with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been and may be amended or supplemented from time to time.

**1.1.197.** *Secured* means, with respect to any Claim, including, without limitation, Bank Claims, Surety Claims (other than the unsecured Surety Claims against T&N and GHI), and any Claim on the part of Federal-Mogul against T&N which was secured on the Loan Notes immediately before they were sold by T&N to Federal-Mogul and Federal Mogul (Continental European Operations) Limited pursuant to an Agreement dated December 9, 2005 made between T&N, the Administrators of T&N, Federal-Mogul (Continental European Operations) Limited and Federal-Mogul, a Claim that is (a) secured in whole or in part as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or other applicable law, or (b) subject to setoff under Section 553 of the Bankruptcy Code or other applicable law, but, with respect to both (a) and (b) above, only to the extent of the value of the holder of such Claim's interest in the particular Estate's interest in the property securing any such Claim or the amount subject to setoff, as the case may be.

**1.1.198.** *Settling Asbestos Insurance Company* means each Asbestos Insurance Company listed on Exhibit 1.1.198 (as the same may be amended from time to time, including following entry of the Confirmation Order) and any other Asbestos Insurance Company that enters into an Asbestos Insurance Settlement Agreement that is determined by the District Court to justify treating such Asbestos Insurance Company as a Protected Party.

26

**1.1.199.** ***Stock Repayment Obligation*** shall have the meaning set forth in Section 4.5.5(b).

**1.1.200.** ***Subordinated Securities Claim*** means a Claim subject to subordination under Section 510(b) of the Bankruptcy Code, including, without limitation, any Claim that arises from the rescission of a purchase or sale of a security of any of the Debtors (including, without limitation, the Notes and the existing Federal-Mogul common and preferred stock classified below in Classes 1M and 1O), or for damages arising from the purchase or sale of such a security, or for reimbursement, indemnification, or contribution allowed under Section 502 of the Bankruptcy Code on account of such Claim.

**1.1.201.** ***Subsidiary*** has the meaning given to that term by Section 736 of the Companies Act 1985 of the United Kingdom, as amended from time to time.

**1.1.202.** ***Supersedeas Bond Action*** means any rights, defenses, counterclaims or affirmative causes of action of the Debtors, Reorganized Federal-Mogul, or the other Reorganized Debtors with respect to a Bonded Claim, or with respect to any supersedeas bond or other form of security or payment assurance issued in connection with a Bonded Claim, or against the issuer or insurer of any payment assurance issued in connection with a Bonded Claim.

**1.1.203.** ***Supplemental Injunction*** means the injunction described in Section 9.3.1 of the Plan.

**1.1.204.** ***Sureties*** means Travelers Casualty and Surety Company of America (***"Travelers"***), SAFECO Insurance Company of America (***"Safeco"***), and National Fire Insurance Company of Hartford and Continental Casualty Company (collectively, ***"CNA"***), as issuers of the CCR Surety Bonds. Any reference to the "Sureties" in the Plan shall be strictly limited to Travelers, Safeco, and CNA in their capacity as issuers of the CCR Surety Bonds, and shall not refer to any or all of Travelers, Safeco, and/or CNA in any other capacity.

**1.1.205.** ***Surety Claims*** means the Allowed Secured (and, in the case of T&N and GHI, unsecured) Claims of the Sureties in the aggregate amount of $28.0 million, as compromised and settled under the terms set forth in the Surety Claims Settlement Agreement. The Surety Claims and all consideration to be distributed under the Plan on account of the Surety Claims shall be allocated as follows: Safeco: $8.7 million; CNA: $8.7 million; Travelers in its capacity as successor in interest to Reliance Insurance Company: $5.3 million; and Travelers: $5.3 million.

**1.1.206.** ***Surety Claims Settlement Agreement*** means that certain Stipulation and Agreement for Compromise and Settlement of Secured Surety Claims, for Treatment Thereof Under Third Amended Joint Plan of Reorganization, and Related Matters as approved by a Final Order of the Bankruptcy Court entered on March 16, 2005.

