(c)     Voting: Class 15H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 15H Claim is entitled to vote to accept or reject the Plan.

### 3.15.3.     Class 15I – Non-Priority T&N Pension Plan Employee Benefit Claims

(a)     Classification: Class 15I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against Bradford.

(b)     Treatment: Each holder of an Allowed Class 15I Claim shall receive the treatment afforded to such Claim under the CVA proposed for Bradford by the Administrators in the U.K. administration proceedings of Bradford.

(c)     Voting: Class 15I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 15I Claim is entitled to vote to accept or reject the Plan.

### 3.15.4.     Class 15J - Asbestos Personal Injury Claims

(a)     Classification: Class 15J consists of all Asbestos Personal Injury Claims against Bradford as to which the holder has not made an election to assert such Claim against T&N as principal and to have such Claim included in Class 6J.

(b)     Treatment: As of the Effective Date, liability for all Class 15J Asbestos Personal Injury Claims shall automatically and without further act, deed or court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance. Additionally, on the Effective Date, the liability of Reorganized Bradford for each Class 15J Claim shall continue but recourse to the assets of Reorganized Bradford in respect of such liability shall, by operation of the Plan, the CVA for Bradford, and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance. Upon the Hercules Policy Expiry Date and/or the EL Asbestos Insurance Expiry Date, Reorganized Bradford shall be, without further order of court, released and discharged from Class 15J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

(c)     Voting: Class 15J is impaired and each holder of a Class 15J Claim is entitled to vote to accept or reject the Plan.

### 3.15.5.     Class 15L - Affiliate Claims

(a)     Classification: Class 15L consists of all Affiliate Claims against Bradford, other than any such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

(b)     Treatment: All Affiliate Claims in Class 15L shall receive the treatment afforded to such Claims under the CVA proposed for Bradford in the U.K. administration

proceedings of Bradford.  If such Affiliate Claims are not compromised under the CVA proposed for Bradford, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Class 15L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against Bradford.  Any and all Class 15L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)     Voting: Class 15L is unimpaired and holders of Class 15L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.15.6.     Class 15P – Equity Interests

(a)     Classification: Class 15P consists of all Equity Interests in Bradford.

(b)     Treatment:  Each holder of an Allowed Equity Interest in Class 15P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)     Voting: Class 15P is unimpaired and holders of Class 15P Equity Interests are thus not entitled to vote to accept or reject the Plan.

## 3.16.   Federal-Mogul Camshafts Limited ("FM Camshafts") (Classes 16A – 16P)

### 3.16.1.     Class 16A - Priority Claims

(a)     Classification:  Class 16A consists of all Priority Claims against FM Camshafts, other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

(b)     Treatment:  Each holder of an Allowed Class 16A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)     Voting: Class 16A is unimpaired and holders of Class 16A Claims are thus not entitled to vote to accept or reject the Plan.

### 3.16.2.     Class 16H – Unsecured Claims

(a)     Classification:  Class 16H consists of all Unsecured Claims against FM Camshafts other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

    **(b)**    Treatment:  Each holder of an Allowed Class 16H Claim shall receive the treatment afforded to such Claim under the CVA proposed for FM Camshafts in the U.K. administration proceedings of FM Camshafts in full satisfaction of such Allowed Class 16H Claim.

    **(c)**    Voting:  Class 16H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 16H Claim is entitled to vote to accept or reject the Plan.

    **3.16.3.**    **Class 16I – Non-Priority T&N Pension Plan Employee Benefit Claims**

    **(a)**    Classification:  Class 16I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against FM Camshafts.

    **(b)**    Treatment:  Each holder of an Allowed Class 16I Claim shall receive the treatment afforded to such Claim under the CVA proposed for FM Camshafts in the U.K. administration proceedings of FM Camshafts.

    **(c)**    Voting:  Class 16I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 16I Claim is entitled to vote to accept or reject the Plan.

    **3.16.4.**    **Class 16L - Affiliate Claims**

    **(a)**    Classification:  Class 16L consists of all Affiliate Claims against FM Camshafts, other than any such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

    **(b)**    Treatment:  All Affiliate Claims in Class 16L shall receive the treatment afforded to such Claims under the CVA proposed for FM Camshafts in the U.K. administration proceedings of FM Camshafts.  If such Affiliate Claims are not compromised under the CVA proposed for FM Camshafts, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Class 16L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FM Camshafts.  Any and all Class 16L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

    **(c)**    Voting:  Class 16L is unimpaired and holders of Class 16L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.16.5.    Class 16P – Equity Interests

(a)    Classification: Class 16P consists of all Equity Interests in FM Camshafts.

(b)    Treatment: Each holder of an Allowed Equity Interest in Class 16P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)    Voting: Class 16P is unimpaired and holders of Class 16P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.17.    Federal-Mogul Eurofriction Limited ("FMEL") (Classes 17A – 17P)

#### 3.17.1.    Class 17A - Priority Claims

(a)    Classification: Class 17A consists of all Priority Claims against FMEL, other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

(b)    Treatment: Each holder of an Allowed Class 17A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)    Voting: Class 17A is unimpaired and holders of Class 17A Claims are thus not entitled to vote to accept or reject the Plan.

#### 3.17.2.    Class 17G -- On-Site Environmental Claims

(a)    Classification: Class 17G consists of all On-Site Environmental Claims against FMEL.

(b)    Treatment: Each holder of an Allowed On-Site Environmental Claim in Class 17G shall retain unaltered the legal, equitable and contractual rights to which such Allowed On-Site Environmental Claim entitles the holder.

(c)    Voting: Class 17G is unimpaired and holders of Class 17G Claims are thus not entitled to vote to accept or reject the Plan.

#### 3.17.3.    Class 17H – Unsecured Claims

(a)    Classification: Class 17H consists of all Unsecured Claims against FMEL other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

(b)    Treatment: Each holder of an Allowed Class 17H Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMEL in the U.K. administration proceedings of FMEL in full satisfaction of such Allowed Class 17H Claim.

(c)     Voting:  Class 17H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 17H Claim is entitled to vote to accept or reject the Plan.

### 3.17.4.     Class 17I – Non-Priority T&N Pension Plan Employee Benefit Claims

(a)     Classification:  Class 17I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against FMEL.

(b)     Treatment:  Each holder of an Allowed Class 17I Claim shall receive the treatment afforded to such Claim under the CVA proposed for FMEL in the U.K. administration proceedings of FMEL.

(c)     Voting:  Class 17I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 17I Claim is entitled to vote to accept or reject the Plan.

### 3.17.5.     Class 17J– Asbestos Personal Injury Claims

(a)     Classification:  Class 17J consists of all Asbestos Personal Injury Claims against FMEL as to which the holder has not made an election to assert such Claim against T&N as principal and to have such Claim included in Class 6J.

(b)     Treatment:  As of the Effective Date, liability for all Class 17J Asbestos Personal Injury Claims shall automatically and without further act, deed or court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Additionally, on the Effective Date, the liability of Reorganized FMEL for each Class 17J Claim shall continue but recourse to the assets of Reorganized FMEL in respect of such liability shall, by operation of the Plan, the CVA for FMEL, and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Upon the Hercules Policy Expiry Date and/or the EL Asbestos Insurance Expiry Date, Reorganized FMEL shall be, without further order of court, released and discharged from Class 17J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

(c)     Voting:  Class 17J is impaired and each holder of a Class 17J Claim is entitled to vote to accept or reject the Plan.

### 3.17.6.     Class 17L - Affiliate Claims

(a)     Classification:  Class 17L consists of all Affiliate Claims against FMEL, other than any such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

(b)     Treatment:  All Affiliate Claims in Class 17L shall receive the treatment afforded to such Claims under the CVA proposed for FMEL in the U.K. administration

proceedings of FMEL.  If such Affiliate Claims are not compromised under the CVA proposed for FMEL, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Class 17L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against FMEL.  Any and all Class 17L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)     Voting: Class 17L is unimpaired and holders of Class 17L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.17.7.     Class 17P – Equity Interests

(a)     Classification:  Class 17P consists of all Equity Interests in FMEL.

(b)     Treatment:  Each holder of an Allowed Equity Interest in Class 17P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

(c)     Voting:  Class 17P is unimpaired and holders of Class 17P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.18.     Federal-Mogul Powertrain Systems International Limited ("Powertrain") (Classes 18A – 18P)

### 3.18.1.     Class 18A - Priority Claims

(a)     Classification:  Class 18A consists of all Priority Claims against Powertrain, other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

(b)     Treatment:  Each holder of an Allowed Class 18A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

(c)     Voting:  Class 18A is unimpaired and holders of Class 18A Claims are thus not entitled to vote to accept or reject the Plan.

### 3.18.2.     Class 18H – Unsecured Claims

(a)     Classification:  Class 18H consists of all Unsecured Claims against Powertrain other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

85

**(b)** Treatment: Each holder of an Allowed Class 18H Claim shall receive the treatment afforded to such Claim under the CVA proposed for Powertrain in the U.K. administration proceedings of Powertrain in full satisfaction of such Allowed Class 18H Claim.

**(c)** Voting: Class 18H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 18H Claim is entitled to vote to accept or reject the Plan.

### 3.18.3. Class 18I – Non-Priority T&N Pension Plan Employee Benefit Claims

**(a)** Classification: Class 18I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against Powertrain.

**(b)** Treatment: Each holder of an Allowed Class 18I Claim shall receive the treatment afforded to such Claim under the CVA proposed for Powertrain in the U.K. administration proceedings of Powertrain.

**(c)** Voting: Class 18I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 18I Claim is entitled to vote to accept or reject the Plan.

### 3.18.4. Class 18L - Affiliate Claims

**(a)** Classification: Class 18L consists of all Affiliate Claims against Powertrain, other than such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

**(b)** Treatment: All Affiliate Claims in Class 18L shall receive the treatment afforded to such Claims under the CVA proposed for Powertrain in the U.K. administration proceedings of Powertrain. If such Affiliate Claims are not compromised under the CVA proposed for Powertrain, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents. If any such Class 18L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against Powertrain. Any and all Class 18L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

**(c)** Voting: Class 18L is unimpaired and holders of Class 18L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.18.5. Class 18P – Equity Interests

**(a)** Classification: Class 18P consists of all Equity Interests in Powertrain.

86

**(b)** Treatment: Each holder of an Allowed Equity Interest in Class 18P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

**(c)** Voting: Class 18P is unimpaired and holders of Class 18P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.19. TBA Industrial Products Limited ("TBA-IP") (Classes 19A – 19P)

#### 3.19.1. Class 19A - Priority Claims

**(a)** Classification: Class 19A consists of all Priority Claims against TBA-IP, other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6A.

**(b)** Treatment: Each holder of an Allowed Class 19A Claim shall retain unaltered the legal, equitable and contractual rights to which such Claim entitles the holder.

**(c)** Voting: Class 19A is unimpaired and holders of Class 19A Claims are thus not entitled to vote to accept or reject the Plan.

#### 3.19.2. Class 19H – Unsecured Claims

**(a)** Classification: Class 19H consists of all Unsecured Claims against TBA IP other than any Claims that are specifically included in any other Class and other than any Claim in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6H.

**(b)** Treatment: Each holder of an Allowed Class 19H Claim shall receive the treatment afforded to such Claim under the CVA proposed for TBA-IP in the U.K. administration proceedings of TBA-IP in full satisfaction of such Allowed Class 19H Claim.

**(c)** Voting: Class 19H is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 19H Claim is entitled to vote to accept or reject the Plan.

#### 3.19.3. Class 19I – Non-Priority T&N Pension Plan Employee Benefit Claims

**(a)** Classification: Class 19I consists of all Non-Priority T&N Pension Plan Employee Benefit Claims against TBA-IP.

**(b)** Treatment: Each holder of an Allowed Class 19I Claim shall receive the treatment afforded to such Claim under the CVA proposed for TBA-IP in the U.K. administration proceedings of TBA-IP.

**(c)** Voting: Class 19I is impaired and, subject to the terms of the Principal CVAs, each holder of an Allowed Class 19I Claim is entitled to vote to accept or reject the Plan.

### 3.19.4.    Class 19J – Asbestos Personal Injury Claims

(a)    Classification:  Class 19J consists of all Asbestos Personal Injury Claims against TBA-IP as to which the holder has not made an election to assert such Claim against T&N as principal and to have such Claim included in Class 6J.

(b)    Treatment:  As of the Effective Date, liability for all Class 19J Asbestos Personal Injury Claims shall automatically and without further act, deed or court order, be assumed by the Trust in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Additionally, on the Effective Date, the liability of Reorganized TBA-IP for each Class 19J Claim shall continue but recourse to the assets of Reorganized TBA IP in respect of such liability shall, by operation of the Plan, the CVA for TBA-IP, and the Confirmation Order, be limited in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan and the provisions relating to the Hercules Policy and any EL Asbestos Insurance.  Upon the Hercules Policy Expiry Date and/or the EL Asbestos Insurance Expiry Date, Reorganized TBA-IP shall be, without further order of court, released and discharged from Class 19J Asbestos Personal Injury Claims in accordance with and to the extent set forth in Article IV of the Plan, including specifically, without limitation, Section 4.5 of the Plan.

(c)    Voting:  Class 19J is impaired and each holder of a Class 19J Claim is entitled to vote to accept or reject the Plan.

### 3.19.5.    Class 19L - Affiliate Claims

(a)    Classification:  Class 19L consists of all Affiliate Claims against TBA-IP, other than any such Affiliate Claims in respect of which the holder has made an election to assert such Claim against T&N, as principal, under Class 6L.

(b)    Treatment:  All Affiliate Claims in Class 19L shall receive the treatment afforded to such Claims under the CVA proposed for TBA-IP in the U.K. administration proceedings of TBA-IP.  If such Affiliate Claims are not compromised under the CVA proposed for TBA-IP, then such Affiliate Claims shall be reinstated in full unless, at the option of the Plan Proponents, they are (a) reinstated in part, or (b) discharged and extinguished, in full or in part, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under the Plan; provided, however, that prior to such discharge and extinguishment such Affiliate Claims may be contributed to capital, transferred, setoff or subject to any other arrangement at the option of the Plan Proponents.  If any such Class 19L Claim is reinstated, in full or in part, such reinstated Claim may, at the option of the Plan Proponents, be subordinated in legal right and priority of payment to all non-Affiliate Claims against TBA-IP.  Any and all Class 19L Claims, or portions thereof, being reinstated and, to the extent, if any, that such Claims are being subordinated to non Affiliate Claims, are set forth in Exhibit 3.1.12.

(c)    Voting:  Class 19L is unimpaired and holders of Class 19L Claims are thus not entitled to vote to accept or reject the Plan.

### 3.19.6.   Class 19P – Equity Interests

**(a)**   Classification:  Class 19P consists of all Equity Interests in TBA-IP.

**(b)**   Treatment:  Each holder of an Allowed Equity Interest in Class 19P shall retain unaltered the legal, equitable and contractual rights to which such Allowed Equity Interest entitles the holder.

**(c)**   Voting:  Class 19P is unimpaired and holders of Class 19P Equity Interests are thus not entitled to vote to accept or reject the Plan.

### 3.20.   Remaining Debtors

The remaining U.S. Debtors and U.K. Debtors not listed above in Sections 3.1 through 3.19, inclusive, of the Plan, are either holding companies or have comparatively minimal business operations (and some or all of such Debtors may be designated as Inactive Debtor Subsidiaries).  Accordingly, in the interest of brevity and convenience, the classification of Claims against and Equity Interests in such remaining Debtors, as well as the treatment of such Claims and Equity Interests, are set forth in summary fashion in Exhibit 3.20 to the Plan with the same legal force and effect as if such classification and treatment terms and provisions were set forth at length herein.

<div align="center">

**ARTICLE IV**
**THE TRUST**

</div>

**4.1.**   **Establishment Of Trust**.  On the Effective Date, the Trust shall be established pursuant to Section 524(g) of the Bankruptcy Code.  The provisions of Sections 4.2, 4.3 and 4.4 hereof which follow shall take effect subject to, and only to the extent not inconsistent with, the provisions of Section 4.5 hereof.

**4.2.**   **Purpose of Trust**.

**4.2.1.**   The Trust shall on the Effective Date assume liability for all Asbestos Personal Injury Claims in accordance with the provisions of Section 4.4 hereof.  The Trust shall, in accordance with the Trust Documents, hold and administer the Trust Assets (including, without limitation, Asbestos In-Place Insurance Coverage), liquidate such Claims, and make distributions to holders of Asbestos Personal Injury Claims from the Trust Assets.  The Trust is a "qualified settlement fund" within the meaning of Section 468B of the IRC and the regulations promulgated thereunder.  The Asbestos Personal Injury Trust Distribution Procedures provide, among other things, for the resolution of Asbestos Personal Injury Claims pursuant to the terms of the Trust Documents, and that resolution of an Asbestos Personal Injury Claim by the Trust will result in a full or partial release of such Claim against the Trust as set forth in the Asbestos Personal Injury Trust Distribution Procedures.  The Trust shall pay Asbestos Personal Injury Claims in accordance with the Trust Documents.  In the event that an Indirect Asbestos Personal Injury Claim against the Debtors is disallowed pursuant to Section 502(e)(1)(B) of the Bankruptcy Code, the right of a holder of such disallowed Claim under applicable non-bankruptcy law to setoff payments by the Trust against such holder's liability to an asbestos personal injury claimant shall be preserved.  Additionally, the Trust shall advocate in any and all

<div align="center">89</div>

actions and proceedings brought against the Debtors and/or Reorganized Debtors which involve Debtor HPE Asbestos Claims that Debtor HPE Asbestos Claims shall be dealt with only in accordance with the terms of the Plan, and the Trust Documents shall provide that the Trust shall cooperate with the Debtors and/or Reorganized Debtors in any and all such actions and proceedings.

**4.2.2.**     For the avoidance of doubt, the Trust's assumption of liabilities to the extent and as set forth in the Plan, including the assumption of any Asbestos Personal Injury Claims against the Debtors, shall not be conditional on the occurrence of the Plan A Date or otherwise limited by anything in the Addendum.

**4.3.     Receipt Of Trust Assets**.  On the Effective Date, all Trust Assets shall be automatically and without further act or deed, transferred to, vested in and assumed by the Trust, subject to the notification requirements contained in Sections 10.3 and 10.5 of the Plan; provided, however, that to the extent that certain Trust Assets, because of their nature or because such assets will accrue or become transferable subsequent to the Effective Date, cannot be transferred to, vested in and assumed by the Trust on the Effective Date, such Trust Assets shall be automatically, and without further act or deed, transferred to, vested in and assumed by the Trust as soon as practicable after the Effective Date.