**1.1.207.** ***Swiss Re Settlement*** means the terms of the settlement of the proceedings brought by European International Reinsurance Company Limited in the English Court against Curzon and the settlement agreement between Curzon and T&N dated 16 January 2004.

27

**1.1.208.**   *T&N* means T&N Limited, a company incorporated in England and Wales.

**1.1.209.**   *T&N Fund* has the same meaning as in the Principal CVAs.

**1.1.210.**   *T&N Hercules Fund* means the fund established under the U.K. Asbestos Trust to hold those Hercules Recoveries referred to in Section 4.5.12(c) *Seventhly* (ii)(2), the assets or investments derived from those recoveries from time to time, and all accumulations of income on or arising from those assets.

**1.1.211.**   *T&N Hercules Fund Costs* has the same meaning as in the Principal CVAs.

**1.1.212.**   *T&N Pension Plan* means the T&N Retirement Benefits Scheme (1989), a defined benefit plan operated by certain of the U.K. Debtors for eligible employees, and the trustees thereof from time to time.

**1.1.213.**   *Third Party Injunction* means the injunction described in Section 9.3.2 of the Plan.

**1.1.214.**   *Thornwood* means Thornwood Associates Limited Partnership, a Delaware limited partnership.

**1.1.215.**   *Trust* means the trust established pursuant to the Trust Agreement and in accordance with Section 524(g) of the Bankruptcy Code, which is a "qualified settlement fund" pursuant to Section 468B of the IRC and the regulations issued pursuant thereto.

**1.1.216.**   *Trust Advisory Committee* or *TAC* means that committee appointed and serving in accordance with Section 4.13.1 of the Plan and having the powers, duties and obligations set forth in the Trust Agreement.

**1.1.217.**   *Trust Agreement* means that certain Asbestos Personal Injury Trust Agreement, effective as of the Confirmation of the Plan, substantially in the form of Exhibit 1.1.217 to the Plan.

**1.1.218.**   *Trust Assets* means the following assets and any income, profits and proceeds derived from such assets subsequent to the transfer of such assets to the Trust: (a) the Reorganized Federal-Mogul Class B Common Stock to be distributed to the Trust pursuant to the Plan, (b) the Asbestos Insurance Actions and the Asbestos Insurance Action Recoveries attributable to any Asbestos Personal Injury Claims, (c) the Asbestos Insurance Settlement Agreements attributable to any Asbestos Personal Injury Claims, other than such agreements attributable to the Hercules Policy, (d) the Asbestos In-Place Insurance Coverage, (e) the Trust Causes of Action and (f) any and all other funds, proceeds or other consideration otherwise contributed to the Trust pursuant to the Plan and/or the Confirmation Order. For the avoidance of doubt, Trust Assets do not include FMP's rights relating to benefits and proceeds of insurance with respect to amounts paid and costs incurred by FMP prior to October 1, 2001 in connection with Pneumo Asbestos Claims under (x) Section 5.1 of the Pneumo Settlement Agreement (as defined in the Plan B Settlement Agreement), (y) Section 11.6 of the 1994 APA (including the

28

insurance Agreement, as defined therein), and (z) Section 5.25 of the 1998 PSA to the extent such benefits and proceeds of insurance exceed $3,200,000 in the aggregate, and Trust Assets shall include any such benefits and proceeds of insurance that aggregate $3,200,000 or less.