**4.4.     Discharge Of Liabilities To Holders Of Asbestos Personal Injury Claims**. Except as provided in the Plan (including, without limitation, the exceptions provided in Section 4.5 hereof and Section 9.3.2(b)(v) of the Plan concerning non-Debtor Affiliates), the transfer to, vesting in and assumption by the Trust of the Trust Assets as contemplated by the Plan shall, as of the Effective Date, discharge all obligations and liabilities of and bar recovery or any action against the Released Parties and their respective estates, Affiliates and subsidiaries, for or in respect of all Asbestos Personal Injury Claims and Demands, including, but not limited to, all Indirect Asbestos Personal Injury Claims and Demands against the Debtors, the Reorganized Debtors, and their respective Estates, Affiliates and subsidiaries (and the Confirmation Order shall so provide for such discharge).  Except as provided in Sections 8.22.3.2 and 4.5 hereof, the Trust shall as of the Effective Date assume sole and exclusive responsibility and liability for all Asbestos Personal Injury Claims, including, but not limited to, Indirect Asbestos Personal Injury Claims, against the Debtors, the Reorganized Debtors, and their respective Estates, Affiliates and subsidiaries and, also except as provided in Section 4.5 hereof, such Claims shall be paid by the Trust from the Trust Assets or as otherwise directed in the Trust Documents.  The Trust shall indemnify and hold the Reorganized Debtors and their non-Debtor Affiliates harmless from and against any and all Asbestos Personal Injury Claims, as well as all associated costs and expenses, to the extent set forth in Section 4.14 below.  Additionally, notwithstanding the foregoing and anything to the contrary in the Plan or the Trust Documents, each Reorganized Hercules-Protected Entity shall also be conclusively deemed to have suffered a loss (y) in the amount of any and all unreimbursed fees, costs and expenses incurred by such Reorganized Hercules-Protected Entity on and after the Effective Date in defending against Asbestos Personal Injury Claims and (z) in the amount of any unreimbursed fees, costs, expenses, indemnity payments, reimbursement amounts, additional premiums or other amounts paid by such Hercules-Protected Entity on and after the Effective Date related to the Hercules Policy or the EL Asbestos Insurance.  The Trust shall indemnify the applicable indemnitee(s) in respect of any such losses in full (without regard to any limitation in Section 4.14 below).

**4.5.** **Special Provisions Applicable to the Reorganized Hercules-Protected Entities**. Notwithstanding any other provisions of the Plan to the contrary, the following provisions regarding the Trust and certain Asbestos Personal Injury Claims shall apply to the Reorganized Hercules-Protected Entities:

**4.5.1.** On the Effective Date, the Trust will assume all liability for Asbestos Personal Injury Claims against the Reorganized Hercules-Protected Entities in excess of both (i) the Hercules Retention and the Hercules Coverage and (ii) all other sums as are attributable to or otherwise represent the Hercules Recoveries to the extent such amounts exceed the Hercules Coverage; provided, however, the Trust shall not assume liability for Asbestos Personal Injury Claims to the extent such Claims are covered by the indemnity provisions of the EL Asbestos Insurance (but shall assume such Claims to the extent they are in excess of the sums referred to in (i) and (ii) above and are not covered by the indemnity provisions of the EL Asbestos Insurance).

**4.5.2.** **Rights granted with the Trust Claim**

**(a)** Each holder of a Debtor HPE Asbestos Claim shall be entitled to a claim (a *"Trust Claim"*) against the Trust which shall be separate and distinct from the Debtor HPE Asbestos Claim.

**(b)** A Trust Claim shall confer, and be limited to conferring, on the holder thereof (y) the right to receive such payment, if any, as is offered or payable by the Trust in accordance with and subject to the terms of the Trust Documents, and (z) the right to pursue any remedies that the holder may have under the Trust Documents against the Trust in respect of the Trust Claim.

**(c)** For the avoidance of doubt, in the event that, for any reason, the Trust (y) has no funds enabling it to make any or any further payment(s) to the holder of any Trust Claim or (z) fails to make any or any further payment(s) to the holder of any Trust Claim which should have been made in accordance with the terms of the Trust Documents:

(i) the right of the holder of the Trust Claim remains strictly limited to asserting the Trust Claim, and any claim arising for failure to make payments in accordance with the terms of the Trust Documents may be asserted solely against the Trust; and

(ii) the terms and provisions of the Plan do not oblige, require or render liable the Debtors in any circumstances to make any payment to the holder of any Trust Claim or the Trust in respect of any sum due to the holder of a Trust Claim from the Trust.

**4.5.3.** **Responsibility for seeking recovery under Hercules Policy.** The Trust and the U.K. Asbestos Trustee shall be jointly responsible for seeking recovery under the Hercules Policy (in the case of the Trust, in accordance with and subject to the provisions of the power of attorney granted by Reorganized T&N pursuant to Section 4.5.11(a)) in a manner which does not contravene the terms of the Hercules Policy. In the event that the Trust and the U.K. Asbestos Trustee, acting reasonably, are nevertheless unable to agree on a particular matter

relating to the Hercules Policy, the English Court shall by Final Order resolve the dispute between them. In the event that the English Court declines for whatever reason to resolve the dispute between the Trust and the U.K. Asbestos Trustee or in the event that the Trust and the U.K. Asbestos Trustee agree that the matter should not be referred to the English Court, then the Trust acting reasonably shall have the exclusive right to determine the matter in question.

### 4.5.4. General provisions applicable to the Hercules Policy and the EL Asbestos Insurance

(a)   Nothing in the Plan or the Trust Documents shall require either expressly or implicitly the Hercules-Protected Entities or their appointed agents or representatives to act other than in accordance with and subject to the terms of the Hercules Policy or the EL Asbestos Insurance.

(b)   Nothing in the Plan or the Trust Documents is intended to affect the validity, effectiveness or terms of the Hercules Policy or the EL Asbestos Insurance, which shall continue to bind the Debtors that are parties thereto immediately after the Effective Date to the same extent as they did immediately before it.

### 4.5.5. Stock Repayment Obligation

(a)   On the Effective Date, the Trust will subscribe for 57.5% of the Reorganized Federal-Mogul Class B Common Stock for the subscription price of £338,000,000.00, such sum being left outstanding as a debt owing by the Trust to Reorganized Federal-Mogul.

(b)   Immediately following such subscription and the issue to the Trust (specifically, the T&N Worldwide Fund within the Trust), Reorganized Federal-Mogul hereby assigns and transfers and agrees to assign and transfer to Reorganized T&N by way of capital contribution all of its right, title and interest in and to such debt (the *"Stock Repayment Obligation"*).

(c)   The Stock Repayment Obligation shall be payable by offset, in whole or in part, upon notice by either Reorganized T&N to the Trust or by the Trust to Reorganized T&N in exercise of the option provided for by Section 4.5.10(a)(i), or shall be payable, in whole or in part, upon notice by the Trust to Reorganized T&N in exercise of the option provided for by Section 4.5.10(a)(ii). The Stock Repayment Obligation shall also be payable by offset as set forth in Section 4.5.21(b). To the extent not payable at any earlier date pursuant to Section 4.5.5, the Stock Repayment Obligation shall be payable 20 years after the Effective Date.

### 4.5.6. Limited Recourse to assets of Reorganized Hercules-Protected Entities.
On and from the Effective Date until discharge and release under Section 4.5.20 of the Plan, any liability of the Reorganized Hercules-Protected Entities for Asbestos Personal Injury Claims (including for the avoidance of doubt CVA Asbestos Claims) and any costs and interest due or which may become due in relation thereto shall continue in full, but recourse to the assets of the Reorganized Hercules-Protected Entities in respect of such liabilities shall, by operation of the Plan, be limited in and to the assets of the relevant Reorganized Hercules-Protected Entity as

specifically referred to in Section 4.5.10(b) and shall otherwise be without recourse as to the relevant Reorganized Hercules-Protected Entities or any of their assets.

### 4.5.7.    Assignment of rights

(a)    With effect from the Effective Date, and pursuant to the Plan, each holder of a Debtor HPE Asbestos Claim hereby assigns and agrees to assign to the Trust his rights to the proceeds of his Debtor HPE Asbestos Claim (whenever such rights may arise).

(b)    With effect from the Effective Date, each holder of a Debtor HPE Asbestos Claim hereby assigns and agrees to assign to Reorganized T&N, all 1930 Act Rights (whenever arising) in respect of or in connection with the Hercules Policy or to the extent that such holder has already assigned or agreed to assign the same under the Principal CVAs, such holder hereby confirms and ratifies such assignment or agreement to assign).

(c)    Each holder of a Debtor HPE Asbestos Claim against a Reorganized Hercules-Protected Entity undertakes with Reorganized T&N that he will not commence or continue any proceedings against Curzon in exercise or purported exercise of his 1930 Act Rights in respect of the Hercules Policy or otherwise.

(d)    Reorganized T&N shall hold the benefit of the undertaking given in Section 4.5.7(c) on trust for itself and Curzon such that Curzon shall be entitled to enforce the provisions of Section 4.5.7(c) directly against each such holder of a Debtor HPE Asbestos Claim.

(e)    Reorganized T&N shall not, after the assignment of 1930 Act Rights or the agreement to assign 1930 Act Rights has taken effect pursuant to Section 4.5.7(b) or the Principal CVAs, assign or otherwise encumber or transfer those 1930 Act Rights or the entitlement to receive the proceeds of those 1930 Act Rights, including, without limitation, its entitlement to receive Hercules Recoveries (other than its entitlement to receive Hercules Recoveries from the Trust and/or the U.K. Asbestos Trustee pursuant to Section 4.5.12(c)).

### 4.5.8.    Appointment of the Trust as agent to assert Claims

(a)    From and after the Effective Date, each holder of a Debtor HPE Asbestos Claim irrevocably appoints the Trust as his agent, in the name of such holder or otherwise, to assert such Debtor HPE Asbestos Claim against the Reorganized Hercules-Protected Entity in any appropriate forum, and such holder shall not be entitled to assert such holder's Debtor HPE Asbestos Claim except through the agency of the Trust.  To the extent permitted by law, this appointment shall remain in full force and effect notwithstanding the death, bankruptcy or insolvency of such holder.  This appointment shall be in addition and without prejudice to the authority conferred by any power of attorney given by the holder of a Debtor HPE Asbestos Claim to the Trust pursuant to the Trust Documents.

(b)    Each holder of a Debtor HPE Asbestos Claim shall do such acts and things and execute such deeds and documents and in particular such forms of assignment, transfer or assurance as the relevant assignee in Sections 4.5.7(a) or 4.5.7(b) may from time to time require to vest in such assignee fully and effectively all the rights assigned or to perfect or evidence the vesting in such assignee of the same.  Holders of Trust Claims shall cooperate with the Trust in

the assertion of Debtor HPE Asbestos Claims against Reorganized T&N or any of the other Reorganized Hercules-Protected Entities. Each such holder hereby unconditionally appoints the Trust to be his agent and on his behalf to do such acts and things and execute such documents as may be required to give effect to this Section 4.5.8(b). Without prejudice to the above assignments, if and to the extent that any interest in any such right as is hereby assigned does not for any reason immediately vest fully and effectively in the assignee, the same shall be held by the said holder absolutely on trust for the Trust or Reorganized T&N (as the case may be) until it does so vest.

        **(c)**    The Trust shall indemnify each holder of a Debtor HPE Asbestos Claim against any costs that may be awarded against such holder in any legal proceedings brought by the Trust on behalf of such holder.

        **(d)**    Without prejudice to the Trust's assertion on behalf of the holder of a Debtor HPE Asbestos Claim of his rights against the applicable Reorganized Hercules-Protected Entity in respect of that holder's particular Debtor HPE Asbestos Claim, no sum received in respect of a Trust Claim shall reduce or extinguish the liability of the applicable Reorganized Hercules-Protected Entity in respect of the Debtor HPE Asbestos Claim.

        **(e)**    The Reorganized Hercules-Protected Entities shall, subject to and in accordance with the provisions of the Hercules Policy including, without limitation, the claims handling rights of Curzon and/or the Reinsurers (whatever they may be), retain the right to assert any defenses, counterclaims, offsets, rights of contribution or any other rights and remedies for the purpose of reducing or defeating their liability for any Debtor HPE Asbestos Claim.

        **(f)**    Without prejudice to the foregoing and in recognition of Curzon and/or the Reinsurers' asserted claims handling rights:

        (i)    the Reorganized Hercules-Protected Entities will, to the extent required by the Hercules Policy, refer Debtor HPE Asbestos Claims to Curzon and/or the Reinsurers or its or their appointed claims handling designee for the further administration, defense and disposition of the Debtor HPE Asbestos Claims and Curzon and/or the Reinsurers will be entitled to exercise all claims handling rights under the Hercules Policy in relation to such proceedings, including defense or settlement of the Debtor HPE Asbestos Claim; and

        (ii)    the claim of the holder of a Debtor HPE Asbestos Claim against the Reorganized Hercules-Protected Entities (acting by his agent the Trust) shall be allowed to proceed in the ordinary course to judgment or settlement, but the holder of a Debtor HPE Asbestos Claim (acting by his agent the Trust) shall not be permitted to enforce any judgment or settlement except in accordance with the provisions of Sections 4.5.6 and 4.5.10(b).

        **(g)**    Any rights of the holder of a Debtor HPE Asbestos Claim to payment from the Trust in respect of a Trust Claim shall be determined solely under and in accordance with the Trust Documents.

**4.5.9.        Establishment of Asbestos Personal Injury Claims.** A Debtor HPE Asbestos Claim is established for the purpose of this Section 4.5.9 when it is established as owing by a Reorganized Hercules-Protected Entity by final judgment or award of a court or arbitrator of competent jurisdiction or when (to the extent required by the Hercules Policy, with the consent of Curzon and/or the Reinsurers, as applicable) an agreement is entered into between the holder of a Debtor HPE Asbestos Claim (acting by his agent the Trust) and the applicable Reorganized Hercules-Protected Entity under which the Debtor HPE Asbestos Claim is so established. CVA Asbestos Claims shall be established pursuant to the Principal CVAs.

**4.5.10.        Satisfaction of or non-enforcement of established Asbestos Personal Injury Claims**

(a)        Once a Debtor HPE Asbestos Claim has been established pursuant to Section 4.5.9, or a CVA Asbestos Claim has been established pursuant to the Principal CVAs, the liability of any Reorganized Hercules-Protected Entity concerned in respect of that Claim, and in respect of any costs and interest due or which may become due in relation thereto, may only be satisfied and discharged by payment or deemed payment to the Trust or the U.K. Asbestos Trustee, as applicable, as agent of the holder of the Claim, as follows:

(i)        (at the option of either the Trust or Reorganized T&N, and notwithstanding that the obligation to the Trust is in its capacity as agent of the holder of that Claim against the Reorganized Hercules-Protected Entity) by setting off against the liability in respect of an established Debtor HPE Asbestos Claim an equivalent amount of the Stock Repayment Obligation (provided that, if the Reorganized Hercules-Protected Entity is not Reorganized T&N, such set off shall not be effected without the prior written consent of Reorganized Federal-Mogul) and in order to effect such set-off, where such consent is given, Reorganized T&N hereby agrees to assign and transfer, for no consideration and at the time that the option is exercised (or, if later, at the time that such consent is given), to the applicable Reorganized Hercules-Protected Entity such part of the Stock Repayment Obligation as is equal to the Debtor HPE Asbestos Claim that has been so established;

(ii)        (at the option of the Trust) by the Trust paying the whole or part of the Stock Repayment Obligation to Reorganized T&N for the purpose of enabling Reorganized T&N to satisfy, or (with the prior written consent of Reorganized Federal-Mogul) to arrange for the relevant Reorganized Hercules-Protected Entity to satisfy, the liability (any such sum to be received and held by Reorganized T&N in trust for that purpose);

(iii)        by payment by the relevant Reorganized Hercules-Protected Entity out of funds made available (whether by loan or in any other manner agreed between Reorganized Federal-Mogul and the Trust and/or the U.K. Asbestos Trustee) to:

(1)        Reorganized T&N, or

95

(2)      (with the prior written consent of Reorganized Federal-Mogul) any other Reorganized Hercules-Protected Entity other than Reorganized T&N,

by the Trust and/or U.K. Asbestos Trustee and/or any other person for the purpose of satisfying any Debtor HPE Asbestos Claims that have been established pursuant to Section 4.5.10 and/or any CVA Asbestos Claims that have been established pursuant to the Principal CVAs; or

(iv)     by payment out of any Hercules Recoveries payable and to be applied under Section 4.5.12(a) *Secondly* or *Thirdly.*

**(b)**     There shall be no recourse to the assets of any Reorganized Hercules-Protected Entity in respect of any Asbestos Personal Injury Claim that may be established against it except (i) to the whole or any part of the Stock Repayment Obligation by way of set-off in accordance with Section 4.5.10(a)(i), (ii) to the proceeds of the repayment of the whole or any part of the Stock Repayment Obligation in accordance with Section 4.5.10(a)(ii), (iii) to the funds made available to the relevant other Reorganized Hercules-Protected Entity in accordance with Section 4.5.10(a)(iii), or (iv) by payment out of the Hercules Recoveries in accordance with Section 4.5.10(a)(iv).

**(c)**     Any loan made by the Trust and/or the U.K. Asbestos Trustee for the purpose mentioned in Section 4.5.10(a)(iii) shall:

(i)     be made to Reorganized T&N or any other Reorganized Hercules-Protected Entity provided that, if the Reorganized Hercules-Protected Entity is not Reorganized T&N, the loan shall not be made except with the prior written consent of Reorganized Federal-Mogul;

(ii)     be made free of interest;

(iii)     be repayable only to the extent of the Repayment Percentage of the principal amount advanced in respect of the relevant Debtor HPE Asbestos Claim or CVA Asbestos Claim; and

(iv)     be repayable only from Hercules Recoveries actually recovered and that are to be applied in accordance with the provisions of Section 4.5.12(a) First, but shall otherwise be without recourse to the assets of the Reorganized Hercules-Protected Entity in question.

**(d)**     It is acknowledged that any benefit derived by a Reorganized Hercules-Protected Entity from the limited recourse provisions in this Section 4.5.10 and in Section 4.5.6 and the indemnities in favor of any Reorganized Hercules-Protected Entity contained in Sections 4.4 and 4.14 are conferred voluntarily upon the relevant Reorganized Hercules-Protected Entity and that it is for the exclusive benefit of that Reorganized Hercules-Protected Entity and not in any respect for the benefit of any insurer.

(e)     To the extent that any Debtor HPE Asbestos Claim has been established and is payable to the Trust in a currency other than British Pounds Sterling, and the liability is to be satisfied by setting off the sum due against the Stock Repayment Obligation, such Debtor HPE Asbestos Claim shall be converted at the London Spot Mid-Point Rate prevailing on the date when the set-off is made or, if such date is not a Business Day, on the previous Business Day, as published in the Financial Times of London.

### 4.5.11.     Process of making Hercules Recoveries

(a)     Reorganized T&N shall, by the Effective Date, provide the Trust with a power of attorney in the form of Exhibit 4.5.11 to enable the Trust to take all necessary and/or appropriate steps (subject to the indemnity contained in Section 4.14.5) to pursue Hercules Recoveries in respect of Debtor HPE Asbestos Claims (but not to receive any payments thereof, except as may be permitted by Section 4.5.12) including the giving of any instructions to the Hercules Payment Agents (being instructions which are not inconsistent with the terms of the Plan).  For the avoidance of doubt, Reorganized T&N shall not be obliged to incur any Hercules Recovery Costs in pursuing any claim against Curzon under the Hercules Policy other than those incurred on its behalf through the use of the power of attorney referred to above and for which it is indemnified under the indemnity contained in Section 4.14.5.