**1.1.219.**   *Trust Causes of Action* means any and all of the actions, claims, rights, defenses, counterclaims, suits and causes of action of the Debtors (other than, prior to the Hercules Policy Expiry Date, the Hercules-Protected Entities and other than any such actions, claims, rights, defenses, counterclaims, suits and causes of action with respect to the EL Coverage), whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction attributable to: (a) all defenses to any Asbestos Personal Injury Claim, including, but not limited to, all defenses under Section 502 of the Bankruptcy Code, (b) with respect to any Asbestos Personal Injury Claim, all rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted, and (c) subject to the provisions of the Plan, any other claims or rights with respect to Asbestos Personal Injury Claims that the Debtors (other than, prior to the Hercules Policy Expiry Date, the Hercules-Protected Entities and other than any such claims or rights with respect to the EL Coverage) would have had under applicable law if the Reorganization Cases had not occurred and the holder of such Asbestos Personal Injury Claim had asserted it by initiating civil litigation against any such Debtor. Notwithstanding the foregoing, Trust Assets and Trust Causes of Action shall not include (x) any of the Debtors' rights arising under or attributable to the Supersedeas Bond Actions, (y) the property, rights or assets, if any, of the Debtors which were previously used to secure or obtain a supersedeas bond with respect to any Allowed Bonded Claim and which are recoverable or recovered by the Debtors after the full satisfaction of such claim or (z) any claim, cause of action, or right of the Debtors or any of them, under the laws of any jurisdiction, for reimbursement, indemnity, contribution, breach of contract or otherwise arising from or relating to any payments made by the Debtors on account of Asbestos Personal Injury Claims prior to the Petition Date.

**1.1.220.**   *Trust Claim* shall have the meaning set forth in Section 4.5.2 of the Plan.

**1.1.221.**   *Trust Documents* means the Trust Agreement, the Asbestos Personal Injury Trust Distribution Procedures and all other agreements, instruments and documents governing the establishment, administration and operation of the Trust, which shall be substantially in the form set forth in the Plan, as they may be amended or modified from time to time in accordance with the Plan and the Trust Agreement.

**1.1.222.**   *Trust Expenses* means any Asbestos Personal Injury Expenses and any other liabilities, costs or expenses of, or imposed upon, or in respect of, the Trust (except for payments to holders of Asbestos Personal Injury Claims on account of such Claims). Trust Expenses shall also expressly include, without limitation, (a) any and all liabilities, costs and expenses incurred subsequent to the Confirmation of the Plan in connection with any and all Asbestos Insurance Actions, or any similar claim, cause of action or right of Reorganized T&N against Curzon and/or the Reinsurers, in each case whether or not any such action results in a recovery for the Trust, (b) the Trust's proportionate share of all liabilities, costs and expenses

incurred by the Reorganized Debtors in taking any action on behalf of or at the direction of the Trustees, if any, including, without limitation, any costs and expenses incurred by the Reorganized Debtors in connection with any action involving an Asbestos Insurance Policy or the Hercules Policy, and (c) to the extent as may be required by Section 4.5.13 of the Plan, the fees and costs incurred by GHI or Ferodo incurred after the Effective Date and any award of costs against either GHI or Ferodo entered after the Effective Date in connection with any litigation concerning GHI's or Ferodo's interest in or right to any Hercules Policy proceeds. Notwithstanding anything to the contrary, Trust Expenses shall include any and all amounts due under any indemnity provided by the Trust pursuant to the Plan.

**1.1.223.**   *Trustees* means the Persons appointed pursuant to Section 4.12 of the Plan for the purpose of acting as trustees of the Trust in accordance with the terms and conditions contained in the Trust Documents, the Plan and the Confirmation Order.

**1.1.224.**   *U.K. Asbestos Trust* means the trust established or to be established pursuant to the Principal CVAs for the benefit of holders of CVA Asbestos Claims against certain of the U.K. Debtors.

**1.1.225.**   *U.K. Asbestos Trust Documents* has the same meaning as in the Principal CVAs.

**1.1.226.**   *U.K. Asbestos Trust Percentage* means 7.14% or such other percentage as may be agreed from time to time under Section 4.5.14.