(b)     The Trust and the U.K. Asbestos Trustee shall cooperate with one another in order to give effect to the split of Hercules Recoveries as is provided for in Section 4.5.12.

(c)     If the holder of a Debtor HPE Asbestos Claim receives any Hercules Recoveries in respect of such Claim, he shall hold such Hercules Recoveries in trust for the purposes set out in Section 4.5.12(a) and shall pay such Hercules Recoveries to the credit of the Hercules Receipt Account on demand.

(d)     As soon as practicable after the Effective Date, the Trust shall (i) accede to the Hercules Payment Agency Agreement by executing an accession deed substantially in the form set out in Schedule 1 to the Hercules Payment Agency Agreement (ii) use all reasonable endeavors to procure that the Trust shall become an account holder of the Hercules Waterfall Account jointly with the U.K. Asbestos Trust.

(e)     In addition to the foregoing, paragraphs 19.7.4 through 19.7.7 of the Principal CVAs are hereby incorporated by reference as if fully set forth herein, but with any necessary changes and as if each reference to a CVA Asbestos Claim were a reference to a Debtor HPE Asbestos Claim.

### 4.5.12.     Division of Hercules Recoveries – Hercules waterfall

(a)     All Hercules Recoveries shall be paid to the credit of the Hercules Receipt Account and shall be held by Reorganized T&N in trust to be applied:

> *First*: in reduction or discharge of any indebtedness (i) of Reorganized T&N under any loans made to Reorganized T&N, or (ii) of any Reorganized Hercules-Protected Entity (other than Reorganized T&N) under any loans made, with the prior written consent of Reorganized Federal-Mogul, to such Reorganized

Hercules-Protected Entity, in each case by the Trust and/or U.K. Asbestos Trustee for the purpose of satisfying Debtor HPE Asbestos Claims that have been established pursuant to Section 4.5.9 and/or for the purpose of satisfying CVA Asbestos Claims that have been established pursuant to the provisions of the Principal CVAs;

*Secondly*: in or towards satisfaction of any liability of Reorganized T&N or, with the prior written consent of Reorganized Federal-Mogul, of any Reorganized Hercules-Protected Entity other than Reorganized T&N, for Debtor HPE Asbestos Claims that have been established pursuant to Section 4.5.9 and/or for CVA Asbestos Claims that have been established pursuant to the provisions of the Principal CVAs and (in each case) for any costs and interest due in relation thereto; and

*Thirdly*: in payment to:

(i)     the Trust on account of and in reduction or discharge of any Debtor HPE Asbestos Claims:

(1)     that may be established in the future against Reorganized T&N or, with the prior written consent of Reorganized Federal-Mogul, of any Debtor HPE Asbestos Claims that may be established in the future against any Reorganized Hercules-Protected Entity other than Reorganized T&N, in each case pursuant to Section 4.5.9, or

(2)     for which Reorganized T&N or any other Hercules Protected Entity could but for such payment otherwise have become liable; and/or

(ii)     the U.K. Asbestos Trustee on account of and in reduction or discharge of any CVA Asbestos Claims:

(1)     that may be established in the future against Reorganized T&N or, with the prior written consent of Reorganized Federal-Mogul, of any CVA Asbestos Claims that may be established in the future against any Reorganized Hercules-Protected Entity other than Reorganized T&N, in each case pursuant to the provisions of the Principal CVAs, or

(2)     for which Reorganized T&N or any other Hercules-Protected Entity could but for such payment otherwise have become liable;

such payments to be dealt with in accordance with Section 4.5.12(c).

(b)     The application of Hercules Recoveries provided for by Section 4.5.12(a) shall be effected by the transfer of the Hercules Recoveries from the Hercules Receipt Account to the Hercules Waterfall Account by the end of the Business Day upon which they are received in cleared funds to the credit of the Hercules Receipt Account (or as soon thereafter as is practicable) and such transfer shall upon being made (automatically and without any further action on the part of Reorganized T&N) repay the indebtedness or satisfy the liabilities or be paid on account of Debtor HPE Asbestos Claims or CVA Asbestos Claims as provided for by

Section 4.5.12(a) in the order of application set out therein to the extent of the Hercules Recoveries so transferred.

(c) The Trust (when it has become into existence and has become an accountholder of the Hercules Waterfall Account) and the U.K. Asbestos Trustee shall hold the Hercules Recoveries standing to the credit of the Hercules Waterfall Account, including any interest and other income accruing thereon from time to time, in trust to be applied on each Review Date (or, if there has been a commutation or settlement of the Hercules Policy, as soon as practicable after transfer of the Hercules Recoveries to the Hercules Waterfall Account representing the proceeds of commutation or settlement), as follows:

*First*: (subject to Section 4.5.18) in or towards satisfaction of those sums due to the Hercules Payment Agents representing remuneration or expenses from time to time due to or payable by the Hercules Payment Agents pursuant to the provisions of the Hercules Payment Agency Agreement;

*Secondly*: in or towards reimbursement on a pari passu basis to (i) Reorganized T&N or any other Hercules-Protected Entity of any sum actually paid by it that remains outstanding representing Hercules Claims Handling Costs (save that Reorganized T&N or the relevant Hercules-Protected Entity shall not seek reimbursement of, or, as the case may be, shall give credit for, any VAT charged to it on such sum to the extent recoverable and actually recovered by it) and (ii) Reorganized T&N of any sum actually paid by Reorganized T&N representing Hercules Recovery Costs that remains outstanding;

*Thirdly*: in or towards reimbursement on a pari passu basis (a) to the Trust of any sum actually paid by it to Reorganized T&N or any other Hercules-Protected Entity that remains outstanding in respect of those liabilities referred to in Section 4.5.12(c) *Secondly* pursuant to any indemnity or similar obligation of the Trust (whether pursuant to Section 4.14.6 or otherwise) and (b) to the U.K. Asbestos Trustee of any sum actually paid by it to Reorganized T&N or any other Hercules-Protected Entity that remains outstanding in respect of the liabilities referred to in Section 4.5.12(c) *Secondly* pursuant to any indemnity or similar obligation of the U.K. Asbestos Trustee (whether pursuant to paragraphs 16.2(e) or 28 of the Principal CVAs or otherwise);

*Fourthly*: in or towards reimbursement on a pari passu basis (i) to the Trust of (aa) any sum actually paid by it that remains outstanding representing Hercules Claims Handling Costs not included in Section 4.5.12(c) *Thirdly*, (save that the Trust shall not seek reimbursement of, or, as the case may be, shall give credit for, any VAT on such sum to the extent recoverable and actually recovered by it) and (bb) any sum actually paid by it that remains outstanding representing Hercules Recovery Costs not included in Section 4.5.12(c) *Thirdly*, and (ii) to the U.K. Asbestos Trustee of (aa) any sum actually paid by it that remains outstanding representing Hercules Claims Handling Costs not included in Section 4.5.12(c) *Thirdly*, (save that the U.K. Asbestos Trustee shall not seek reimbursement of, or, as the case may be, shall give credit for, any VAT on such sum to the extent

recoverable and actually recovered by it) and (bb) any sum actually incurred by it that remains outstanding representing Hercules Recovery Costs not included in Section 4.5.12(c) *Thirdly*. To the extent that either the Trust or the U.K. Asbestos Trustee pay Hercules Claims Handling Costs or Hercules Recovery Costs out of their own assets (or, in the case of the U.K. Asbestos Trustee, such sums are paid out of the Remuneration Reserve or the Remuneration Fund), they shall be entitled to recover an amount equal to such Hercules Claims Handling Costs or Hercules Recovery Costs pursuant to this Section 4.5.12(c) *Fourthly* as if such amount were Hercules Claims Handling Costs or Hercules Recovery Costs which remained outstanding;

*Fifthly*: in or towards establishing a reasonable reserve to meet remuneration which will fall due, and expenses which the Hercules Payment Agents have forecast are likely to be incurred by the Hercules Payment Agents, pursuant to the provisions of the Hercules Payment Agency Agreement in the period of 6 months following the relevant or (as the case may be) the last Review Date, to the extent not already reserved by a previous determination;

*Sixthly*: in or towards establishing a reasonable reserve to meet Hercules Claims Handling Costs and Hercules Recovery Costs which the Hercules Payment Agents, in consultation with Reorganized T&N, the Trust and the U.K. Asbestos Trustee have forecast are likely to be incurred by any of Reorganized T&N, any other Hercules-Protected Entity, the Trust or the U.K. Asbestos Trustee in the period of 6 months following the relevant or (as the case may be) the last Review Date to the extent not already reserved by a previous determination; and

*Seventhly*, as to the balance of Hercules Recoveries available on the date of application under this Section 4.5.12(c):

(i)     if it is determined pursuant to Section 4.5.13 that either or both of GHI or Ferodo are entitled to Hercules Recoveries, in payment to the Trust of an amount equal to:

(1)     21% of the balance if both GHI and Ferodo are determined to be so entitled,

(2)     17% of the balance if only GHI is determined to be so entitled, or

(3)     4% of the balance if only Ferodo is determined to be so entitled,

or, in each case, such other percentage as may be agreed between the Trust and the U.K. Asbestos Trustee; and

(ii)     as to the remaining balance, in payment of:

(1)     the U.S. Asbestos Trust Percentage of such balance, first, to Reorganized Federal-Mogul in payment of any amounts owing to it under any indemnity

contained in the Plan given by the Trust to Reorganized Federal-Mogul and, secondly, to the Trust;

(2)     the U.K. Asbestos Trust Percentage of such balance to the U.K. Asbestos Trustee (with any sums so paid forming part of the assets of the T&N Hercules Fund); and

(3)     the Chester Street Percentage of such balance to the U.K. Asbestos Trustee, with any sums so paid forming part of the assets of the Chester Street Hercules Fund.

**4.5.13.     Possible entitlement of GHI and Ferodo to Hercules Recoveries.** The amount of the Hercules Recoveries to which:

**(a)**     T&N (or the holders of 1930 Act Rights in respect of T&N), and

**(b)**     either or both of GHI and Ferodo,

are entitled between and among them shall be determined by the English Court by Final Order or agreed by the relevant parties and any application for directions commenced by the Administrators of T&N to seek such determination may be continued by the Supervisors following the discharge of the Administration Order in respect of T&N.  Hercules Recoveries to which either or both of GHI and Ferodo and/or the holders of Asbestos Personal Injury Claims against GHI or Ferodo are determined to be entitled (not being payments made under Section 4.5.12(c) *Seventhly* (i)) shall be paid to the Hercules Receipt Account to be applied in accordance with Section 4.5.12(a).

**4.5.14.    Alteration of the Chester Street Percentage.** Paragraph 19.10 of the Principal CVAs is hereby incorporated by reference as if fully set forth herein (but with any necessary changes).

**4.5.15.    Loans to Reorganized Hercules-Protected Entities.** Paragraph 19.11 of the Principal CVAs is hereby incorporated by reference as if fully set forth herein (but with any necessary changes).

**4.5.16.    Hercules U.S. Holding Account.** Paragraph 19.12 of the Principal CVAs is hereby incorporated by reference as if fully set forth herein (but with any necessary changes).

**4.5.17.    Investment of Hercules Recoveries.** Paragraph 19.13 of the Principal CVAs is hereby incorporated by reference as if fully set forth herein (but with any necessary changes).

**4.5.18.    Payment of tax on interest.** Paragraph 19.14 of the Principal CVAs is hereby incorporated by reference as if fully set forth herein, except that the reference to CVAs in paragraph 19.14.3 of the Principal CVAs shall be deemed to be a reference to the Plan (but with any necessary changes).

**4.5.19.    Certain Recoveries under the Hercules Policy**

(a)    To the extent that:

(i)    any Hercules-Protected Entity (other than a U.K. Debtor party to the Principal CVAs or Ferodo or GHI) is sued or otherwise pursued on a liability or alleged liability (other than with respect to a Non-CVA Asbestos Claim) for which coverage is provided under the Hercules Policy, or

(ii)    any Hercules-Protected Entity is sued or otherwise pursued in respect of a Non-CVA Asbestos Claim for which coverage is provided under the Hercules Policy (unless the holder of such claim has made an election under paragraph 19.17 of the Principal CVAs for his Non-CVA Asbestos Claim to be treated as if it were a CVA Asbestos Claim), subject to Section 4.5.19(c), Reorganized T&N shall be entitled (but not required), at Reorganized T&N's own cost (which cost shall not be liable to be reimbursed whether under Section 4.5.12(c) or otherwise), to seek and obtain coverage for such liability under or with respect to the Hercules Policy and retain the proceeds thereof. This is subject to the proviso, however, that Reorganized T&N shall pay to the Hercules Payment Agents (and the Hercules Payment Agents shall pay to the U.K. Asbestos Trustee) any and all proceeds paid on account of such liability by Curzon less the following amounts that may be retained by Reorganized T&N, namely:

(iii)    the amount (if any) to which GHI and Ferodo would have been entitled had Section 4.5.12(c) *Seventhly* applied to such proceeds, and

(iv)    an amount equal to the U.S. Asbestos Trust Percentage of the balance of such proceeds.

102

Reorganized T&N's rights under this Section 4.5.19(a) shall not prevent a commutation or settlement of the Hercules Policy (subject to and in accordance with Section 4.5.21) if the Trust and the U.K. Asbestos Trustee agree to a commutation or settlement with Curzon and the Reinsurers.  Reorganized T&N's rights under this Section 4.5.19(a) shall be extinguished on such commutation or settlement and the Trust and the U.K. Asbestos Trustee shall have no obligation to consult Reorganized T&N in relation to any such commutation or settlement.

     **(b)**    The proceeds received by the U.K. Asbestos Trustee pursuant to Section 4.5.19(a) shall be divided between the T&N Hercules Fund and the Chester Street Hercules Fund in the ratio that the U.K. Asbestos Trust Percentage bears to the Chester Street Percentage respectively.

     **(c)**    In exercising its rights under Section 4.5.19(a), Reorganized T&N shall in good faith (a) consult with the Trust and the U.K. Asbestos Trustee and give consideration to their views and (b) give the Trust and the U.K. Asbestos Trustee reasonable notice of its intention to commence any legal proceedings against either or both of Curzon or the Reinsurers (or of any legal proceedings which either or both of Curzon or the Reinsurers take against Reorganized T&N in consequence of its exercise of its rights under Section 4.5.19(a)) and shall provide the Trust and the U.K. Asbestos Trustee with copies of such documents as they may reasonably require in relation to any such proceedings.  Nothing in this Section 4.5.19(c) shall oblige Reorganized T&N to provide the Trust or the U.K. Asbestos Trustee with documents that are privileged or documents the provision of which might reasonably be expected to prejudice its case in any proceedings.

     **4.5.20.**    **Discharge of liability for Debtor HPE Asbestos Claims and CVA Asbestos Claims**

     **(a)**    From and after the Hercules Policy Expiry Date,

     (i)    the Trust will assume sole and exclusive liability for all remaining Asbestos Personal Injury Claims (whether then existing or at any time in the future coming into existence) against the Reorganized Hercules-Protected Entities (other than Claims covered by the indemnity provisions of the EL Asbestos Insurance, to the extent so covered);

     (ii)    the Reorganized Hercules-Protected Entities shall automatically and without further order of court be discharged and released from any and all liability with respect to Asbestos Personal Injury Claims (whether then existing or at any time in the future coming into existence and other than Claims covered by the indemnity provisions of the EL Asbestos Insurance, to the extent so covered); and

     (iii)    all rights of the Reorganized Hercules-Protected Entities to assert any defenses, counterclaims, offsets, rights of contribution or similar rights and remedies for the purpose of reducing or defeating any Asbestos Personal Injury Claim (whether then existing or at any time in the future coming into existence and other than Claims covered by the indemnity provisions of the EL Asbestos Insurance, to the extent so

covered) shall be transferred from the Reorganized Hercules-Protected Entities to the Trust.

(b)     With effect from the later of the Hercules Policy Expiry Date and the EL Asbestos Insurance Expiry Date:

(i)     the Trust will assume sole and exclusive liability for all remaining Asbestos Personal Injury Claims (whether then existing or at any time in the future coming into existence) against the Reorganized Hercules-Protected Entities;

(ii)    the Reorganized Hercules-Protected Entities shall be automatically and without further order of court discharged and released from any and all liability with respect to such remaining Asbestos Personal Injury Claims (whether then existing or at any time in the future coming into existence);

(iii)   all rights of the Reorganized Hercules-Protected Entities to assert any defenses, counterclaims, offsets, rights of contribution, or similar rights and remedies for the purpose of reducing or defeating any such remaining Asbestos Personal Injury Claim (whether then existing or at any time in the future coming into existence) shall be transferred from the Reorganized Hercules-Protected Entities to the Trust; and

(iv)    Reorganized T&N agrees to assign to the Trust and to the U.K. Asbestos Trustee any interest that it may have in the Hercules Recoveries transferred to the Hercules Waterfall Account pursuant to Section 4.5.12 (but without prejudice to its right to receive any sums due to it under the applications set out in Section 4.5.12).

### 4.5.21.   Commutation

(a)     The Trust and the U.K. Asbestos Trustee may jointly negotiate with Curzon and/or the Reinsurers for the commutation of the Hercules Policy or settlement of claims thereunder.  If requested to do so by the Trust and the U.K. Asbestos Trustee, Reorganized T&N will enter into any agreement with Curzon and/or the Reinsurers reasonably required to give effect to such commutation or settlement.  Any such agreement may extinguish Reorganized T&N's rights to receive recoveries under the Hercules Policy under Section 4.5.19.  This Section 4.5.21(a) is subject to the provisos:

(i)     that Reorganized T&N shall not be required to enter into any such agreement unless the effect of the commutation or settlement is in the reasonable opinion of Reorganized Federal-Mogul Tax Neutral in the United Kingdom to Reorganized T&N and to each of the Hercules-Protected Entities, and

(ii)    that the Trust shall not agree to any such commutation or settlement unless

(1)     in the reasonable opinion of Reorganized Federal-Mogul the effect of the commutation or settlement is Globally Tax Neutral to Reorganized Federal-Mogul, each Subsidiary of Reorganized Federal-Mogul and any other Hercules-Protected Entity (an "*FMC Entity*");

(2)     if any portion of the Stock Repayment Obligation is then outstanding, then the commutation or settlement operates in satisfaction of all rights and obligations of both Curzon and T&N under the Hercules Policy and, prior to or contemporaneously with such commutation or settlement, the Stock Repayment Obligation then outstanding is fully extinguished; and

(3)     any portion of the Stock Repayment Obligation that is so extinguished is, in the reasonable opinion of Reorganized Federal-Mogul, extinguished in a manner such that no liability for tax (including, without limitation, any liability for tax arising in connection with any absolute or timing mismatch for any tax purpose) would arise for any FMC Entity in connection with the Stock Repayment Obligation (including, without limitation, the operation of Sections 4.5.5, 4.5.10, and 4.5.21 of the Plan).