**1.1.227.**   *U.K. Asbestos Trustee* means The T&N Asbestos Trustee Company Limited, which is or shall be the trustee of the U.K. Asbestos Trust and whose board of directors as at the U.K. Effective Date shall be made up of James Gleave, Anne O'Keefe and one independent director, or such other person who may be appointed as the trustee of the U.K. Asbestos Trust from time to time.

**1.1.228.**   *U.K. Court* means any court of competent jurisdiction in any part of the United Kingdom.

**1.1.229.**   *U.K. Debtors* means, for purposes of this Plan, those Debtors so listed in footnote 1 of the Plan for which a plan of reorganization is proposed as part of this Plan.

**1.1.230.**   *U.K. Effective Date* means "Effective Date" as defined by the Principal CVAs.

**1.1.231.**   *U.K. Global Settlement Agreement* means that certain Agreement between Federal-Mogul, T&N Limited, the other Plan Proponents, High River Limited Partnership, the Administrators, and the PPF filed with the Bankruptcy Court on September 26, 2005, as approved by the Bankruptcy Court by a Final Order entered on November 15, 2005.

**1.1.232.**   *United Kingdom Tax* means United Kingdom corporation tax or other tax chargeable in the United Kingdom.

**1.1.233.** *United Kingdom Taxpayer* means any member of the Federal-Mogul Group (as defined in the Principal CVAs) which is subject to United Kingdom Tax.

**1.1.234.** *United States Trustee* means the Office of the United States Trustee for the District of Delaware.

**1.1.235.** *Unsecured Claim* means any Claim against one or more of the Debtors (regardless of whether such Claim is covered by insurance), not specifically included in a separately identified Class of Claims or Equity Interests, and to the extent that such Claim is neither secured nor entitled to priority under applicable law.  Unsecured Claims shall expressly include, without limitation, (a) any claim arising from the rejection of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code, (b) any portion of a Claim to the extent the value of the holder's interest in the applicable Estate's interest in the property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to Section 506(a) of the Bankruptcy Code, (c) Other U.K. Claims (including, specifically, Off-Site Environmental Claims against any U.K. Debtors), (d) any unsecured deficiency claims held by the holders of Bonded Non-Asbestos Claims, (e) Asbestos Property Damage Claims against any U.S. Debtors to the extent that such Claims are not Bonded Claims, (f) Excluded Non-Qualified Pension Claims, (g) Off-Site Environmental Claims, (h) Other Cooper Claims, and (i) Claims arising from the provision of goods or services to the Debtors prior to the Petition Date, including the Claims of commercial trade creditors.  Unless otherwise specifically provided in an applicable provision of the Plan, Unsecured Claims shall not include (i) Administrative Claims, (ii) Priority Claims, (iii) Bank Claims, (iv) Surety Claims, (v) Noteholder Claims, (vi) Other Secured Claims, (vii) On-Site Environmental Claims, (viii) Non-Priority Employee Benefit Claims, (ix) Asbestos Personal Injury Claims, (x) Bonded Claims, (xi) Affiliate Claims, (xii) Pneumo Parties Claims, and (xiii) Equity Interests.

**1.1.236.** *Unsecured Creditors Committee* means the Official Committee of Unsecured Creditors of the Debtors appointed in the Reorganization Cases by the United States Trustee.

**1.1.237.** *U.S. Asbestos Trust Percentage* means 88.10% or such other percentage as may be agreed from time to time under Section 4.5.14.

**1.1.238.** *U.S. Debtors* means those Debtors so listed in footnote 1 of the Plan.

**1.1.239.** *VAT* means value added tax chargeable in accordance with the Value Added Tax Act 1994 of the United Kingdom and any substantially similar tax that may replace it.

**1.1.239A.** *Vellumoid Claim* means any Federal-Mogul Vellumoid Asbestos Claim, as that term is defined in the CIP Agreement.