(b)     If any portion of the Stock Repayment Obligation is outstanding at the time of any commutation or settlement, the Trust and Reorganized T&N may agree upon a final accounting of all remaining Debtor HPE Asbestos Claims (whether established through settlements, or otherwise pursuant to Section 4.5.9, but in each case excluding Claims covered by the indemnity provisions of the EL Asbestos Insurance, to the extent so covered) against Reorganized T&N or, with the prior consent of Reorganized Federal-Mogul against any Reorganized Hercules Protected Entity other than T&N, and, subject to Section 4.5.21(a), any agreement for the commutation of the Hercules Policy or settlement of claims thereunder may provide for the reduction by offset of the Stock Repayment Obligation against the amounts that were so agreed, such reduction to take effect contemporaneously with any such commutation or settlement and immediately prior to the discharge set forth in Section 4.5.20 of the Plan.

(c)     In addition to the foregoing, paragraphs 19.19.2 through 19.19.16 (with the exception of paragraph 19.19.16(c)) of the Principal CVAs are hereby incorporated by reference as if those paragraphs were fully set forth herein (save to the extent that any provision in those paragraphs imposes any obligation on Federal-Mogul that as at the Effective Date has already been performed), and as if terms used therein which are defined in the Principal CVAs had the meanings ascribed to them in the Principal CVAs, but with the following changes:

(i)     the reference to paragraph 19.7.1 in paragraph 19.19.9(c) of the Principal CVAs shall be substituted by a reference to Section 4.5.11 of the Plan; and

(ii)     the references to paragraphs 19.15.1 and 19.15.2 in paragraph 19.19.10 of the Principal CVAs shall be substituted by references to Sections 4.5.19(a) and 4.5.19(b) of the Plan respectively.

**4.6.     Special Provisions Relating to CVA Asbestos Claims**.  As set forth in Sections 4.2 and 4.5 of the Plan, the Trust shall assume liability for all Asbestos Personal Injury Claims, including, without limitation, CVA Asbestos Claims.  The Trust, however, shall direct all CVA Asbestos Claims to the U.K. Asbestos Trust for resolution in accordance with the Principal CVAs.  The treatment of and payments to the holders of CVA Asbestos Claims by the U.K. Asbestos Trust in accordance with the Principal CVAs shall be the sole treatment and payments available to the holders of CVA Asbestos Claims.  Such treatment and payments shall be deemed

to be treatment and payments by the Trust, and the holders of CVA Asbestos Claims shall have no other rights against the Trust or entitlement to any payments from the Trust.

4.7.    **The Swiss Re Settlement**.  All holders of Asbestos Personal Injury Claims against Reorganized T&N shall be deemed to approve and be bound by the Swiss Re Settlement and (notwithstanding Section 4.5.9) agree that any 1930 Act Rights respecting the Hercules Policy or otherwise shall be limited in the same way and to the same extent as Reorganized T&N's rights under the Hercules Policy are limited by the Swiss Re Settlement as if each and every holder of an Asbestos Personal Injury Claim against Reorganized T&N had entered into the Swiss Re Settlement on the same terms mutatis mutandis as Reorganized T&N.  This approval shall constitute formal approval to the entry by T&N into the settlement agreement between Curzon and T&N dated 16 January 2004 for the purpose of clause 2.1(iii) of that agreement.  Confirmation of the Plan shall constitute approval of the Swiss Re Settlement pursuant to section 1123(b) of the Bankruptcy Code.

4.8.    **Extension of Injunctions to Curzon and/or Its Reinsurers**.  After Confirmation of the Plan through and including the Effective Date, in the event that any commutation of or settlement of claims under the Hercules Policy is reached, the Debtors shall have the ability, with the consent of the Asbestos Claimants Committee and the Future Claimants Representative, to extend the provisions of the Supplemental Injunction and the Asbestos Insurance Entity Injunction so that those injunctions cover Curzon and/or its Reinsurers.

4.9.    **Investment Guidelines**.  Pursuant to Section 3.2 of the Trust Agreement, all monies held in the Trust shall be invested, subject to the investment limitations and provisions enumerated in the Trust Agreement, and shall not be limited to the types of investments described in Section 345 of the Bankruptcy Code.

4.10.   **Excess Trust Assets**.  To the extent there are any Trust Assets remaining at such time as the Trust is terminated, such excess Trust Assets shall be transferred to such charitable purposes as the Trustees, in their reasonable discretion, shall determine, provided that, if practicable, the charity or charities to which such excess Trust Assets are transferred shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos-related lung disorders.

4.11.   **Trust Expenses**. The Trust shall pay all Trust Expenses from the Trust Assets as provided in the Trust Documents, including proceeds of applicable Asbestos Insurance Policies, except to the extent such assets are precluded by agreement with an Asbestos Insurance Company from being used for payment of Trust Expenses.  Neither the Debtors' Estates nor the Reorganized Debtors shall have any obligation to pay any Trust Expenses.  Additionally, the Trust shall promptly pay all Trust Expenses of Reorganized Debtors for any and all liabilities, costs or expenses incurred in taking any action on behalf of or at the direction of the Trustees.

4.12.   **Selection Of The Initial Trustees**.  The three initial Trustees of the Trust shall be the persons identified in the Trust Agreement.  All successor Trustees shall be appointed in accordance with the terms of the Trust Agreement. For purposes of performing their duties and fulfilling their obligations under the Trust Agreement and the Plan, each Trustee shall be deemed

to be (and the Confirmation Order shall so provide) a "party in interest" within the meaning of Section 1109(b) of the Bankruptcy Code.

### 4.13. Advising The Trust.

**4.13.1.    The Trust Advisory Committee.** The Trust Advisory Committee shall be established pursuant to the Trust Agreement. The TAC shall have four members and shall have the functions, duties and rights provided in the Trust Agreement. On or before the Confirmation Date, the four initial members of the TAC shall be selected by the Asbestos Claimants Committee.

**4.13.2.    Successor Committee Members.** Each member of the Trust Advisory Committee shall serve in accordance with the terms and conditions contained in the Trust Agreement.

**4.13.3.    Future Claimants Representative.** From and after the Effective Date, the Future Claimants Representative shall continue to serve in that capacity as an advisor to the Trust.

### 4.14. Trust Indemnity Obligations. 

Notwithstanding anything to the contrary in the Trust Documents, the Trust shall have the indemnification obligations set forth in Article IV of the Plan, including, without limitation, the indemnification obligations set forth below.

**4.14.1.**

**(a)**     Except as provided in section 4.14.2 below with respect to Non-Debtor Asbestos Claims against any non-Debtor Affiliates, if, on or after the Effective Date, the Reorganized Debtors and/or any of their non-Debtor Affiliates are held liable for any Asbestos Personal Injury Claim that is not for any reason successfully dealt with in accordance with the terms of the Plan and the Trust Documents or the CVAs (as the case may be), and if such Asbestos Personal Injury Claim is asserted in the United States, then the Trust shall indemnify the Reorganized Debtors and/or any of their non-Debtor Affiliates, as applicable, in full for any loss, cost, fees or expenses incurred in connection with such Asbestos Personal Injury Claim.

**(b)**     Except as provided in 4.14.2 below with respect to Non-Debtor Asbestos Claims, if, on or after the Effective Date, the Reorganized Debtors and/or any of their non-Debtor Affiliates are held liable for any Asbestos Personal Injury Claim that is not for any reason successfully dealt with in accordance with the terms of the Plan and the Trust Documents or the CVAs (as the case may be), and if such Asbestos Personal Injury Claim is asserted outside of the United States, then the Trust shall indemnify the Reorganized Debtors and/or any of their non-Debtor Affiliates, as applicable, in an amount equal to (i) the value of such Asbestos Personal Injury Claim as determined by settlement or judgment times (ii) the applicable payment percentage under the Asbestos Personal Injury Trust Distribution Procedures. For purposes of determining the amount of indemnification due under this Section 4.14 and only for such purpose, the value of such Asbestos Personal Injury Claim as set forth in (i) shall be the amount of any settlement or judgment plus all costs of defenses and expenses related to such Asbestos Personal Injury Claim. Notwithstanding anything to the contrary, if the Asbestos Personal Injury Claim for which indemnity is due under this Section 4.14 is an Other Asbestos Disease (Disease

Level I – Cash Discount Payment) as defined in the Asbestos Personal Injury Trust Distribution Procedures, then the Trust shall indemnify the Reorganized Debtors and/or any of their non-Debtor Affiliates, as applicable, in an amount equal to the Scheduled Value for such Asbestos Personal Injury Claim.

**4.14.2.** If, on or after the Effective Date, the Reorganized Debtors and/or any of their non-Debtor Affiliates are held liable for any claim attributable to, directly or indirectly, injuries or other damages caused or allegedly caused by the presence of, or exposure to, asbestos and arising or allegedly arising, in whole or in part, directly or indirectly, from acts or omissions of one or more of the non-Debtor Affiliates (a "*Non-Debtor Asbestos Claim*"), and if such claim is asserted outside of the United States (or, with respect to any such claim asserted against a non-Debtor Affiliate, if such claim is asserted anywhere in the world), the Trust shall indemnify the Reorganized Debtors and/or any of their non-Debtor Affiliates in an amount equal to the lesser of (i) the amount actually paid on such Non-Debtor Asbestos Claim by the Reorganized Debtors and/or the non-Debtor Affiliates, as applicable, plus fees and costs related to such Non-Debtor Asbestos Claim, times the applicable payment percentage under the Asbestos Personal Injury Trust Distribution Procedures and (ii) what the holder of such Non-Debtor Asbestos Claim would have received from the applicable sub-fund if the Non-Debtor Asbestos Claim had been dealt with in accordance with the terms of the Plan and the Trust Documents and did not proceed to judgment. In the event the Asbestos Personal Injury Trust Distribution Procedures do not contain a matrix for any such Non-Debtor Asbestos Claim, the amount of indemnity due under this Section 4.14.2 shall be determined by using the Average Value set forth in the matrix applicable to T&N and as defined in the Asbestos Personal Injury Trust Distribution Procedures.

**4.14.3.** Notwithstanding Sections 4.14.1 and 4.14.2 above, if, on or after the Effective Date, the Reorganized Debtors and/or any of their non-Debtor Affiliates are sued on account of an Asbestos Personal Injury Claim or a Non-Debtor Asbestos Claim that relates to a stream of liability for which there is no applicable payment percentage and such Asbestos Personal Injury Claims and/or Non-Debtor Asbestos Claims may be tendered to an insurance company for handling and payment, the applicable Reorganized Debtor and/or non Debtor Affiliate shall tender such Asbestos Personal Injury Claim or Non-Debtor Asbestos Claim, as applicable, to the Trust so the Trust can properly access any available insurance. The Trust shall use its best efforts to have such Asbestos Personal Injury Claim and/or Non-Debtor Asbestos Claim paid by any applicable insurance and, if the Trust obtains any insurance proceeds on account of such claims, the Trust shall remit such proceeds to the applicable Reorganized Debtor and/or non-Debtor Affiliate to the extent necessary to fully reimburse all such entities, in the aggregate, for amounts they paid with respect to all such Asbestos Personal Injury Claims and Non-Debtor Asbestos Claims.

**4.14.4.** The Trust shall indemnify each Reorganized Debtor on an after-tax basis for all and any adverse tax consequences suffered by any of the Reorganized Debtors arising (either directly or indirectly) as a result of or attributable to the implementation of Article IV of the Plan.

**4.14.5.** The Trust shall indemnify Reorganized T&N in relation to all liabilities, costs, charges and expenses at any time incurred or suffered by Reorganized T&N by

reason of the exercise by the Trust of the power granted under the power of attorney referred to in Section 4.5.11(a).

**4.14.6.** The Trust, the T&N Fund and the Chester Street Fund shall severally indemnify Reorganized T&N in respect of Hercules Claims Handling Costs incurred by it or by any other Hercules-Protected Entity before the effective date of the Principal CVAs in the proportions equivalent to those in which the proceeds of the Hercules Policy are split pursuant to Section 4.5.12(c) *Seventhly* (b) or such other proportions as may be agreed in accordance with the provisions of Section 4.5.14. The Trust, the T&N Fund and the Chester Street Fund shall not be required to pay any sum under these indemnities until the relevant Hercules Claims Handling Costs have actually been paid. Reorganized T&N shall not agree with Curzon or the Reinsurers the quantum of such Hercules Claims Handling Costs without obtaining the prior written consent of the Trust and the U.K. Asbestos Trustee (such consent not be unreasonably withheld).

**4.14.7.** Except as otherwise provided in the Addendum, and notwithstanding anything in the Trust Agreement, including, without limitation, Section 3.1 of the Trust Agreement, the Trust shall (i) be obligated to pay the indemnification as required under the Plan without regard to which stream of asbestos liability the indemnification relates to and (ii) pay such indemnification from any and all available assets in any of the Funds (as such term is defined in the Trust Agreement) without regard to which Fund or stream of asbestos liability such indemnification relates to; provided, however, that (x) funds paid to the Trust by an Asbestos Insurance Company with respect to an Asbestos Insurance Policy that are reserved, by express agreement with such Asbestos Insurance Company (other than the terms of the Asbestos Insurance Policy itself), for payment of covered Asbestos Personal Injury Claims and related expenses shall not be used to pay indemnification of liabilities that were not covered by such Asbestos Insurance Policy; and (y) nothing in this Section 4.14.7 is intended or shall be construed to limit the assertion, applicability, or effect of any Asbestos Insurer Coverage Defenses.

**4.14.8.** If the EL Insurers and/or Curzon or its Reinsurers assert any Asbestos Personal Injury Claim, EL Claims Handling Costs Claim or Hercules Claim against the Reorganized Debtors and such Claim is not for any reason dealt with in accordance with the terms of the Plan and the Trust Documents or the CVAs (as the case may be), then the Trust shall indemnify the Reorganized Debtors against the full amount of any and all damages, losses, fees and expenses incurred with respect to such Claim.

**4.14.9.** For the avoidance of doubt, any indemnity due to the Hercules-Protected Entities under this Section 4.14 shall be subject to the limitations set forth in Section 4.4 above.

**4.14.10.** Subject to Section 4.14.11 below, if the U.K. Asbestos Trustee does not pay any of its indemnity obligations with respect to a loss pursuant to the Principal CVAs within 45 days of a demand for payment of such indemnity, the Trust shall be required to pay any such indemnity obligation; provided, however, that (a) if the loss to be indemnified relates to the exercise by the Trust and the U.K. Asbestos Trustee of their joint responsibility to seek Hercules Recoveries, the Reorganized Debtors can seek payment under any applicable indemnity, without limitation, from either or both the Trust and/or the U.K. Asbestos Trustee, (b)

if the loss to be indemnified related to the Hercules Claims Handling Costs referred to in Section 4.14.6, the Reorganized Debtors can seek payment under the applicable indemnity from each of the Trust, the T&N Fund and the Chester Street Fund in their several proportions, in either case whether or not the U.K. Asbestos Trustee is able to pay its indemnity obligations with respect to such loss, (c) in the event the Trust actually pays any indemnity obligation of the U.K. Asbestos Trustee, the Trust shall be subrogated to the rights of the indemnitee against the U.K. Asbestos Trustee with respect to such payment, and (d) in the event the U.K. Asbestos Trustee makes a payment on any of its indemnity obligations to Reorganized Federal-Mogul after the Trust has already paid such amount, Reorganized Federal-Mogul shall reimburse such amount to the Trust. Nothing herein shall limit the Trust's indemnity obligations for Asbestos Personal Injury Claims asserted in the U.S. under the Plan. For the avoidance of doubt, the application of funds through the Hercules Policy waterfall under the Principal CVAs and the Plan is not an indemnity, but is in addition to the indemnities granted in the Principal CVAs and the Plan.

**4.14.11. Timing of Indemnity Payments.** The Trust shall pay its indemnity obligations under this Article IV on a semi-annual basis starting on the six-month anniversary of the Effective Date and every six months thereafter. Notwithstanding this semi-annual schedule, if, at any time, the Trust's unpaid indemnity obligations under this Plan equal or exceed $2.5 million, the Trust shall indemnify the applicable indemnitee(s) in full within 15 Business Days of receiving notice from Reorganized Federal-Mogul that the unpaid indemnity obligations exceed $2.5 million (*"Indemnity Obligation Reduction Notice"*). The Trust shall continue to pay its indemnity obligations under this Article IV to the applicable indemnitee(s) in full on a semi-annual basis starting on the date on which payment is remitted or earlier in the event the Trust receives an Indemnity Obligation Reduction Notice before the end of the applicable semi-annual period.

**4.15. Retrospective Insurance Premiums and Related Matters.** Notwithstanding anything to the contrary in the Plan or the Plan Documents, (i) any entity (including the Trust, any Reorganized Debtor and any non-Debtor Affiliate) that tenders a Claim to an Asbestos Insurance Company shall be responsible, for purposes of such Claim, for any retrospective insurance premium, self-insured retention, deductible, or similar obligation of the insured under the Asbestos Insurance Policies to which such Claim is tendered; (ii) with respect to any self-insured retention, deductible or similar obligation, any Asbestos Insurance Company to which such Claim is tendered may seek to establish, as one of its Asbestos Insurer Coverage Defenses, that such entity has not, in fact, fulfilled the obligations of the insured under the Asbestos Insurance Policies to which such Claim was tendered; and (iii) with respect to any retrospective insurance premium or similar obligation, any Asbestos Insurance Company to which such Claim is tendered may offset the amount of such retrospective insurance premium or similar obligation against any amount otherwise payable by such Asbestos Insurance Company on account of such claim under its Asbestos Insurance Policies.

## ARTICLE V
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**5.1. Assumption And Rejection Of Unexpired Leases And Executory Contracts**

**5.1.1.     Assumption.**  All unexpired leases and executory contracts that (a) have not been expressly rejected by the U.S. Debtors with approval of the Bankruptcy Court on or prior to the Effective Date or (b) are not rejected pursuant to Section 5.1.2 or Section 5.2 below shall, as of the Effective Date (and subject to the occurrence of the Effective Date), be assumed by the Debtors.  Not later than sixty (60) days prior to the scheduled date for the Confirmation Hearing, the Debtors will file with the Bankruptcy Court an exhibit (the "*Cure Exhibit*") setting forth those unexpired leases and executory contracts which are being assumed by the U.S. Debtors and as to which the U.S. Debtors believe that cure amounts are owing, together with the respective cure amounts due for each such assumed lease or executory contract. With respect to any unexpired leases or executory contracts which are being assumed by the U.S. Debtors but as to which the U.S. Debtors contend that no cure amounts are due, such unexpired leases and executory contracts will not be included on the Cure Exhibit.  The U.S. Debtors may modify, supplement or amend the Cure Exhibit up to and including the Confirmation Date.  Not later than the earlier of (i) thirty (30) days prior to the scheduled Confirmation Hearing or (ii) if the proposed cure amount for any particular unexpired lease or executory contract is amended by any U.S. Debtor following the filing of the initial Cure Exhibit, thirty (30) days after such amendment is filed by the U.S. Debtors with the Bankruptcy Court, the non-Debtor party to any such unexpired lease or executory contract which the U.S. Debtors propose to assume may dispute the cure amount, if any, set forth by the U.S. Debtors with respect to the assumption of such unexpired lease or executory contract by filing an appropriate objection with the Bankruptcy Court.