**1.1.240.** *Warrants* means the warrants for the purchase of Reorganized Federal Mogul Common Stock which are to be issued by Reorganized Federal Mogul pursuant to the Plan and the warrant agreement attached hereto as Exhibit 1.1.240 to the Plan.

**1.2.   Other Terms.** Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine and neuter. The word "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and are not limited to any particular article, section, subsection, or clause contained in the Plan. Any capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require. Whenever used in the Plan, the terms "officer," "director," or "agent" shall not include the Administrators. The rules of construction set forth in Section 102 of the Bankruptcy Code shall also apply in construing and interpreting the provisions of the Plan.

**1.3.   Deemed Acts.** Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

**1.4.   Exhibits.** All Plan Documents, to the extent not annexed hereto, shall be contained in a separate Appendix of Plan Documents, which shall be filed with the Clerk of the Bankruptcy Court not later than a date to be established by the Bankruptcy Court. The Plan Documents shall be made available for review, inspection, and copying at the expense of the party in interest, either (a) through posting on the Internet at http://www.fmoplan.com or (b) during normal business hours at the office of Debtors' counsel, as follows:

Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000

**ARTICLE II**
**TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS**

**2.1.   Allowed Administrative Claims.** Except (i) to the extent that any holder agrees to different treatment and (ii) with respect to compensation or reimbursement of expenses of professionals to the extent allowed by the Bankruptcy Court under Sections 328, 330(a) or 331 of the Bankruptcy Code (which shall be addressed in accordance with Section 2.5 of the Plan), on the Distribution Date, each holder of an Allowed Administrative Claim against any of the Debtors shall receive Cash equal to the Allowed Amount of its Administrative Claim in full satisfaction, settlement, release, extinguishment and discharge of such Claim; provided, however, that Allowed Administrative Claims representing (a) liabilities incurred on or after the Petition Date in the ordinary course of business by the Debtors and (b) postpetition contractual liabilities arising under loans or advances to the Debtors, including, but not limited to the DIP Facility, whether or not incurred in the ordinary course of business, shall be paid by Reorganized Federal-Mogul or the applicable Reorganized Debtor, in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto, subject to the provisions set forth in Section 2.2 of the Plan. Each Allowed Administrative Claim shall be paid from, and to the extent of available assets of, the respective Debtor's Estate to which such Claim applies or has been allocated, and thereafter to the extent of any insufficiency, from funds advanced to the relevant Debtor by the Estate of Federal-Mogul.

32

**2.2.     No Double Payment of Administrative Claims.**  To the extent that an Administrative Claim is Allowed against the Estate of more than one Debtor, there shall be only a single recovery on account of such Allowed Claim.  In addition, to the extent any amount that would otherwise constitute an Administrative Claim is paid under the CVA of any U.K. Debtor (other than an Administrative Claim for the professional fees, costs and expenses in the Reorganization Cases of any of the U.K. Debtors), the payment under the CVA shall be the only payment on account of such Claim.

**2.3.     Special Provisions Relating to United States Customs and Border Protection.** Notwithstanding any provision in the Plan or Confirmation Order to the contrary; (1) the Allowed Administrative Claim of the United States Customs and Border Protection ( *"Customs"*) shall be paid in full in Cash on the Effective Date to the extent the Administrative Claim of Customs is Allowed on the Effective Date, provided, however, that to the extent that the Administrative Claim of Customs becomes Allowed after the Effective Date, it shall be paid in full in Cash as soon as practicable after it is Allowed; (2) interest shall accrue on the Allowed Administrative, Allowed Priority Tax and Allowed Secured Claims of Customs to the extent required by applicable law at a rate and method which is either mutually agreed in writing by Customs and the Debtors, or in the case of disagreement, to the extent adjudicated by the Bankruptcy Court; (3) Confirmation of the Plan shall not affect any rights of Customs against the sureties, or the rights of the sureties against Customs, with respect to any Customs bonds that secure payment of any of Customs' claims; and (4) to the extent permitted by applicable bankruptcy and nonbankruptcy law, Confirmation of the Plan shall not extinguish any rights of Customs to assert setoff or recoupment with respect to any of its Allowed prepetition and post-petition claims against any amounts owed to the Debtors by the United States.  Notwithstanding anything to the contrary in this provision or elsewhere in the Plan or Confirmation Order, the Debtors reserve the right to object to and defend against any and all Claims asserted by Customs.