**5.1.2.     Rejection.**  Notwithstanding Section 5.1.1 above, the U.S. Debtors shall reject each and all of the executory contracts and unexpired leases designated in the list of rejected contracts (as such list may be amended or supplemented up to and including the Confirmation Date) that will be included in Exhibit 5.1.2 of the Plan filed with the Bankruptcy Court prior to the Confirmation Hearing.

**5.1.3.     Reservation.**  Notwithstanding Sections 5.1.1 and 5.1.2 above, Section 5.2 shall not apply to any unexpired lease or executory contract that is specifically identified and dealt with otherwise under the Plan.

**5.1.4.     Prepetition Settlement Agreements Relating to Asbestos Insurance Policies.**  Notwithstanding Sections 5.1.1 – 5.1.3 above, all settlement agreements affecting Asbestos Insurance Policies entered into prior to the Petition Date shall be considered non-executory contracts and shall neither be assumed nor rejected by the Debtors.  Except to the extent that the permissibility of the Assignment (as defined in the Bankruptcy Insurance Stipulation) is determined in the Reorganization Cases by resolution of the issue specified in Section 3(a) of the Bankruptcy Insurance Stipulation, the rights and obligations of the parties under such settlement agreements, including the question of whether any breach has occurred, shall be determined under applicable non-bankruptcy law.

**5.2.     Rejected Unexpired Leases And Executory Contracts.**  Notwithstanding anything to the contrary set forth in Section 5.1 hereof, the U.S. Debtors hereby expressly reject, pursuant to Section 365 of the Bankruptcy Code, the following executory contracts and unexpired leases:  (a) all product warranties, indemnity agreements and similar agreements of the U.S. Debtors (including any obligation of the U.S. Debtors to pay any costs or expenses related

111

to such product warranties) which relate to asbestos or asbestos-related products that were made, mined, manufactured, produced, distributed, sold, marketed or supplied by the U.S. Debtors, whether or not the liabilities or obligations resulting thereunder constitute or will be treated as Asbestos Personal Injury Claims pursuant to the Plan; (b) all product warranties of the U.S. Debtors (including any obligation to pay any costs or expenses related to such warranties), which relate to products no longer made, manufactured, produced, distributed, sold, marketed or supplied by the U.S. Debtors; provided, however, that any such warranties comprising a portion of otherwise-executory contracts of the Debtors that are assumed pursuant to the Plan shall not be rejected pursuant to this Section 5.2; and (c) the Dan=Loc Deed of Special Indemnity and the Dan=Loc Deed of Guarantee, except as set forth in Section 8.20 of the Plan.

     **5.3.**   **Continuation Of Product Warranties**.  The Reorganized U.S. Debtors may elect to honor any product warranty as to non-asbestos products rejected pursuant to Section 5.2 of the Plan if honoring such product warranty would, in the judgment of the Reorganized U.S. Debtors, confer a reasonably comparable benefit upon the Reorganized U.S. Debtors.

     **5.4.**   **Collective Bargaining Agreements and Retiree Benefit Plans**.

**5.4.1.**    **General.** Notwithstanding any other provisions of the Plan or of this Article V, the Plan Proponents reserve the right to seek to reject, modify and/or terminate any collective bargaining agreements with respect to which any of the Debtors is a party in accordance with Section 1113 of the Bankruptcy Code, any retiree benefit plans of any or all of the Debtors in accordance with Section 1114 of the Bankruptcy Code and any other employee benefit programs in accordance with applicable law; provided, however, that absent the termination of any retiree benefit plans to which Section 1114 of the Bankruptcy Code is applicable in accordance with Section 1114 of the Bankruptcy Code, and subject to the provisions of Section 5.4.2 of the Plan, payment of all retiree benefits under retiree benefit plans to which Section 1114 of the Bankruptcy Code is applicable shall be continued after the Effective Date in accordance with Section 1129(a)(13) of the Bankruptcy Code.

**5.4.2.**    **Special Provisions Relating to U.K. Debtors' Pension Plans and Excluded Non-Qualified Pension Claims.** Nothing in Section 5.4.1 of the Plan shall alter or modify (i) the treatment of Excluded Non-Qualified Pension Claims as Unsecured Claims under the Plan, or (ii) the treatment of any claims relating to the FM Ignition Pension Plan and/or the T&N Pension Plan under the CVAs (as such treatment is incorporated into the Plan).

**5.4.3.**    **Special Provisions Relating to Federal-Mogul Corporation Pension Plan.** Unless and until the Federal-Mogul Corporation Pension Plan is terminated pursuant to applicable law, Reorganized Federal-Mogul and each of the other Reorganized U.S. Debtors, as a successor to its respective Debtor, shall comply with any and all of its obligations under the Federal-Mogul Corporation Pension Plan pursuant to applicable law.  Notwithstanding anything to the contrary in this section or elsewhere in the Plan, including but not limited to Article IX, there shall be no discharge, exculpation or release of any claims with respect to the Federal-Mogul Corporation Pension Plan, including any claims asserted by the Pension Benefit Guaranty Corporation with respect to the Federal-Mogul Corporation Pension Plan, whether against the Debtors, the Reorganized U.S. Debtors or any other persons or entities liable under applicable law.

**5.5.**    **Damages Upon Rejection.** The Bankruptcy Court shall determine the dollar amount, if any, of the Claim of the non Debtor party for damages resulting from the rejection of any executory contract or unexpired lease; provided, however, that any such Entity that holds or asserts a Claim against a U.S. Debtor or its Estate must file a Proof of Claim with the Bankruptcy Court within thirty (30) calendar days following the Confirmation Date, or as otherwise ordered by the Bankruptcy Court. To the extent any such Claim is Allowed by the Bankruptcy Court by Final Order, such Claim shall become, and shall be treated for all purposes under the Plan as an Unsecured Claim, or, as applicable, an Asbestos Personal Injury Claim, in the Reorganization Case of the particular U.S. Debtor which is a party to such contract or lease, and the holder thereof shall receive distributions under the Plan as a holder of an Allowed Unsecured Claim or Asbestos Personal Injury Claim. The Plan shall constitute notice to Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the bar date for filing a Proof of Claim in connection therewith; provided, however, that the U.S. Debtors shall have no obligation to notify such Entities that Confirmation has occurred.

**5.6.**    **Corporate Indemnities**

**5.6.1.**     **Prepetition Indemnification and Reimbursement Obligations.** For purposes of the Plan, the respective obligations of Federal-Mogul and its Affiliated Debtors to indemnify and reimburse Persons who are or were directors, officers or employees of the Debtors on the Petition Date or at any time thereafter, against and for any obligations pursuant to the articles of incorporation, codes of regulation, bylaws (including, without limitation, the obligations of Federal-Mogul pursuant to Article IV of the By-Laws of Federal-Mogul), applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, shall survive Confirmation of the Plan, remain unaffected thereby, and not be discharged under Section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date.

**5.6.2.**     **Plan Indemnity.** In addition to the matters set forth in Section 5.6.1 and not by way of limitation thereof, the Reorganized Debtors shall indemnify and hold harmless all Persons who are or were officers or directors of the Debtors on the Petition Date or thereafter on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including attorney's fees) on account of claims or causes of action threatened or asserted by any third party against such officers or directors that seek contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of the assertion of primary claims against such third party by any representative of the Debtors' Estates.

**5.6.3.**     **Limitation on Indemnification.** Notwithstanding anything to the contrary set forth in this Plan or elsewhere, the Reorganized Debtors shall not be obligated to indemnify and hold harmless any Person or Entity for any claim, cause of action, liability, judgment, settlement, cost or expense that results primarily from such Person's or Entity's bad faith, gross negligence or willful misconduct.

<div align="center">

**ARTICLE VI**
**ACCEPTANCE OR REJECTION OF THE PLAN**

</div>

**6.1.**     **Each Impaired Class Entitled To Vote Separately.** Subject to Section 6.3 below, the holders of Claims or Equity Interests in each impaired Class of Claims or Equity Interests that receive or retain property pursuant to the Plan shall be entitled to vote separately to accept or reject the Plan.

**6.2.**     **Acceptance By Impaired Classes Of Claims.** Pursuant to Section 1126(c) of the Bankruptcy Code, but subject to Section 6.3 below, an impaired Class of Claims shall have accepted the Plan if, after excluding any Claims held by any holder designated pursuant to Section 1126(e) of the Bankruptcy Code, (a) the holders of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (b) more than one half in number of such Allowed Claims actually voting in such Class have voted to accept the Plan.

**6.3.**     **Acceptance Pursuant To Section 524 Of The Bankruptcy Code.** Pursuant to Section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, the respective Classes of Asbestos Personal Injury Claims shall have accepted the Plan only if the holders of at least 75 percent of the Claims who voted in such Classes have voted to accept the Plan.

6.4. **Presumed Acceptance Of Plan**. Classes of Claims or Equity Interests designated as unimpaired are conclusively presumed to have voted to accept the Plan pursuant to Section 1126(f) of the Bankruptcy Code. In addition, by virtue of the Surety Claims Settlement Agreement and the U.K. Global Settlement Agreement, and the Plan's implementation of the relevant provisions of such agreements, the holders of Surety Claims, Non-Priority FM Ignition Pension Plan Employee Benefit Claims and Non-Priority T&N Pension Plan Employee Benefit Claims are presumed to have voted to accept the Plan.

6.5. **Presumed Rejection Of Plan**. Impaired Classes of Claims or Equity Interests that do not receive or retain any property under the Plan are conclusively presumed to have voted to reject the Plan pursuant to Section 1126(g) of the Bankruptcy Code.

6.6. **Votes With Respect to U.K. Debtors**. The CVA Supervisors for each of the U.K. Debtors that are covered by the Principal CVAs shall be entitled to exercise the right, if any, to vote on the Plan in respect of any Unsecured Claims (other than Asbestos Property Damage Claims and any other Unsecured Claims referred to in paragraph 41.2 of the Principal CVAs), Non-Priority T&N Pension Plan Employee Benefit Claims, and Non-Priority FM Ignition Pension Plan Claims against any or all of such U.K. Debtors.

6.7. **Confirmability And Severability Of The Plan**.

**6.7.1.     Consensual Confirmation.** The Confirmation requirements of Section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Therefore, notwithstanding the combination of the separate plans of reorganization of all U.S. Debtors and U.K. Debtors in this Plan for purposes of, among other things, economy and efficiency, the Plan shall be deemed a separate Chapter 11 plan for each such Debtor.

**6.7.2.     Cramdown.** With respect to any impaired Class of Claims or Equity Interests that fails to accept the Plan in accordance with Section 1129(a) of the Bankruptcy Code, including such Classes as may be created pursuant to amendments to the Plan, the Plan Proponents request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code with respect to such non-accepting Classes, in which case or cases the Plan shall constitute a motion for such relief.

**6.7.3.     Reservation of Rights.** The Plan Proponents reserve the right to modify or withdraw the Plan, any other plan, or the Plan in its entirety, for any reason, including, without limitation, in the event that any separate plan for a particular Debtor is not confirmed. In addition, should the Plan, or any individual Debtor's plan, fail to be accepted by the requisite number and amount of Claims and Equity Interests voting, as required to satisfy Sections 524(g) (in the case of any Debtor subject to Asbestos Personal Injury Claims) and 1129 of the Bankruptcy Code, and notwithstanding any other provision of the Plan to the contrary, the Plan Proponents reserve the right to amend, modify or withdraw such plan or the Plan in its entirety. Notwithstanding the foregoing, in the case of any modifications to the Plan relating to the Plan A Settlement or the Plan B Settlement, the Plan Proponents' ability to modify the Plan shall be subject to the terms of the Plan Support Agreement.

## ARTICLE VII
## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

**7.1.     Conditions To Confirmation.** Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived by the Plan Proponents and, with respect to any waiver of the condition set forth in Section 7.1.4, the written consent of Cooper LLC, Cooper Industries, Ltd. or Pneumo Abex, as applicable; provided, however, that in the case of Pneumo Abex, such consent shall not be unreasonably withheld. These conditions to Confirmation, which are designed, among other things, to ensure that the Injunctions, releases and discharges set forth in Article IX shall be effective, binding and enforceable, are as follows:

**7.1.1.     Findings of Fact.** The Bankruptcy Court and/or the District Court, as applicable, shall have made the following findings in substantially the following form:

**(a)**     The Supplemental Injunction, the Third Party Injunction and the Asbestos Insurance Entity Injunction are to be implemented in connection with the Trust;

**(b)**     As of the Petition Date, certain of the Debtors had been named as defendants in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos containing products;

116

     **(c)**      Subject to Article IV of the Plan, upon Confirmation, the Trust shall assume the liabilities of the Debtors with respect to Asbestos Personal Injury Claims;

     **(d)**      The Trust will be funded in part by the Reorganized Federal Mogul Class B Common Stock, and all rights to receive dividends or other distributions on account of such Class B Common Stock;

     **(e)**      On the Effective Date, the Trust will own a majority of the voting shares of Reorganized Federal-Mogul;

     **(f)**      The Trust will use its assets or income to pay Asbestos Personal Injury Claims;

     **(g)**      The Debtors are likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Personal Injury Claims that are addressed by the Supplemental Injunction, the Third Party Injunction and the Asbestos Insurance Entity Injunction;

     **(h)**      The actual amounts, numbers and timing of future Demands cannot be determined;

     **(i)**      Pursuit of Asbestos Personal Injury Claims, including Demands, outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands;

     **(j)**      The terms of the Supplemental Injunction, the Third Party Injunction and the Asbestos Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in the Disclosure Statement;

     **(k)**      Pursuant to court orders or otherwise, the Trust shall operate through mechanisms, such as structured, periodic or supplemental payments, Pro Rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Trust will value, and be in a financial position to pay, present Asbestos Personal Injury Claims and future Asbestos Personal Injury Claims and Demands that involve similar Claims in substantially the same manner;

     **(l)**      The Future Claimants Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Supplemental Injunction, the Third Party Injunction and the Asbestos Insurance Entity Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in the Supplemental Injunction, the Third Party Injunction and the Asbestos Insurance Entity Injunction, and transferred to and assumed by the Trust;

     **(m)**      The inclusion of each Debtor or beneficiary within the protection afforded by the Supplemental Injunction, the Third Party Injunction and the Asbestos Insurance Entity Injunction, as applicable, is fair and equitable with respect to the persons that might subsequently

117

assert Demands against each such Debtor or beneficiary in light of the benefits provided, or to be provided, to the Trust on behalf of such Debtor or such beneficiary;

(n)     The Plan complies with Section 524(g) of the Bankruptcy Code in all respects; and

(o)     The Supplemental Injunction, the Third Party Injunction and the Asbestos Insurance Entity Injunction are essential to the Plan and the Debtors' reorganization efforts.

7.1.2.     **Confirmation Order.** The Bankruptcy Court and/or District Court, as applicable, shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order entered in conjunction therewith in form and substance acceptable to the Plan Proponents.

7.1.3.     **Exit Facilities.** The Debtors shall have obtained a binding commitment(s) for the Exit Facilities on terms reasonably acceptable to the Plan Proponents.

7.1.4.     **Pneumo Abex Settlement.** Either (a) the Confirmation Order (and any order of the District Court affirming the Confirmation Order) shall approve the Plan B Settlement or (b) the Confirmation Order shall approve the Plan B Settlement and the Confirmation Order, together with such other order of the Bankruptcy Court and/or the District Court that may be proposed by the Debtors and the other Plan Proponents approving the Plan A Settlement (the *"Plan A Approval Order"*) shall approve the Plan A Settlement; provided, however, that the affirmation of the Confirmation Order (or any other order that approves the Plan B Settlement) by the District Court shall only be required with respect to the Plan B Settlement if the District Court rules on the Plan B Settlement. The Confirmation Order (or any portion thereof) shall be in form and substance reasonably acceptable to Cooper LLC and Cooper Industries, Ltd. with respect to matters related to or contemplated by the Plan B Settlement. Provisions of the Confirmation Order that approve the Plan B Settlement, to the extent directly related to Pneumo Abex's or PCT's rights under the Plan B Settlement Agreement and directly related to Pneumo Abex or PCT, shall also be subject to the consent of Pneumo Abex, which consent shall not be unreasonably withheld. Any provisions of the Confirmation Order pertaining to the Plan A Settlement, or the Plan A Approval Order, if applicable, (i) shall be in form and substance reasonably acceptable to Cooper LLC and Cooper Industries, Ltd., and (ii) to the extent the provisions thereof are directly related to Pneumo Abex or PCT, shall be subject to the consent of Pneumo Abex, which consent shall not be unreasonably withheld.

7.2.     **Conditions To Effectiveness.** Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall not occur unless and until each of the following conditions has been satisfied or waived by the Plan Proponents and, with respect to any waiver of Section 7.2.5, the written consent of Cooper LLC and Cooper Industries, Ltd., and the Debtors have filed a notice with the Bankruptcy Court stating that all such conditions have been satisfied or waived:

7.2.1.     **Confirmation Order.** The Confirmation Order shall have been issued by the Bankruptcy Court and affirmed by the District Court, and the Confirmation Order shall have become a Final Order; provided, however, that once the Confirmation Order has been

affirmed by the District Court, the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order at the sole option of the Plan Proponents unless the effectiveness of the Confirmation Order has been stayed or vacated, in which case the Effective Date may be, again at the sole option of the Plan Proponents, the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order.

**7.2.2.** **Trust.** The Trust Assets shall have been transferred to, vested in and assumed by the Trust in accordance with Section 4.3 of the Plan, other than any Trust Assets to be transferred to, vested in and assumed by the Trust after the Effective Date, and the Trust is capable of complying with its obligations under Section 8.3.6 of the Plan.

**7.2.3.** **Corporate Documents.** The Trust Documents and the other applicable corporate documents necessary or appropriate to implement the Plan shall have been executed, delivered and, where applicable, filed with the appropriate governmental authorities.

**7.2.4.** **United States Trustee's Fees.** The fees of the United States Trustee then owing by the Debtors shall have been paid in full.

**7.2.5.** **Pneumo Abex Settlement.** Either (a) the Confirmation Order and, if applicable, any affirmance thereof by the District Court, shall approve the Plan B Settlement or (b) the Confirmation Order shall approve the Plan B Settlement and the Confirmation Order, together with the Plan A Approval Order (if applicable), shall approve the Plan A Settlement; provided, however, that the affirmation of the Confirmation Order by the District Court shall only be required with respect to the Plan B Settlement if the District Court rules on the Plan B Settlement. Neither the Confirmation Order (or any order of the District Court affirming the Confirmation Order) nor the Plan A Approval Order need to be a Final Order for this condition to be satisfied.

**7.2.6.** **Other Assurances.** The Plan Proponents shall have obtained tax rulings, decisions, opinions or other assurances regarding certain tax consequences of the Plan, as they deem satisfactory.