**2.4.     Priority Tax Claims.**  Except to the extent that any holder agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive on account of such Claim deferred cash payments, over a period not exceeding six years after the date of assessment of each such Claim, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Priority Tax Claim.  Each Allowed Priority Tax Claim shall be paid from, and to the extent of available assets of, the respective Debtor's Estate against which such Claim is asserted, and thereafter to the extent of any insufficiency, from funds advanced to the relevant Debtor by the Estate of Federal-Mogul; provided, however, that Federal-Mogul's Estate shall not be obligated to advance funds for the payment of Priority Tax Claims, if any, against any Debtor for which a Plan is not confirmed.

**2.5.     Treatment of Claims for Payment or Reimbursement of Professional Fees and Expenses.**  All final requests for compensation or reimbursement of the fees of any professional employed in the Reorganization Cases pursuant to Section 327 or 1103 of the Bankruptcy Code or otherwise, including any Claims for making a substantial contribution under Section 503(b)(4) of the Bankruptcy Code, must be filed and served on the Reorganized Debtors and their counsel, together with the Bankruptcy Court-appointed fee auditor, the Office of the United States Trustee, counsel to each of the other Plan Proponents, and counsel to the administrative agent under the Exit Facilities, not later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such

professionals or other entities for compensation or reimbursement of expenses must be filed and served on the parties specified above in this Section 2.5 and the requesting professional or other entity not later than twenty (20) days after the date on which the applicable application for compensation or reimbursement was served; provided, however, that, in lieu of such twenty (20) day objection deadline, the following protocol shall apply to the fee auditor previously appointed by the Bankruptcy Court in the Reorganization Cases:

      (i)    if the fee auditor has any questions for any applicant, the fee auditor may communicate such questions in writing to the applicant in an initial report (an *"Initial Report"*) within forty-five (45) days after the date on which the applicable application for compensation or reimbursement was served on the fee auditor;

      (ii)    any applicant who receives such an Initial Report and wishes to respond thereto shall respond within thirty (30) days after the date of the Initial Report and shall serve upon the fee auditor via e-mail a response in an electronic format such as Microsoft Word, WordPerfect, or Excel, but not Adobe Acrobat;

      (iii)    within thirty (30) days after the date on which any response to an Initial Report is served on the fee auditor (or, if no such response is served, within thirty (30) days after the deadline for serving such Initial Report has passed), the fee auditor shall file with the Court a final report with respect to each such application for compensation or reimbursement; and

      (iv)    within twenty (20) days after the date of the final report, the subject applicant may file with the Court a response to such final report.

Notwithstanding the foregoing, the fee auditor and a professional may agree to extend any of the time periods set forth in items (i) through (iv) above with respect to any application filed by such professional.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

    Summary. Pursuant to Sections 1122 and 1123 of the Bankruptcy Code, Claims and Equity Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation and distribution pursuant to the Plan, as set forth herein. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. Other than Asbestos Personal Injury Claims, a Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

    **ALLOWED CLAIMS HELD AGAINST ONE DEBTOR WILL BE SATISFIED SOLELY FROM THE CASH AND ASSETS OF SUCH DEBTOR AND ITS ESTATE, PROVIDED THAT, TO THE EXTENT OF ANY INSUFFICIENCY, FUNDS MAY BE ADVANCED TO THE RELEVANT DEBTORS BY THE ESTATE OF FEDERAL-MOGUL. EXCEPT AS SPECIFICALLY SET FORTH HEREIN, NOTHING IN THE**