**7.2.7.** **Exit Facilities.** The Reorganized Debtors shall have entered into agreements with respect to the Exit Facilities and the Closing Date, as to be defined in the Exit Facilities, shall have occurred.

**7.2.8.** **Notice of Effective Date.** The Debtors shall have filed with the Bankruptcy Court a notice of the occurrence of the Effective Date, which notice shall confirm that the foregoing conditions have been satisfied or waived.

## ARTICLE VIII
## IMPLEMENTATION OF THE PLAN

### 8.1. Matters Involving the U.K. Debtors

**8.1.1.** **CVAs for the U.K. Debtors.** The Plan recognizes and incorporates the treatment provided by the CVAs for those categories of Claims that are treated by the CVAs.

When the Plan provides that a Claim shall receive the treatment afforded to such Claim under the applicable CVA, the Plan means that such Claim will receive a distribution in respect of such Claim from the CVA Supervisors in accordance with the provisions of the applicable CVA. Claims against the U.K. Debtors that are not treated by the CVAs and Claims against those of the U.K. Debtors for which CVAs have not been proposed shall be Allowed or not Allowed and, if Allowed, receive a distribution, solely in accordance with the terms of the Plan.

**8.1.2.     Treatment of Asbestos Property Damage Claims Against the U.K. Debtors Under the Plan and CVAs.**  Holders of Asbestos Property Damage Claims against the U.K. Debtors have the option of foregoing the treatment of such Claims specified in the CVAs. In the event that a holder of an Asbestos Property Damage Claim against a U.K. Debtor elects to forego the treatment of such Asbestos Property Damage Claim under the CVAs by not submitting notice of such Asbestos Property Damage Claim to the CVA Supervisors in accordance with the terms of the CVAs, such Asbestos Property Damage Claim may be pursued in the Bankruptcy Court under and pursuant to the Bankruptcy Code, in which case any Allowed Asbestos Property Damage Claims against a U.K. Debtor proven pursuant to such process shall receive the treatment specified in this Plan for Asbestos Property Damage Claims against the relevant U.K. Debtor.

**8.1.3.     Reservation of Rights.**  The Plan Proponents reserve the right to seek to have the Bankruptcy Court enforce the CVAs, including, but not limited to, the treatment of Claims against the U.K. Debtors under the CVAs as a matter of comity or otherwise.

**8.2.     Continued Corporate Existence.**  Each of the Reorganized Debtors, other than such Inactive Debtor Subsidiaries as may be dissolved, liquidated, wound-up, struck off and/or merged into another entity, shall continue to exist immediately after the Effective Date as a separate corporate entity in accordance with the applicable law in the jurisdiction in which it is incorporated, under its respective certificate of incorporation and bylaws or other organizational documents in effect before the Effective Date, except as its certificate of incorporation, bylaws or other organizational documents are amended by the Plan.

**8.3.     Federal-Mogul Corporation Securities and Corporate Governance**

**8.3.1.     Cancellation Of Existing Stock In Federal-Mogul.**  On the Effective Date, the Federal-Mogul common and preferred stock classified in Classes 1M and 1O, and all unexercised rights, warrants and options relating to such stock and any other rights attached to the ownership of any equity securities of Federal-Mogul, shall be deemed cancelled and of no further force and effect.  The holders of such cancelled instruments, securities and other documentation shall have no rights arising from or relating to such instruments, securities or other documentation or the cancellation thereof, except the rights provided pursuant to the Plan.

**8.3.2.     Conversion of Convertible Subordinated Debentures.**  On the Effective Date, all beneficiaries of Convertible Subordinated Debentures, except those who have affirmatively elected not to do so in connection with their vote on the Plan, will be deemed to have exercised their rights to convert their securities into Federal-Mogul common stock on the terms provided for in the indenture governing those securities and debentures.  For purposes of the classification and treatment of Claims and Equity Interests under the Plan, such conversion

120

shall be deemed to have occurred on the Record Date, and the resulting common stock interests arising from such conversion shall be included in and treated as Equity Interests under Class 10.

**8.3.3.   Cancellation of Notes, Other Debt Securities and Indentures.** On the Effective Date, (i) the Notes, the Convertible Subordinated Debentures and any other debt securities issued by the Debtors shall be deemed cancelled and of no further force and effect and (ii) the obligations of the Debtors under any agreements governing such Notes, the Convertible Subordinated Debentures or other debt securities, including, without limitation, the Indentures, shall be cancelled and discharged. Except as provided in this section and the Plan, the holders of any such cancelled instruments, debt securities and related documentation shall have no rights arising from or relating to such instruments, securities or other documentation or the cancellation thereof. Notwithstanding the foregoing, each Indenture, Note and Convertible Subordinated Debenture shall continue in effect solely for the purposes of (a) allowing the Indenture Trustees to make distributions on account of Noteholder Claims and Convertible Subordinated Debenture Claims under the Plan and (b) permitting the Indenture Trustees to maintain any rights or Liens they may have for unpaid fees, costs and expenses under such Indentures; provided, however, that such rights and Liens are limited to the distributions, if any, to Noteholders. Notwithstanding the preceding sentence, clauses (a) and (b) of this section shall not represent exceptions to the discharge of the Debtors' liabilities under the Bankruptcy Code and the Confirmation Order. Additionally, upon payment in full of the fees and expenses of the Indenture Trustees pursuant to Section 8.14.6 of the Plan, any such rights or Liens of the Indenture Trustees shall terminate.

**8.3.4.   Issuance Of Reorganized Federal-Mogul Common Stock.** On the Effective Date, Reorganized Federal-Mogul shall issue 49.9 million shares of Reorganized Federal-Mogul Class A Common Stock and 50.1 million shares of Reorganized Federal-Mogul Class B Common Stock. Concurrently with such issuance, Reorganized Federal-Mogul shall distribute (i) all of the shares of the Class B Common Stock (less the shares of Class B Common Stock issued pursuant to Section 4.5.5 hereof) to the Trustees of the Trust as part of the consideration to be paid for the Trust's assumption of all Asbestos Personal Injury Claims (which shall then be allocated to the sub-Trusts created under the Trust Documents as provided therein), (ii) the Class B Common Stock issued under Section 4.5.5 of the Plan to the Trustees of the Trust and (iii) all of the shares of the Class A Common Stock to the Disbursing Agent for further distribution Pro Rata to the holders of Allowed Noteholder Claims, Allowed Convertible Subordinated Debenture Claims, and Allowed Class H Unsecured Claims that make the Stock Election described in Section 8.15.2 of the Plan. For the purpose of distributions to the holders of Allowed Noteholder Claims, the Indenture Trustee under each series of Notes shall be deemed to be the sole holder of the Allowed Noteholder Claim for all Allowed Noteholder Claims for such series of Notes. Accordingly, all distributions of Reorganized Federal-Mogul Class A Common Stock on account of Allowed Noteholder Claims shall be distributed to the Indenture Trustees for further distribution to the Noteholders pursuant to the terms of the respective Indentures. Distribution of such Reorganized Federal-Mogul Class A Common Stock shall be deemed complete upon delivery of one or more share certificates representing such shares to the Indenture Trustees, on behalf of the Noteholders. The Disbursing Agent shall not be entitled to vote any shares of Reorganized Federal-Mogul Class A Common Stock.

**8.3.5.**    **Specific Provisions Relating to Reorganized Federal-Mogul Class B Common Stock**.  Upon formation of the Trust on the Effective Date in accordance with Section 4.1 of the Plan, the Trust shall issue Reorganized Federal-Mogul a note in the face amount of $125 million (the *"$125 Million Note"*), which note shall mature ten (10) Business Days after the Effective Date (the *"Maturity Date"*).  In addition, also on the Effective Date, to secure repayment of the $125 Million Note, the Trust shall grant Reorganized Federal-Mogul a security interest in 13.888888888% of the Reorganized Federal-Mogul Class B Common Stock to be distributed to the Trust pursuant to the Plan (the *"Pledged Stock"*).  On the Maturity Date, in exchange for and in complete satisfaction of the $125 Million Note, the Trust shall either (i) pay the entire $125 million principal amount in Cash to Reorganized Federal-Mogul or (ii) if the Trust does not make the foregoing payment on the Maturity Date, then Reorganized Federal-Mogul shall automatically and without any further notice or action have full and complete ownership of the Pledged Stock; provided, however, that 32% of the 13.888888888% of Reorganized Federal-Mogul Class B Common Stock so paid to Reorganized Federal-Mogul shall be held in escrow by Reorganized Federal-Mogul (the *"Escrowed Shares"*) or, if the $125 million principal amount is paid in Cash, 32% of such Cash shall be held in escrow by Reorganized Federal-Mogul (the *"Escrowed Cash"*).  If, after the Relevant Claims have been satisfied or provided for in full, any portion of the Chester Street Fund Assets is released to Reorganized T&N or such other member or members of the UK Group as Reorganized FMUK may direct pursuant to the Release Provisions, a number of the Escrowed Shares equivalent in value at the time of release to the portion of the Chester Street Fund Assets released pursuant to the Release Provisions shall be returned to the Trust; provided, however, that if an amount in excess of £22 million is released pursuant to the Release Provisions, then a number of shares valued at $17.9640719 per share shall be returned to the Trust (any and all shares returned to the Trust pursuant to this sentence, the *"Returned Shares"*) with respect to any amount released pursuant to the Release Provisions in excess of £22 million.  If, however, the $125 million principal amount is paid in Cash, a percentage of the Escrowed Cash equivalent in value to the portion of the Chester Street Fund Assets released pursuant to the Release Provisions shall be returned to the Trust.  Any Escrowed Shares or Escrowed Cash that are not returned to the Trust, after the Relevant Claims have been satisfied or provided for in full, shall be transferred to Reorganized Federal-Mogul.  In this Section 8.3.5:

(a)    "*UK Trust Deed*" means the Trust Deed dated October 10, 2006 made between (i) T&N acting by its administrators, (ii) the companies listed in Schedule A thereto acting by their respective administrators, and (iii) The T&N Asbestos Trustee Company Limited;

(b)    the "*Release Provisions*" means paragraph 15.1.3 of the Principal CVAs, Clause 2.4.3(b) of the UK Trust Deed, and/or Clause 4.1.2 of the UK Trust Deed;

(c)    the "*Relevant Claims*" means (i) the Chester Street Fund Costs, (ii) the remuneration, costs and expenses to be met out of the Chester Street Fund Assets pursuant to paragraph 18.1.3(f)(ii) of the Principal CVAs, and (iii) the Chester Street Trust Claims;

(d)    the expressions "*Chester Street Fund Assets*", "*Chester Street Fund Costs*", "*Chester Street Trust Claims*", "*UK Group*" and "*FMUK*" have the same respective meanings as in the UK Trust Deed and the expression "*Tax*" has the same meaning as in the Principal CVAs; and

(e)     any reference in this Section 8.3.5 to the "amount released pursuant to the Release Provisions" shall be construed as such amount net of any deduction or withholding from such amount that has been made on account of Tax.

### 8.3.6.     Thornwood Call Option.

(a)     **Grant and Exercise of Call.**  Thornwood (or its designee) is hereby granted by the Trust on the Effective Date a call (the *"Call"*) on all of the Reorganized Federal-Mogul Class B Common Stock other than the Pledged Stock (the *"Call Stock"*).  The Call shall be governed by the terms and conditions specified in the Stock Option Agreement attached hereto as Exhibit 8.3.6(a).

(b)     **Additional Provisions Applicable If Call Is Exercised.**  In the event that Thornwood or its designee exercises the Call and the Trust repays the $125 Million Note in Cash as provided in Section 8.3.5 of the Plan, then Thornwood or its designee shall be granted an additional call on the Pledged Stock (the *"Pledged Stock Option"*), which shall expire sixty (60) days after Thornwood (or its designee) is first permitted to exercise the Pledged Stock Option and shall be exercisable for additional Cash consideration on the same terms as the Reorganized Federal-Mogul Class B Common Stock covered by the Call.  In the event that Thornwood or its designee exercises the Call and the Trust does not repay the $125 Million Note in Cash as provided in Section 8.3.5, and Federal-Mogul takes the Pledged Stock in full and complete satisfaction of the $125 Million Note, then upon return to the Trust, any Returned Shares (as described in Section 8.3.5 above) shall be offered to Thornwood or its designee for additional Cash consideration on the same terms as the Reorganized Federal-Mogul Class B Common Stock covered by the Call.  If Thornwood and/or its designee declines to purchase such stock, the Trust shall have the ability to sell the stock on the open market, subject to regulatory and contractual compliance.  In addition, if the Call is exercised, Thornwood (or its designee) (as applicable) shall comply with the terms of the Letter Agreement attached to the Plan as Exhibit 8.3.6(b).

(c)     **Provisions Applicable If Call Is Not Exercised.**  In the event that Thornwood (or its designee) does not exercise the Call on or prior to the expiration date of the Call as set forth in the Stock Option Agreement, Thornwood will provide the Trust with a term loan facility in the amount of $100 million, which term loan facility shall be secured by the Reorganized Federal-Mogul Class B Common Stock held by the Trust.  The terms and conditions of the term loan facility provided for by this Section 8.3.6(c) shall be as set forth in the Loan Agreement attached hereto as Exhibit 8.3.6(c).

### 8.3.7.     Issuance of Warrants

(a)     Subject to Section 8.3.7(b) below, on the Effective Date, if Classes 1D and 1J have both voted to accept the Plan, and if at least one of Classes 1M, 1N or 1O has also voted to accept the Plan, Reorganized Federal-Mogul shall issue Warrants for the purchase of shares of Reorganized Federal-Mogul Class A Common Stock in an amount calculated in accordance with Sections 3.1.13, 3.1.14 and/or 3.1.15, as applicable.  Concurrently with such issuance, Reorganized Federal-Mogul shall distribute such Warrants to the Disbursing Agent for further

distribution consistent with the terms and provisions of the Plan. The Disbursing Agent shall not be entitled to exercise any of the Warrants.

(b)    If the Bankruptcy Court and/or District Court, as applicable, holds, determines or rules that the Plan is not confirmable due to the gifting, issuance or distribution of the Warrants, then (a) no Warrants shall be issued or distributed pursuant to the Plan and (b) Classes 1M, 1N and 1O shall receive no distributions under the Plan.

8.3.8.    **Surrender of Securities or Instruments.** On or before the Effective Date, or as soon as practicable thereafter, each holder of an instrument (a *"Certificate"*) evidencing the Notes, the Convertible Subordinated Debentures or any other debt securities (but excluding securities representing Bank Claims) shall surrender such Certificate to the Disbursing Agent, or, with respect to indebtedness that is governed by an Indenture, to the Indenture Trustee. The surrender of any global certificate held by an Indenture Trustee shall constitute surrender of the Notes or other debt securities pertaining to such global certificate for purposes of this provision. No distribution of property hereunder shall be made to or on behalf of any such holder unless and until such Certificate is received by the Disbursing Agent or the respective Indenture Trustee, or evidence of the loss, theft, mutilation or destruction of such Certificate is established to the reasonable satisfaction of the Disbursing Agent or the respective Indenture Trustee. Any such holder who fails to (a) surrender or cause to be surrendered such Certificate, or (b) execute and deliver an affidavit of loss, theft, mutilation or destruction and indemnity to the reasonable satisfaction of the Disbursing Agent or the respective Indenture Trustee prior to the second anniversary of the Effective Date, (i) shall be deemed to have forfeited all rights and Claims or interests in respect of such Certificate, (ii) shall not participate in any distribution hereunder, and (iii) all property in respect of such forfeited distribution, including interest accrued thereon, shall be distributed Pro Rata to and among holders of the same securities, and in accordance with legal rights and priorities of those holders who properly surrendered such Certificates pursuant to the Plan.

8.3.9.    **Registration of Certain Reorganized Federal-Mogul Securities.** On the Effective Date, Reorganized Federal-Mogul shall execute and deliver a registration rights agreement substantially in the form set forth in Exhibit 8.3.9 hereto obligating Reorganized Federal-Mogul to register for resale, to the extent required by federal and state securities laws, the Reorganized Federal-Mogul Common Stock, the Reorganized Federal-Mogul Junior Secured PIK Notes and the Warrants under the Securities Act of 1933 in accordance with the terms set forth in such registration rights agreement. The holders of Reorganized Federal-Mogul Common Stock, Reorganized Federal-Mogul Junior Secured PIK Notes and Warrants entitled to enter into such registration rights agreement are those that (i) are issued 10% or more of the Reorganized Federal-Mogul Common Stock, (ii) would otherwise qualify as an "underwriter" as defined in Section 1145(b) of the Bankruptcy Code or (iii) reasonably request to do so.

8.3.10.    **Reporting Requirements Under Securities Exchange Act of 1934 and Listing on Securities Exchange or Quotation System.** Reorganized Federal-Mogul shall be a mandatory reporting company under Section 12 of the Securities Exchange Act of 1934, as amended. In addition, Reorganized Federal-Mogul will use its best efforts to list, as promptly as practicable after the Effective Date, the Reorganized Federal-Mogul Class A Common Stock on a national securities exchange or for quotation on a national automated interdealer quotation

system but will have no liability if it is unable to do so. Persons receiving distributions of Reorganized Federal-Mogul Class A Common Stock, by accepting such distributions, will have agreed to cooperate with Reorganized Federal-Mogul's reasonable requests to assist Reorganized Federal-Mogul in its efforts to list the Reorganized Federal-Mogul Class A Common Stock on a national securities exchange or quotation system, including, without limitation, appointing or supporting the appointment of a sufficient number of directors to the Board of Directors of Reorganized Federal-Mogul who satisfy the independence and other requirements of any such national securities exchange or quotation system.

8.3.11.     **Transfer Restrictions**. On the Effective Date, Reorganized Federal-Mogul, the Trust and certain Noteholders shall enter into a Lockup Agreement substantially in the form set forth in Exhibit 8.3.11 hereto. The Trust and such Noteholders shall be bound by certain restrictions on transfer of their shares of Reorganized Federal-Mogul Common Stock as set forth in such Lockup Agreement.

8.3.12.     **Certificate Of Incorporation and Bylaws**.

8.3.12.1.     The Certificate of Incorporation of Reorganized Federal-Mogul shall, as of the Effective Date, be amended in its entirety substantially in the form set forth in Exhibit 8.3.12(1) hereto, and the Bylaws of Reorganized Federal-Mogul shall be amended in their entirety substantially in the form set forth in Exhibit 8.3.12(2) hereto. Consistent with, but only to the extent required by, Section 1123(a)(6) of the Bankruptcy Code, the amended Certificate of Incorporation of Reorganized Federal-Mogul shall, among other things, prohibit the issuance of non-voting equity securities.

8.3.12.2.     The amended Certificate of Incorporation of Reorganized Federal-Mogul shall provide that the initial board of directors of Reorganized Federal-Mogul shall consist of nine members (as determined in accordance with the amended Certificate of Incorporation), and that the holders of Reorganized Federal-Mogul Class A Common Stock shall initially be entitled to nominate six (6) directors and the holders of Reorganized Federal-Mogul Class B Common Stock shall initially be entitled to nominate three (3) directors. Additionally, the amended Certificate of Incorporation shall provide that certain major transactions by Reorganized Federal-Mogul shall require the approval of a majority of both the directors elected by the holders of Reorganized Federal-Mogul Class A Common Stock and the directors elected by the holders of Reorganized Federal-Mogul Class B Common Stock. Notwithstanding the foregoing, of the six (6) directors that the holders of the Reorganized Federal-Mogul Class A Common Stock shall initially be entitled to nominate, one of such directors shall be the Chief Executive Officer of Reorganized Federal-Mogul, and one other of such directors shall be Neil Subin, presently chairman of the Unsecured Creditors Committee.

**8.3.13.   Initial Board of Directors of Reorganized Federal-Mogul.** On and after the Effective Date, the business and affairs of Reorganized Federal-Mogul shall become the general responsibility of its board of directors, subject to, and in accordance with, the Certificate of Incorporation and the Bylaws of Reorganized Federal-Mogul. The initial board of directors shall consist of the nine individuals identified in Exhibit 8.3.13 hereto.

**8.3.14.   New Employment Agreements.** On the Effective Date, Reorganized Federal-Mogul may implement new employment agreements and/or equity-based compensation and pension plans, which shall become binding, effective and operative as of the Effective Date.

**8.3.15.   Grant of Non-Qualified Stock Options.** As soon as practicable after the Effective Date, Reorganized Federal-Mogul shall grant José Maria Alapont, the President, Chairman of the Board of Directors, and Chief Executive Officer of Federal-Mogul, non-qualified stock options to purchase the number of shares of Reorganized Federal-Mogul Class A Common Stock equivalent to four percent (4%) of the number of shares of the Reorganized Federal-Mogul Class A Common Stock and the Reorganized Federal-Mogul Class B Common Stock issued on the Effective Date. The grant of such non-qualified stock options shall be subject to the terms and conditions in the Stock Option Agreement attached to the Plan as Exhibit 8.3.15 (the "*Stock Option Agreement*"). The Certificate of Incorporation of Reorganized Federal-Mogul shall authorize the issuance of the number of shares of Reorganized Federal-Mogul Class A Common Stock necessary to fulfill the provisions of this Section 8.3.15 and the Stock Option Agreement.

**8.3.16.   Reincorporation of Reorganized Federal-Mogul.**

**8.3.16.1.   General.** Prior to the Effective Date, a new corporate entity, known as "New Federal-Mogul Corporation" shall be incorporated as a Delaware corporation (*"New Federal-Mogul"*), and New Federal-Mogul shall be a wholly-owned subsidiary of Federal-Mogul. On the Effective Date, Federal-Mogul shall merge with and into New Federal-Mogul (the "*Merger*"), with New Federal-Mogul surviving the merger and becoming Reorganized Federal-Mogul, with the surviving corporation to be renamed "Federal-Mogul Corporation". Immediately after the consummation of the Merger, New Federal-Mogul shall issue the Reorganized Federal-Mogul Common Stock, the Warrants and the Reorganized Federal-Mogul Junior Secured PIK Notes, as provided in Sections 8.3.4, 8.3.7 and 8.11 of the Plan. All references herein to Reorganized Federal-Mogul shall refer to New Federal-Mogul from and after the Merger.

**8.3.16.2.   Reservation of Rights.** Notwithstanding the provisions of Section 8.3.16.1 of the Plan, the Plan Proponents reserve the right to maintain Reorganized Federal-Mogul Corporation as a Michigan corporation and adopt an amended and restated certificate of incorporation in Michigan. In such event, the Plan Proponents shall file such amended and restated certificate of incorporation prior to the Confirmation Hearing.

**8.4.   Ownership and Management of Reorganized Debtors other than Reorganized Federal-Mogul.** From and after the Effective Date, each Debtor shall retain its Equity Interest in any other Debtor. The initial boards of directors for the Reorganized Debtors other than Reorganized Federal-Mogul are set forth in Exhibit 8.4 hereto.

126

**8.5.**   **Dissolution Of Inactive Debtor Subsidiaries**. On or subsequent to the Effective Date, in the discretion of the new board of directors, Reorganized Federal-Mogul, or the applicable parent company, may take such actions as may be necessary or appropriate to effect the liquidation, dissolution, winding-up, striking off, or other disposition, if any, of some or all of the Inactive Debtor Subsidiaries.

**8.6.**   **Corporate Action**. All matters provided for under the Plan involving the corporate structure of the Debtors, or any corporate action to be taken by, or required of the Debtors, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action or vote by the stockholders or directors of any of such entities.

**8.7.**   **Vesting of Assets**. On the Effective Date, all property of the Estate of each Debtor (including, but not limited to, any tax credits or other tax-related benefits that are property of the Estate of any Debtor) shall revest in the applicable Reorganized Debtor free and clear of all Claims, Liens, encumbrances and other interests, except as provided in the Plan and the Confirmation Order. As of the Effective Date, each Reorganized Debtor may operate its business, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

**8.8.**   **Preservation of Rights Of Action**.

**8.8.1.**   **Rights of Action.** Except for the Trust Causes of Action and except as provided in Section 11.5 of the Plan or as otherwise provided in the Plan or the Confirmation Order, in accordance with Section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all rights, claims, causes of action, suits and proceedings accruing to or for the benefit of the Debtors or the Estates pursuant to the Bankruptcy Code, or pursuant to any other statute or legal theory, and which shall include, but are not limited to, all causes of action arising under Sections 542, 543, 544, 547 through 551 and 553 of the Bankruptcy Code and which, for the avoidance of doubt, shall specifically include any action for recovery of "preferential transfers" described in Section 11 of the Disclosure Statement.

**8.8.2.**   **Designation of Estates' Representative.** The Unsecured Creditors Committee shall be deemed the appointed representative of the Estates to pursue, litigate, compromise and settle any action to avoid and recover transfers made to or for the benefit of former Federal-Mogul officers Richard Snell and Alan Johnson. The Reorganized Debtors shall be deemed the appointed representatives to pursue, litigate, compromise and settle any other rights, remedies, claims, causes of action, suits or proceedings.

**8.8.3.**   **Asbestos Insurance Actions.** Notwithstanding any other provision of the Plan to the contrary and without limiting the foregoing, the Reorganized Debtors, with the consent of the Trustees, may retain, prosecute and enforce any Asbestos Insurance Action in their own name, for the benefit of the Trust and the holders of Asbestos Personal Injury Claims, provided that any costs and expenses to be incurred by the Reorganized Debtors in any such

Asbestos Insurance Action shall be reimbursed to the Reorganized Debtors by the Trust as Trust Expenses as soon as practically possible.

    **8.9.**   **Setoffs**. Except as otherwise provided in the Addendum and the Plan B Settlement Agreement with respect to the Plan B Settlement, each Reorganized Debtor (or the Trust to the extent it pertains to an Asbestos Personal Injury Claim) may, pursuant to the applicable provisions of the Bankruptcy Code or applicable non-bankruptcy law, setoff against any applicable Allowed Claim (before any distribution is made on account of such Claim) any and all claims, rights, causes of action, debts or liabilities of any nature that the applicable Reorganized Debtor (or the Trust to the extent it pertains to an Asbestos Personal Injury Claim) may hold against the holder of such Allowed Claim; provided, however, that the failure to effect such a setoff shall not constitute a waiver or release of any such claims, rights, causes of action, debts or liabilities.

    **8.10.**   **Reorganized Federal-Mogul Secured Term Loan Agreement**. On the Effective Date, (i) Reorganized Federal-Mogul, as borrower, (ii) the other Reorganized U.S. Debtors and F-M UK Holding Limited, as guarantors, (iii) the holders of Class 1B Bank Claims, as lenders, (iv) JPMorgan Chase Bank, N.A., as Administrative Agent for the lenders, and (v) the holders of Class 1C Surety Claims, shall become parties to the Reorganized Federal-Mogul Secured Term Loan Agreement regardless of whether any such party actually executes the Reorganized Federal Mogul Secured Term Loan Agreement. The Reorganized Federal-Mogul Secured Term Loan Agreement shall provide for, among other things, (a) the issuance to the holders of Allowed Class 1B Bank Claims, in accordance with each such holder's previously existing rights under the Bank Credit Agreement, of term loans in the principal amount of $1,303,897,117.90 (as adjusted as of the Effective Date to convert any foreign currencies to U.S. dollars) plus the amount of any draws prior to the Effective Date on letters of credit outstanding under the Bank Credit Agreement (but excluding draws prior to the Effective Date on letters of credit outstanding under the Tranche C Loans portion of the DIP Facility) and (b) the issuance to the holders of Class 1C Surety Claims of term loans in the principal amount of $22,764,000.00. Unless repaid earlier, the term loans issued to the holders of Class 1B Bank Claims and Class 1C Surety Claims shall be repayable in periodic installments maturing six and a half years after the Effective Date, at a rate of interest based on rates in the London interbank market or, at Reorganized Federal-Mogul's option, an alternate base rate. The obligations of the Reorganized U.S. Debtors with respect to the Reorganized Federal-Mogul Secured Term Loan Agreement shall be secured by Liens on substantially all domestic assets of the Reorganized U.S. Debtors and on 65% of the equity in the first-tier foreign subsidiaries owned by the Reorganized U.S. Debtors and Reorganized F-M UK Holding Limited. Except as otherwise provided in the Reorganized Federal-Mogul Secured Term Loan Agreement, such Liens shall be junior only to the Liens securing the Exit Facilities.

    **8.11.**   **Issuance of Reorganized Federal-Mogul Junior Secured PIK Notes**. On the Effective Date, Reorganized Federal Mogul shall issue and distribute to the PIK Notes Trustee, on behalf of all holders of Class 1B Bank Claims and all holders of Class 1C Surety Claims, and for ultimate distribution to each such holder in accordance with such holder's previously existing rights under the Bank Credit Agreement and the Surety Claims Settlement Agreement, respectively, the Reorganized Federal-Mogul Junior Secured PIK Notes. The Federal-Mogul Junior Secured PIK Notes shall have an aggregate original principal amount of $305,236,000.00,

shall mature on the eleventh anniversary of the Effective Date and shall bear interest at a fixed rate, initially payable partially in cash and partially in kind.  The obligations of Reorganized Federal-Mogul with respect to the Reorganized Federal-Mogul Junior Secured PIK Notes shall be secured by Liens on substantially all domestic assets of the Reorganized U.S. Debtors and on 65% of the equity in the first-tier foreign subsidiaries owned by the Reorganized U.S. Debtors and Reorganized F-M UK Holding Limited.  Except as otherwise provided in the indenture for the Reorganized Federal-Mogul Junior Secured PIK Notes, such Liens shall be junior only to the Liens securing (i) the Exit Facilities and (ii) the Reorganized Federal-Mogul Secured Term Loan Agreement.

**8.12.   Exit Facilities**.  On the Effective Date, Reorganized Federal-Mogul shall enter into the Exit Facilities.  The proceeds of the Exit Facilities shall be used to (a) repay obligations under the DIP Facility on the Effective Date, (b) make cash payments required under the Plan and/or (c) provide working capital for the business operations and general corporate purposes of the Reorganized Debtors.

**8.13.   Effectuating Documents And Further Transactions**.  The Chief Executive Officer, President, or any Vice President of each Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**8.14.   Distributions Under the Plan**

**8.14.1.   General Matters**.  The Disbursing Agent shall make all distributions required under the Plan (other than distributions to holders of Asbestos Personal Injury Claims).  Distributions shall be made on the Distribution Date (unless otherwise provided herein or ordered by the Bankruptcy Court) with respect to all Claims except Asbestos Personal Injury Claims.  Distributions with respect to Asbestos Personal Injury Claims shall be made in accordance with the Asbestos Personal Injury Trust Distribution Procedures.  Distributions to be made on the Distribution Date shall be deemed actually made on the Distribution Date if made either (a) on the Distribution Date or (b) as soon as practicable thereafter, but in no event later than ten Business Days after the Distribution Date, except as otherwise provided for herein, or except as may be ordered by the Bankruptcy Court.  Except where the Plan contemplates deferred payment or delivery of property or securities, payments to be made by the Disbursing Agent pursuant to the Plan shall be made in Cash or by check drawn on a domestic bank or by wire transfer from a domestic bank.

**8.14.2.   Withholding Of Taxes**.  The Disbursing Agent or the Trust, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state and local taxes payable with respect thereto or payable by the Person entitled to such assets to the extent required by applicable law.

**8.14.3.   Allocation of Consideration**.  To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for tax purposes, be allocated to the principal amount of

the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

        **8.14.4.    Unclaimed Property.**  Except as provided in Section 8.3.4 of the Plan with respect to distributions of Reorganized Federal-Mogul Class A Common Stock to or for the benefit of Noteholders, and Section 8.10 of the Plan with respect to distributions on account of Bank Claims and Surety Claims, any Cash, assets, and other property to be distributed under the Plan, but excluding any distributions from the Trust, that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (a) one year after the Distribution Date, or (b) six months after an order allowing such Entity's Claim becomes a Final Order, shall become vested in, and shall be transferred to, the applicable Reorganized Debtor whose Estate owed or paid the Claim, notwithstanding state or other escheat or similar laws to the contrary. In such event, such Entity's Claim shall no longer be deemed to be Allowed and such Entity shall be deemed to have waived its rights to such payments or distributions under the Plan pursuant to Section 1143 of the Bankruptcy Code, and such Entity shall have no further Claim in respect of such distribution and shall not participate in any further distributions under the Plan with respect to such Claim.

        **8.14.5.    Transfer Taxes.**  Pursuant to Section 1146 of the Bankruptcy Code, and to the fullest extent permitted by law, no stamp tax, transfer tax or other similar tax shall be imposed or assessed by any taxing authority on account of (i) the issuance, transfer or exchange of any securities issued under the Plan; (ii) the transfer of any assets or property pursuant to the Plan (including as collateral for any indebtedness contemplated by the Plan) or (iii) the making or delivery of an instrument of transfer under the Plan.

        **8.14.6.    Indenture Trustee Compensation.**  The Indenture Trustees shall receive reasonable compensation and reimbursement of actual and necessary expenses pursuant to the Indentures and pursuant to the procedures set forth herein.

        **(a)**    Not later than five (5) days after the Confirmation Date, the Indenture Trustees shall submit to Reorganized Federal-Mogul reasonably detailed statements of the fees and expenses incurred by the Indenture Trustees through such date along with any estimated fees and expenses for services to be rendered after such date in effectuating the distribution of Reorganized Federal-Mogul Class A Common Stock to the Noteholders and the surrender and cancellation of the Notes as contemplated by the Plan (the "***Statements***").

        **(b)**    Reorganized Federal-Mogul shall pay all undisputed Statements submitted by the Indenture Trustees in Cash on the Effective Date. If Reorganized Federal Mogul disputes any Statement, Reorganized Federal-Mogul shall notify the applicable Indenture Trustee of the basis for the dispute in writing on or prior to ten (10) days after the Effective Date. Such notice shall also set forth the amount Reorganized Federal-Mogul believes is due and owing, if any, to the applicable Indenture Trustee. If the applicable Indenture Trustee and Reorganized Federal-Mogul thereafter reach an agreement with regard to the disputed Statement, Reorganized Federal-Mogul shall promptly pay the agreed-upon amount to the applicable Indenture Trustee. If the parties are unable to reach an agreement as to any disputed Statement, the applicable Indenture Trustee shall file a request for allowance and payment of an Administrative Expense with the Bankruptcy Court on or before thirty (30) days after the Effective Date (the "***Request***").

If no Request is filed by such date, the applicable Indenture Trustee shall be deemed to have consented to the amount of fees and expenses agreed to by Reorganized Federal-Mogul. Reorganized Federal-Mogul shall be given notice and an opportunity to respond to any and all Requests. Upon the entry of a Final Order with respect to any Request, Reorganized Federal-Mogul shall pay the applicable Indenture Trustee the amount allowed in such Final Order in Cash.

(c) Upon payment of the Indenture Trustees' fees and expenses in accordance with the foregoing paragraphs, the charging liens of the Indenture Trustees upon distributions to the Noteholders, if any, will be discharged.

8.14.7. **Record Ownership Date.** Only Persons who hold Notes, are beneficiaries of Convertible Subordinated Debentures or hold Equity Interests of record as of the Record Date will be entitled to receive distributions payable on account of such Claims or Equity Interests under the Plan. The Disbursing Agent and any transfer or distribution agent shall be entitled to treat the record holder of a registered security as the sole holder of any Equity Interest evidenced thereby for purposes of all notices, payments or distributions under the Plan. No notice of any transfer of any such security shall be binding on the Disbursing Agent or any transfer or distribution agent unless such transfer has been properly registered in accordance with the provisions of the governing indenture or agreement at least ten Business Days prior to any Distribution Date. If there is any dispute regarding the identity of the Entity entitled to receive a distribution in respect of a Claim or Equity Interest under the Plan, no distribution need be made in respect of such Claim or Equity Interest until such dispute has been resolved.

8.14.8. **Transfer of Claim.** In the event that the holder of any Claim shall transfer such Claim on or after the Effective Date, it shall immediately advise the Disbursing Agent or the Trust, as the case may be, in writing of such transfer. The Disbursing Agent or the Trust, as the case may be, shall be entitled to assume that no transfer of any Claim has been made by any holder unless and until written notice of a transfer has been actually received by the Disbursing Agent or the Trust. Each transferee of any Claim shall take such Claim subject to the provisions of the Plan, and, except as provided in a notice of transfer, the Disbursing Agent or the Trust, as the case may be, shall be entitled to assume conclusively that the transferee named in any notice of transfer shall thereafter be vested with all rights and powers of the transferor of such Claim. The provisions of this Section 8.14.8 shall not apply to holders or transferees of Bank Claims or Noteholder Claims.

8.14.9. **Cash Payments.** Cash payments on account of Allowed Claims of creditors of the U.S. Debtors located in the United States of America shall be paid in U.S. dollars. Cash payments on account of Allowed Claims of creditors of the U.S. Debtors located outside the United States of America, and cash payments on account of Allowed Claims against the U.K. Debtors to be paid under the Plan, shall be paid under the currency in which the Claim is denominated in the invoice or under the currency in which the Claim is otherwise payable under applicable non-bankruptcy law.

8.14.10. **Distributions to Holders of Claims to be Treated Under CVAs.** In the event that a Claim is Allowed under the Plan by virtue of its allowance under the CVA applicable to a particular U.K. Debtor or is to be satisfied out of the assets of the U.K. Asbestos

Trust, the payments made on account of such Claim shall be the only amounts payable on account of such Claim, and no further payment on account of such Claim shall be made under the Plan.

       **8.14.11.**   **Payment of Plan B Settlement Amount.**  Payment of the Plan B Settlement Amount shall not be subject to the provisions of this Section 8.14 of the Plan, but shall instead be governed by the provisions of Section 8.22 of the Plan and the Plan B Settlement Agreement.

       **8.14.12.**   **Payment of Owens-Illinois Settlement Amount.**  Payment of the Owens-Illinois Settlement Amount shall not be subject to the provisions of Section 8.14 or 8.15 of the Plan, but shall instead be governed by the provisions of Section 8.25 of the Plan and the Owens-Illinois Settlement Agreement.

       **8.14.13.**   **Payment of Statutory Fees.**  All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  After the Effective Date, the Reorganized Debtors shall pay all required fees pursuant to 28 U.S.C. § 1930 or any other statutory requirement and comply with all statutory reporting requirements related to the foregoing.

       **8.14.14.**   **Payment of Amounts to The Travelers Indemnity Company & Affiliates.**  Payments to The Travelers Indemnity Company & Affiliates on account of the proofs of claim filed thereby with respect to the Deductible Amount (as defined in the Commutation Agreement) shall not be subject to the provisions of Section 8.14 or 8.15 of the Plan, but shall instead be governed by the terms of the Commutation Agreement.

     **8.15.**   <u>**Distributions to Holders of Unsecured Claims Against U.S. Debtors**</u>.  The following provisions shall apply to distributions to the holders of Class H Unsecured Claims against the U.S. Debtors.

       **8.15.1.**   **Cash Distribution.**  In the event that the total amount of Allowed Unsecured Claims against the U.S. Debtors (including the total amount of Allowed Unsecured Claims of any holders making the stock election set forth below in Section 8.15.2) is determined by the Plan Proponents or by the Reorganized Debtors, as applicable, to be in excess of $258.0 million, then the amount of the Cash distributions to holders of Allowed Unsecured Claims against such Debtors will be adjusted so that each such holder will receive, on account of its Allowed Unsecured Claim, total Cash payments equal to such holder's Pro Rata portion of $90.3 million (and the calculation of such Pro Rata portion shall take into account all Allowed Class H Unsecured Claims against the U.S. Debtors including the Allowed Unsecured Claims of any holders making the stock election set forth below in Section 8.15.2).  In the event the Claims allowance and reconciliation process for Unsecured Claims against the U.S. Debtors is not completed on or prior to the second anniversary of the Distribution Date, then Reorganized Federal Mogul shall make a determination as to whether it is likely that such Claims will exceed $258.0 million.  If it is determined that such Claims will exceed $258.0 million, then Reorganized Federal-Mogul shall adjust all remaining payments to be made on account of such Claims so that the holders of such Claims will receive a Pro Rata portion of $90.3 million and Reorganized Federal-Mogul shall take any and all necessary steps to facilitate the distributions in

accordance with this Section 8.15.1 including, without limitation, setting reasonable reserves, if necessary, and withholding portions of any distributions pending the completion of the Claims allowance and reconciliation process for the applicable Debtors.

8.15.2.    **Class H Stock Election.** The holders of Allowed Class H Unsecured Claims against the U.S. Debtors shall be entitled to elect to receive a Pro Rata share of Reorganized Federal-Mogul Class A Common Stock instead of the Cash distribution provided for Allowed Class H Unsecured Claims in Article III of the Plan. For purposes of this Section 8.15.2, a holder making such an election is referred to as an *"Electing Holder."* An Electing Holder must represent that it has not, at the time of making its election, agreed to sell its claims to a third party. Any Cash that would have been distributed to an Electing Holder had they not made the election will remain with Reorganized Federal-Mogul.

8.15.2.1.    **Calculation of Pro Rata Share of Stock.** The Pro Rata portion of Reorganized Federal-Mogul Class A Common Stock to be distributed to each Electing Holder shall be determined by the proportion that such Electing Holder's Allowed Class H Unsecured Claim against a U.S. Debtor bears to the aggregate amount of all Allowed Class 1D Noteholder Claims, Allowed Class 1F Subordinated Debenture Claims and Allowed Class H Unsecured Claims against the U.S. Debtors held by all other Electing Holders; provided, however, Allowed Class 1F Subordinated Debenture Claims shall not include any holders of Convertible Subordinated Debenture Claims that have converted or deemed to have converted their respective Convertible Subordinated Debentures to Federal-Mogul common stock pursuant to Section 8.3.2 of the Plan; provided further, however, if the aggregate amount of Allowed Class H Unsecured Claims exceeds $258.0 million, then each Electing Holder's Pro Rata share of the stock shall be reduced to reflect the reduced Cash distribution such Electing Holder would have received had such Electing Holder not made the stock election provided herein. If, at or prior to the Confirmation Hearing, the Plan Proponents believe that the aggregate amount of Allowed Class H Unsecured Claims against the U.S. Debtors is likely to exceed $258.0 million, then the Plan Proponents shall seek Bankruptcy Court approval of an appropriate withholding and reserve mechanism for the stock to be distributed to all Electing Holders pending the completion of the Claims allowance and reconciliation process for the applicable Debtors.

8.15.2.2.    **Election Form.** The Debtors shall send an election form substantially in the form set forth in Exhibit 8.15.2.2 along with the notice of the Confirmation Hearing to all holders of Allowed Class H Unsecured Claims against the U.S. Debtors. The election forms shall be mailed to, and only be exercisable by, the owner of such Allowed Class H Unsecured Claims as of January 22, 2007. The entities listed on Exhibit 8.15.2.2A shall be deemed to be the record owners of the Class H Unsecured Claims set forth on Exhibit 8.15.2.2A (and they shall be the record owner for only such Claims) as of January 22, 2007. Any subsequent owner, assignee, or transferee shall not be entitled to make the election set forth in Section 8.15.2. Any election form must be received by the Debtors on or before 45 days after the Bankruptcy Court enters an order approving the Supplemental Disclosure Statement. If the holder of any disputed Class H Unsecured Claim against a U.S. Debtor wishes to make the stock election, such holder must file a motion, prior to the deadline to object to the Plan, seeking temporary allowance and an estimation of such disputed Class H Unsecured Claim for election purposes. If, at or prior to the Confirmation Hearing, the holder of a disputed Class H Unsecured Claim wishes to make the stock election, the Plan Proponents shall seek Bankruptcy Court

approval of an appropriate withholding and reserve mechanism for the stock to be distributed to all Electing Holders pending the completion of the Claims allowance and reconciliation process for the applicable Debtors.

**8.15.3.     Ad Hoc Committee of Unsecured Creditors.** The Plan Proponents support the granting of, and shall not object to, any application by the Ad Hoc Committee of Certain Unsecured Creditors (or its counsel) pursuant to Section 503(b) of the Bankruptcy Code seeking compensation and reimbursement of actual and reasonable legal fees and expenses incurred in these Reorganization Cases in an amount up to but not exceeding $150,000.00.

**8.16.     Implementation of Plans for Federal-Mogul Bradford Limited and Federal-Mogul Sealing Systems (Rochdale) Limited.**

**8.16.1.**     The Plan, as it relates to Federal-Mogul Bradford Limited (**"Bradford"**), will be implemented in part pursuant to an agreement dated as of December 17, 2003, by and among T&N, Bradford, the T&N Administrators, the Bradford Administrators, Federal Mogul Gorzyce, S.A. (**"F-M Gorzyce"**) and Federal Mogul Holding Deutschland GmbH, which agreement provides for (i) the lease of certain of Bradford's plant, tooling and machinery and (ii) the license of certain of Bradford's know-how utilized in its piston-manufacturing operations to F-M Gorzyce, a non-Debtor Affiliate of the Debtors located in Poland.  That agreement further provides for the sale of such leased and licensed assets, together with Bradford's customer goodwill, to F-M Gorzyce pursuant to a purchase option to be exercised by F-M Gorzyce through the Plan, pursuant to Section 524(g)(3)(A)(ii) of the Bankruptcy Code. Accordingly, the Confirmation Order shall provide that F-M Gorzyce shall exercise the purchase option described in this paragraph as part of the implementation of the Plan and that pursuant to Section 524(g)(3)(A)(ii) of the Bankruptcy Code F-M Gorzyce shall have no liability with respect to any Asbestos Personal Injury Claim or Demand that may be made against it by reason of its status as the transferee of and/or successor to the assets of Bradford.

**8.16.2.**     The Plan, as it relates to Federal-Mogul Sealing Systems (Rochdale) Limited (**"FMSS-Rochdale"**), will be implemented in part pursuant to an agreement dated as of August 4, 2006, by and among T&N, FMSS-Rochdale, the T&N Administrators, the FMSS-Rochdale Administrators, and Federal-Mogul Sealing Systems (Pty) Limited (**"FMSS-South Africa"**), which agreement provides for the lease of certain of FMSS-Rochdale's plant, machinery and tooling to FMSS-South Africa, a non-Debtor Affiliate of the Debtors.  That agreement further provides for the sale of such plant, machinery and tooling to FMSS-South Africa pursuant to a purchase option to be exercised by FMSS-South Africa through the Plan, pursuant to Section 524(g)(3)(A)(ii) of the Bankruptcy Code.  Accordingly, the Confirmation Order shall provide that FMSS-South Africa shall exercise the purchase option described in this paragraph as part of the implementation of the Plan and that pursuant to Section 524(g)(3)(A)(ii) of the Bankruptcy Code FMSS-South Africa shall have no liability with respect to any Asbestos Personal Injury Claim or Demand that may be made against it by reason of its status as the transferee of and/or successor to the assets of FMSS-Rochdale.

**8.17.     Objections to Claims Other than Asbestos Personal Injury Claims.**  Subject to the provisions of Article IV and Section 8.18, after the Effective Date, only the applicable Reorganized Debtor against whose Estate a Claim was filed or deemed filed may object to the

allowance of any Claim, except that (i) the Unsecured Creditors Committee, the Asbestos Claimants Committee and the Future Claimants Representative shall also have standing and capacity to object to the Administrative Expense Claims of professionals employed or retained in these Reorganization Cases; (ii) all rights of any Asbestos Insurance Company with respect to the defense and settlement of Debtor Insurance Claims, or claims asserted by any non-Debtor party against any Debtor or any Asbestos Insurance Company for coverage under any Asbestos Insurance Policy, are preserved; (iii) insurers that have issued or subscribed policies that provide or may be alleged to provide coverage for Debtor Insurance Claims shall retain any rights they may have to object to the allowance of such Debtor Insurance Claims; and (iv) the Unsecured Creditors Committee shall also have standing and capacity to object to the Claims of Richard Snell and Alan Johnson. Subject to the provisions of Article IV and Section 8.18, after the Effective Date, the applicable Reorganized Debtor against whose Estate a Claim was filed or deemed filed shall be accorded the power and authority to allow or settle and compromise any Claim, except for the Administrative Expense Claims of professionals employed by or on behalf of the Estates and Debtor Insurance Claims, without notice to any other party or approval of or notice to the Bankruptcy Court. Unless otherwise ordered by the Bankruptcy Court, and except as to any (a) late-filed Claims, (b) Asbestos Personal Injury Claims, (c) Claims granted to Dana Corporation and/or any of its affiliates pursuant to that certain settlement agreement between Dana Corporation, certain of its affiliates, and certain of the Debtors, which settlement agreement was approved by the Bankruptcy Court on August 21, 2003, and (d) Claims asserted by the United States of America or any of the States party to the Environmental Settlement Agreements relating to the Additional Sites (as defined in the Environmental Settlement Agreements), all objections to Claims against the U.S. Debtors shall be filed with the Bankruptcy Court on or before six months following the Effective Date. Objections to late-filed Claims against the U.S. Debtors shall be filed not later than the later of (a) six months following the Effective Date or (b) sixty (60) days after the Reorganized Debtor receives actual notice of the filing of such Claim. Nothing in this Section 8.17 or any other provision of the Plan shall be deemed to limit or impair the ability of the United States Trustee to object to Administrative Expense Claims of professionals employed during these Reorganization Cases.

    **8.18.**   **Resolution of Asbestos Personal Injury Claims**. Asbestos Personal Injury Claims (other than CVA Asbestos Claims) shall be resolved in accordance with the Trust Documents, subject to the provisions of Article IV of the Plan and subject to the right of any Asbestos Insurance Company to raise any Asbestos Insurer Coverage Defense in response to a demand by the Trust that such insurer handle, defend, or pay any such claim.

    **8.19.**   **Settling Asbestos Insurance Companies**. After the Confirmation Hearing and prior to the Effective Date, the Debtors, and, from and after the Effective Date, the Trust, may, at any time, in its or their sole and absolute discretion, move the District Court to extend the Third Party Injunction to any Asbestos Insurance Company, for good cause shown. Such motion shall be served upon the parties entitled to notice pursuant to the Bankruptcy Court's Order Establishing Case Management Procedures and Hearing Schedule, and shall disclose, to the extent necessary, the terms of any Asbestos Insurance Settlement Agreement with any Asbestos Insurance Company.

    **8.20.**   **Release by Dan=Loc Group**. On the Effective Date, each of the Dan=Loc Deed of Special Indemnity and the Dan=Loc Deed of Guarantee shall be deemed terminated by

agreement and the Dan=Loc Group shall release any and all Claims, obligations and liabilities (including, but not limited to, Environmental Claims) whatsoever against any and all of the Debtors, their non-Debtor Affiliates and the Released Parties (i) under the Deed of Special Indemnity, (ii) under the Deed of Guarantee (iii) or otherwise, except that Asbestos Property Damage Claims against the Debtors that the Dan=Loc Group had under the Dan=Loc Deed of Special Indemnity and Dan=Loc Deed of Guarantee as of the Petition Date shall, to the extent that any such Claims are Allowed, be treated as Unsecured Claims under the Plan. In addition to releasing any Environmental Claims against the Debtors, Dan=Loc is also waiving and releasing any and all claims against four non-Debtor Affiliates that are parties to the 1997 Dan=Loc Asset Purchase Agreement.

     **8.21.   Implementation of Environmental Settlements.** The Plan will implement those certain settlement agreements by and among the Debtors and (i) the United States of America, the State of Georgia, the State of Indiana, the Commonwealth of Kentucky, the Commonwealth of Pennsylvania, the City of Battle Creek, Michigan, the Board of County Commissioners, Lucas County, Ohio, and certain PRP Groups dated as of December 1, 2004 (and approved by the Bankruptcy Court by a Final Order dated December 1, 2004), (ii) the State of Michigan, dated as of November 7, 2005 (and approved by the Bankruptcy Court by a Final Order dated November 7, 2005, and (iii) the State of Ohio, dated as of October 27, 2006 (and approved by the Bankruptcy Court by a Final Order dated as of October 27, 2006 (collectively, the *"Environmental Settlement Agreements"*) wherein, among other things, all Environmental Claims against the U.S. Debtors with respect to Additional Sites (as defined in each of the Environmental Settlement Agreements) shall be discharged under Section 1141 of the Bankruptcy Code in exchange for giving the holders of such Claims (i) the distributions and rights afforded under the Plan to the holders of Allowed Unsecured Claims in Class H against the relevant Debtor once such Claims have been liquidated in accordance with the terms of the Environmental Settlement Agreements and (ii) the other rights provided under the Environmental Settlement Agreements, including but not limited to the right to liquidate Environmental Claims involving the Additional Sites after the Effective Date, notwithstanding their having been discharged under 11 U.S.C. § 1141. Accordingly, the provisions of this Plan shall not alter or prejudice the specific rights provided to the parties under the Environmental Settlement Agreements pertaining to Environmental Claims arising or relating to the Additional Sites, and in the event of any inconsistencies between the Plan and the Environmental Settlement Agreements pertaining to Environmental Claims arising or relating to the Additional Sites, the terms of the Environmental Settlement Agreements shall govern. In addition, any other Environmental Claims by parties which are not settling pursuant to the Environmental Settlement Agreements, and which are not liquidated prior to the Effective Date, may be settled by the applicable Reorganized U.S. Debtors to the extent such settlements are substantially similar to the provisions of the Environmental Settlement Agreements relating to Environmental Claims with respect to Additional Sites.

     **8.22.   Implementation of Plan B Settlement With Pneumo Parties.** The Plan will implement the Plan B Settlement in the event Articles II and III of the Plan B Settlement Agreement become effective pursuant to Section 5.01 of the Plan B Settlement Agreement prior to the Date of Finality. The Plan B Settlement Agreement is attached to the Plan as Exhibit 8.22. The Plan B Settlement shall not become effective if the Date of Finality occurs and the Plan A Settlement becomes fully and finally effective.

**8.22.1.     Plan B Settlement Amount.**  In full, final and complete satisfaction of any Released Claims Against FMC Group, on or as soon as reasonably practicable following the Plan B Date (but in no event later than 10 days after the Plan B Date), (a) $138,000,000 shall be paid to Cooper Industries, LLC (*"Cooper LLC"*) by wire transfer of immediately available funds from assets available for distribution under the Plan and (b) $2,000,000 shall be paid to Pneumo Abex by wire transfer of immediately available funds from assets available for distribution under the Plan (the $138,000,000 payment and the $2,000,000 payment referred to in this Section 8.22.1 being collectively referred to as the *"Plan B Settlement Amount"*).  Cooper LLC's and Pneumo Abex's entitlement to receive payments of their respective portions of the Plan B Settlement Amount shall not be subject to any defense, counterclaim, offset, subordination, reduction, disallowance, or modification under the Plan or otherwise, including, but not limited to, under Section 502(d) of the Bankruptcy Code.

**8.22.2.     Restriction on Payments.**  If the Plan B Effective Date occurs, none of the Debtors, their non-Debtor Affiliates, nor the Disbursing Agent shall make any payment, distribution or contribution under the Plan (other than a payment, distribution or contribution to the Trust or other Entity necessary to pay the Plan B Settlement Amount and which payment, distribution or contribution (or the Cash proceeds thereof) is actually used by the Trust or such other Entity to pay the Plan B Settlement Amount to Cooper LLC and Pneumo Abex (as applicable) prior to the time the Plan B Settlement Amount is paid in full in accordance with Section 8.22.1 of the Plan and Section 2.01 of the Plan B Settlement Agreement.

**8.22.3.     Plan B Settlement Mutual Releases; Limited Exceptions to Discharge**

**8.22.3.1.**     Except as otherwise provided in the Plan B Settlement Agreement, the Plan B Settlement is a complete, final and comprehensive settlement and resolution of any and all Claims between the Pneumo Parties, or any of them, and the Debtors and their non-Debtor Affiliates, or any of them.

**8.22.3.2.**     On the terms and subject to the conditions set forth in the Plan B Settlement Agreement, the various releases set forth in Article III of the Plan B Settlement Agreement shall become effective as of the Effective Date.  Notwithstanding any other provision of the Plan, the Claims set forth in Section 3.03 of the Plan B Settlement Agreement that are not released (the *"Pneumo Excluded Claims"*) shall remain unaltered, shall continue in full force and effect and shall not be subject to any treatment or discharge under the Plan, regardless of the classes into which any such preserved Claims would otherwise be categorized and the treatment otherwise afforded to the Pneumo Excluded Claims in such classes under any other provision of the Plan.

**8.22.4.     Funding of Plan B Settlement Amount.**

**8.22.4.1.     If Call is Exercised on Effective Date.**

(a)     If the Call (as defined in Section 8.3.6 of the Plan) in favor of Thornwood or its designee is exercised on the Effective Date and the Plan B Date occurs on the Effective Date, then the Trust shall pay the Plan B Settlement Amount pursuant to Section 8.22.1 of the

137